UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-21313-Civ-SEITZ
        (03-20272-Cr-SEITZ)
MAGISTRATE JUDGE P.A. WHITE

JUAN CARLOS ELSO,          :

          Movant,          :

v.                         :          **REPORT OF**
                                      **MAGISTRATE JUDGE**
UNITED STATES OF AMERICA,  :

          Respondent.      :

_____

Introduction

Juan Carlos Elso, a former Florida licensed attorney, has filed a pro se motion to vacate pursuant to 28 U.S.C. §2255, attacking his convictions and sentences for conspiracy to conduct financial transactions affecting interstate and foreign commerce, conspiracy to conduct money laundering, and knowingly conducting a financial transaction entered following a jury verdict in Case No. 03-20272-Cr-Seitz.

This case has been referred to the undersigned for consideration and report pursuant to 28 U.S.C. §636(b)(1)(B) and Rules 8 and 10 of the Rules Governing Section 2255 Proceedings in the United States District Courts.

The court has reviewed the movant's motion with memorandum (Cv-DE#1),[1] amended motion (Cv-DE#13), and second amended motion

_____

[1] The movant, who was licensed to practice federal law in this district, is aware of the court's Local Rules, which proscribes the filing of any memorandum or reply which exceeds twenty (20) pages without first obtaining permission from the court. See Local Rule 7.1(c)(2). Here, the movant's initial

(Cv-DE#21), the response of the government to this court's order to show cause with multiple exhibits (Cv-DE#30), the movant's reply thereto (Cv-DE#35), the Presentence Investigation Report (PSI), and all pertinent portions of the underlying criminal file.

In his initial motion (Cv-DE#1), the movant raises the following claims:

1.   The court lacked subject matter jurisdiction as to Count Four, because it failed to state a federal offense. (Cv-DE#1:6).

2.   Trial counsel was ineffective for the following specified reasons. (Cv-DE#1:7).

   A.   Counsel failed to investigate, challenge the indictment, and file pre-trial motions. (Cv-DE#1:7-8).

   B.   Counsel failed to lodge a <u>Batson</u>[2] challenge to the government's use of peremptory challenges to remove Hispanic venirepersons from the jury panel. (Cv-DE#1:8).

   C.   Counsel failed to call witnesses and failed to present readily available defenses and evidence at trial. (Cv-DE#1:8).

   D.   Counsel failed to object to: (i) the erroneous jury instructions, (ii) the excessive security measures during trial, and (iii) the court's voir dire regarding outside influences. (Cv-DE#1:9).

   E.   Counsel failed to timely file post-trial motions for judgment of acquittal, arrest of judgment, and for new trial. (Cv-DE#1:9).

---

motion and reply well exceed the page limitations referenced above. The movant is cautioned that future non-compliance with the local rules may result in dismissal of the non-compliant pleading.

[2]<u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

2

F.   Counsel was deficient because she was addicted to and/or otherwise using illegal drugs during the course of movant's trial, which precluded her from lodging proper objections, effectively cross-examining witnesses, pre-senting evidence, and otherwise meaningfully challenging the government's proof. (Cv-DE#1:10).

G.   Counsel failed to: (i) object to judicial fact finding during the sentencing hearing, (ii) preserve the movant's Sixth Amendment rights, and/or (iii) challenge the constitutionality of the federal sentencing guidelines, as applied. (Cv-DE#1:10).

H.   Counsel failed to request a minor role reduction, and a downward departure under the aiding and abetting cross-reference section, or pursuant to U.S.S.G. §5K2.0. (Cv-DE#1:10).

3.   Appellate counsel was ineffective for the following specified reasons. (Cv-DE#1:12).

A.   Counsel failed to challenge the sufficiency of the evidence on appeal. (Cv-DE#1:12).

B.   Counsel failed to raise a <u>Franks</u>[3] issue, and issues pertaining to the government's improper comment on the movant's silence and the government's unlawful shifting of the burden of proof. (Cv-DE#1:12).

C.   Counsel failed to assign as error the denial of the movant's motion for mistrial based on the erroneous admission of hearsay evidence. (Cv-DE#1:13).

D.   Counsel failed to assign as error trial counsel's ineffectiveness, and for failing to preserve the movant's Sixth Amendment rights. (Cv-DE#1:13).

E.   Counsel failed to challenge the improper enhancements to the movant's guideline

---

[3]<u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

sentence for abuse of trust/special skills and obstruction of justice. (Cv-DE#1:14).

    F.    Counsel erred during oral argument by conceding movant's defense. (Cv-DE#1:14).

4.    His due process rights were violated for the following specified reasons. (Cv-DE#1:16).

    A.    The government engaged in prosecutorial misconduct before the grand jury, and again by selectively prosecuting the movant. (Cv-DE#1:16).

    B.    The government suborned perjury of its witnesses, Elizabeth Garcia, Francisco Gato, and Detective Henry O. Fernandez. (Cv-DE#1:17).

    C.    The government suppressed and/or withheld evidence. (Cv-DE#1:19).

    D.    The government interfered with the movant's Sixth Amendment right to compulsory process. (Cv-DE#1:20).

    E.    The government constructively amended the Indictment. (Cv-DE#1:21).

    F.    The court's bias and partiality affected the integrity of the trial. (Cv-DE#1:22).

    G.    The trial court erred in refusing to grant severance of Count 2. (Cv-DE#1:23).

    H.    The movant's right to a public trial was abridged by the court, who prohibited the movant's children from attending the proceedings. (Cv-DE#1:23).

    I.    The court imposed a mandatory guideline sentence and made judicial fact-finding in arriving at the ultimate sentence imposed. (Cv-DE#1:24;Memo:64).

In his amended motion (Cv-DE#13), the movant raises an additional claim as follows:

4

5.   Pursuant to the Supreme Court's decision in <u>Cuellar</u> <u>v. United States</u>,[4] the movant's convictions as to Counts 1 and 4 of are unlawful and subject to dismissal. (Cv-DE#13).

In his second amended motion (Cv-DE#21), the movant raises an additional claim, as follows:

6.   Appellate counsel was ineffective for failing to request that the appellate court stay and/or recall issuance of the mandate. (Cv-DE#21).

Many of the claims raised above, could have been, but were not raised on direct appeal. The law is clear that habeas relief is an extraordinary remedy which "may not do service for a [ ] [direct] appeal." <u>United States v. Frady</u>, 456 U.S. 152, 165 (1982). A defendant who has exhausted his right to appeal is presumed to stand "fairly and finally convicted." <u>Id</u>. at 164. Unless a claim alleges a lack of jurisdiction or constitutional error, the scope of collateral attack has remained extremely limited. <u>United States v. Addonizio</u>, 442 U.S. 178, 185 (1979). Consequently, "[i]f issues are raised and considered on direct appeal, a defendant is thereafter precluded from urging the same issues in a later collateral attack.... A defendant is, of course, entitled to a hearing of his claims, but not to duplicate hearings. The appellate process does not permit reruns." <u>Moore v.. United States</u>, 598 F.2d 439, 441 (5th Cir. 1979).[5]

---

[4]<u>Cuellar v. United States</u>, 553 U.S. 550 (2008).

[5]In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981), the United States Court of Appeals for the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

5

In general, claims not raised on direct appeal may not be considered on collateral attack. A movant can, however, overcome his procedural default of claims not raised on direct appeal. The burden a movant must meet differs, depending upon the type of claim he raises. First, "nonconstitutional claims can be raised on collateral review only when the alleged error constitutes a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." <u>Burke v. United States</u>, 152 F.3d 1329, 1331 (11th Cir. 1998)(citations and internal quotations omitted). A movant's burden with regard to constitutional claims not presented on direct appeal is slightly less stringent. Constitutional claims may be considered if the movant can "show cause excusing his failure to raise the issues previously and actual prejudice resulting from the errors." <u>Cross v. United States</u>, 893 F.2d 1287, 1289 (11th Cir. 1990). Jurisdictional issues, however, are not subject to procedural default because federal courts are of limited jurisdiction and the parties cannot by waiver or default confer a jurisdictional foundation that is otherwise lacking. <u>Harris v. United States</u>, 149 F.3d 1304, 1306 (11th Cir. 1998). The foregoing bars and default will be discussed, when applicable, in this Report *infra*.

## Procedural History

For an appreciation of this case and the multitude of claims raised herein, a full review of the procedural history of the underlying criminal case is essential. Specifically, an Indictment

was returned charging the movant[6] with conspiracy to launder money, which were the proceeds of distribution and sale of cocaine, in violation of 18 U.S.C. §1956(a)(1)(B)(i) (Count 1), conspiracy to launder proceeds of the distribution and sale of cocaine for the purpose of avoiding a transaction reporting requirement under state or federal law, in violation of 18 U.S.C. §1956(a)(1)(B)(ii) and (h) (Count 2), and money laundering, in violation of 18 U.S.C. §1956(a)(1)(B)(i) (Count 4). (Cr-DE#2). Prior to trial, the movant filed a motion to suppress $266,800 in cash seized on November 16, 2001 from his automobile pursuant to a search warrant. (Cr-DE#61). Following an evidentiary hearing, a Report was entered recommending that the motion be denied. (Cr-DE#92). Thereafter, the district judge adopted the Report and denied the movant's motion to suppress. (Cr-DE#125). The movant then proceeded to trial, where he was found guilty as charged, following a jury verdict. (Cr-DE#235). By special verdict, however, as to Count 2, the jury found the movant not guilty of conspiring to violate 18 U.S.C. §1956(a)(1)(B)(i)(laundering drug proceeds to conceal and disguise), but guilty of conspiracy to violate 18 U.S.C. §1956(a)(1)(B)(ii)(laundering drug proceeds to avoid a transaction reporting requirement). (Cr-DE#235). It then appears that the movant filed an untimely, post-trial motion for judgment of acquittal or new trial (Cr-DE#s261,279,285), which was denied by the court on jurisdictional grounds. (Cr-DE#286). However, the court noted, in the alternative, that even if it had jurisdiction, the motion would still be denied on the merits. (Id.).

Prior to sentencing, a PSI was prepared which revealed as follows. Pursuant to U.S.S.G. §3D1.2(d), the offenses of conviction

---

[6]His coconspirator, Andrew Diaz, was only charged in Count 1, the conspiracy offense. However, prior to trial, Diaz pled guilty and testified as a government witness at movant's trial. (Cr-DE#s53,143 et seq.).

were grouped together and thus the base offense determined on the basis of the total amount of laundered funds involved. (PSI ¶57). Next, the PSI determined that, under U.S.S.G. §2S1.1(a)(2), the base offense level was set at 8, but because the amount of laundered funds involved $390,480.00, the level was increased 12 levels, resulting in an adjusted offense level 20. (PSI ¶58).

An additional 12-level increase was then had based on specific offense characteristics, role in the offense, and obstruction of justice, resulting in a total adjusted offense level 32. (PSI ¶¶59-67). It appears the original PSI had an additional two levels added for reckless endangerment, but at sentencing the enhancement was removed. (See-Statement of Reasons).

The probation officer next determined that the movant had a total of zero criminal history points, resulting in a criminal history category I. (PSI ¶70). Based on a total offense level 32 and a criminal history category I, the guideline range was set at 121 to 151 months in prison. (PSI ¶122). The statutory range of imprisonment as to each of the counts of conviction, for violations of 18 U.S.C. §1956(h), (a)(1)(B)(i), and (a)(1)(B)(ii), was zero to 20 years in prison. (PSI ¶121).

The movant filed objections to the PSI and a request for a downward departure in sentence. (Cr-DE#294). On May 28, 2004, the movant appeared for sentencing. (Cr-DE#s306,316). After hearing argument from the parties, the court sustained the movant's objection as to the reckless endangerment enhancement, and therefore reduced the movant's offense level from a level 34 to a level 32. (See Statement of Reasons). Thereafter, the court sentenced the movant to three concurrent terms of 120 months in prison as to Counts 1, 2, and 4, followed by a total term of 3

8

years supervised release, and a $25,000.00 fine. (Cr-DE#306,310). Meanwhile, an amendment judgment was next entered to correct a clerical mistake. (Cr-DE#310).

The movant appealed, raising a multitude of claims of trial court error during the pre-trial phase, including the suppression hearing, at trial, post-trial, and then at sentencing.[7] On September 2, 2005, the Eleventh Circuit Court of Appeals affirmed the movant's convictions and sentences in a written, but unpublished opinion. See United States v. Elso, 422 F.3d 1305 (11th Cir. 2005); (Cr-DE#332). Certiorari review was denied on May 16, 2006. Elso v. United States, 547 U.S. 1131 (2009). Rehearing was denied on August 21, 2006. Elso v. United States, 548 U.S. 934 (2006). For purposes of the federal one-year limitations period, at the latest the judgment of conviction in the underlying criminal case became final on August 21, 2006, when rehearing of the denial of certiorari review was denied by the Supreme Court.[8]

While the foregoing rehearing motion was still pending, the movant returned to the district court filing a succession of *pro se* pleadings in the underlying criminal case. Specifically, on June 12, 2006, the movant filed a motion for relief from judgment, asserting that the court lacked subject matter jurisdiction as to

---

[7]The claims are gleaned from the movant's initial brief on appeal which can be found on Westlaw, a legal research database, at United States v. Elso 2004 WL 4996856 (11th Cir. 2004). The brief is also attached as an exhibit to the government's response. (See Cv-DE#30:Ex.1).

[8]The Supreme Court has stated that a conviction is final when a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied. Griffith v. Kentucky, 479 U.S. 314, 321, n.6 (1986); accord, United States v. Kaufman, 282 F.3d 1336 (11th Cir. 2002). Once a judgment is entered by a United States court of appeals, a petition for writ of certiorari must be filed within 90 days of the date of entry. The 90 day time period runs from the date of entry of the judgment rather than the issuance of a mandate. Sup.Ct.R. 13; see also, Close v. United States, 336 F.3d 1283 (11th Cir. 2003).

Count 4 of the Indictment. (Cr-DE#335). According to the movant, the government failed to allege in Count 4 that the at-issue financial transaction affected interstate or foreign commerce. (Id.). The movant alternatively argued that Count 4 also failed to state an offense. (Id.). After receiving the government's response thereto, the district court entered an order finding it did, in fact, have jurisdiction over the offense. (Cr-DE#344). The court also rejected the movant's argument as to the sufficiency of the Indictment because it was untimely and thus waived. (Id.). The court's finding in this regard was affirmed on appeal. United States v. Elso, 571 F.3d 1163, 1167 (11th Cir. 2009); (Cr-DE#418).

While the foregoing appeal was still pending, the movant returned to the district court filing a motion seeking recusal of the district judge, asserting that the judge was biased and prejudiced against him. (Cr-DE#354). Thereafter, he filed a motion for production seeking the unsealing of docket entries 341 and 343. (Cr-DE#358). On November 28, 2006, the court entered an omnibus order denying the movant's motion to disqualify, and denying his motion to strike and for production and/or unsealing of documents. (Cr-DE#364).

On December 8, 2006 and again on January 22, 2007, the movant filed motions for inspection of grand jury minutes. (Cr-DE#s367,376). He next filed multiple motions, including, in pertinent part, a Rule 33(b)(1) motion for new trial based on newly discovered evidence arising from prosecutorial misconduct during the grand jury proceedings, and collusion between the district judge and the government. (Cr-DE#370). On March 26, 2007, the district court denied all of the motions. (Cr-DE#388). On February 8, 2010, the Eleventh Circuit Court of Appeals affirmed the trial court's denial of the motions in a written, but unpublished

opinion. <u>United States v. Elso</u>, 364 Fed.Appx. 595 (11th Cir. 2010); (Cr-DE#420).

Before conclusion of all the foregoing post-conviction motions and appeals therefrom was had, the movant timely filed his initial motion to vacate on May 14, 2007, less than one year after his conviction became final in August 2006.[9] (Cv-DE#1:67). After the one year limitations expired, however, the movant next filed on July 3, 2008, a supplemental motion challenging the validity of his convictions and sentencing in light of the then Supreme Court's then recent decision in <u>Cuellar v. United States</u>, 553 U.S. 550 (2008). (Cv-DE#13). On September 24, 2009, the movant filed a second amendment to his §2255 motion, raising an additional claim challenging appellate counsel's effectiveness for failing to raise a <u>Cuellar</u> challenge. (Cv-DE#21).

The amended motions are clearly outside the federal one-year limitations period, and thus any claims raised therein must either relate back to those claims raised in his initial, timely filed motion, or be timely filed within a year of the Supreme Court's <u>Cuellar</u> decision, but only if that decision has been made retroactively applicable to cases on collateral review. <u>See cf.</u> <u>Davenport v. United States</u>, 217 F.3d 1341 (11 Cir. 2000).

While this Court acknowledges that the timeliness issue should ordinarily be resolved first, judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a movant while the bar issues are complicated. <u>See cf.</u>, <u>Lambrix v. Singletary</u>, 520 U.S. 518 (1997). <u>See also</u> <u>Barrett v. Acevedo</u>, 169

---

[9]<u>See</u>: <u>Adams v. U.S.</u>, 173 F.3d 1339 (11 Cir. 1999) (prisoner's pleading is deemed filed when executed and delivered to prison authorities for mailing).

F.3d 1155, 1162 (8 Cir. 1999)(stating that judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner and the procedural bar issues are complicated), cert. denied, 528 U.S. 846 (1999); Chambers v. Bowersox, 157 F.3d 560, 564 n. 4 (8 Cir. 1998)(stating that "[t]he simplest way to decide a case is often the best.") In this case, judicial economy dictates that the movant's claims be addressed on the merits.

<u>Facts Adduced at Trial</u>

For an appreciation of the issues involved in this proceeding, a full review of the facts adduced at trial is essential. Briefly, however, the Eleventh Circuit succinctly summarized the evidence admitted at trial as follows:

> At trial, the government presented testimony that Elso [movant] had become friends with Andy and Rudy Diaz, brothers who were importing cocaine. During their friendship, which began in 1994, Elso represented Rudy in a drug case in which charges were dropped in 2001. Andy Diaz testified that he paid Elso $50,000 for his legal services at that time, and paid Elso's investigator $7,000, all in cash.
>
> Elso's convictions under §1956(a)(1)(B)(i), and §1956(h), were based on the events of November 15, 2001, when Elso retrieved $266,800 in drug money from Andy Diaz's home. According to testimony presented at trial, Andy Diaz arrived at Elso's office that day after having delivered almost $500,000 in drug proceeds to an undercover agent posing as a Colombian courier, and claimed he was being followed by law enforcement agents. He expressed concern that law enforcement agents would discover and seize more drug money that was hidden in a floor safe at his home. Elso told Andy he would take care of the situation. After moving Andy's truck in an effort to throw off the surveillance, Elso went to Andy's home, retrieved $266,800 in cash from the floor safe, loaded it into a briefcase which he put into his car trunk, and attempted to drive back to his law office. When law enforcement agents tried to stop his car, he refused to stop, continuing to try to evade the police until he was blocked by traffic. Agents impounded his car, obtained a search warrant, and seized the money they found in

the trunk.

> Elso's conviction under §1956(h) for conspiracy to violate §1956(a)(1)(B)(ii) was based on a 1999 wire transfer Elso performed for Elizabeth Garcia, the common-law wife of Wlberth Gaviria, another client Elso represented on drug charges. The government presented evidence that Garcia was given $200,000 in drug money to distribute for laundering. She was to divide the money into amounts less than $10,000 to avoid federal reporting requirements. Garcia brought $10,000 of that money to Elso, who deposited the money into his law firm's trust account, kept $200 as a commission, and wired the remaining $9800 to an account affiliated with Colombian drug suppliers. Elso did not file federally required reports in conjunction with this transaction....

United States v. Elso, 422 F.3d 1305, 1307-08 (11th Cir. 2005); (Cr-DE#332).

Notwithstanding the succinct summary above, given the specificity of the multitude of claims raised herein, a summary of the facts adduced at trial is warranted. In 1991, Andy Diaz joined forces with his brother Rudy in the narcotics trafficking business. (R16:143-45; R18:84). Rudy, who had been a drug trafficker since 1983, used the name Joe Navallo because he was a fugitive on federal drug charges filed in 1989. R16:152; R18:81-82). The Diazes supervised boat crews who transported cocaine to the United States from Colombia and the Caribbean. (R16:145).

In 1994, the Diazes lost a large shipment of cocaine, which was seized by law enforcement in the Azores. (R16:146). Andy contacted John Suarez, Rudy's brother-in-law, seeking his recommendation for a criminal defense attorney who could determine the status of the crew. (R16:148-50; R18:86; R19:22). Suarez, a County Clerk employee who often provided his brothers-in-law with confidential information regarding investigations, was aware of the nature of the Diazes' activities. (R16:150,184; R18:84-85,101).

Suarez recommended the movant, and introduced Andy to the movant at a shopping mall parking lot. (R16:150; R18:86-87). Andy advised the movant of the details regarding the cocaine shipment and his and Rudy's role in the operation. (R16:151). The movant later reported to Andy that the crew was in jail in the Azores. (R16:151). Thereafter, Andy paid the movant $4,000 in $100 denominations for the information. (R16:152).

Meanwhile, in 1997, the Diazes next lost a 1000-kilogram cocaine shipment when it was seized in Elliot Key. (R16:156; R8:88). The Diazes contacted the movant, who met them, Suarez, and Augusto Ibanez, one of the crew members, at a McDonald's parking lot. (R16:157-59; R18:89-90). Later, the movant advised Andy to steer clear of Ibanez because he might be an informant. (R16:160; R18:89-91).

Following the seizure, the Diazes and the movant began to socialize, with the Diazes paying cash for meals and drinks, which on occasion were in excess of $1,000. (R16:160-61,196-97). Andy also used cocaine in the movant's presence. (R17:28). Later, in 1999, the movant also helped Andy get out of a jam when Andy used a car, which turned out to be stolen, as a trade-in. (R16:162-63). The dealership sued Andy (R16:162-63), who had no legitimate funds with which to reimburse the auto dealer, so Andy gave cash to the movant, who then wrote a $10,000 check from his law firm's trust account, payable to the auto dealer. (R16:163).

Next, from 1999 through 2001, the Diazes worked with Colombian trafficker, Alejandro Poveda. (R16:164). The Diazes used Fernando Arias, Elkin Rivera, and Jaime Negrin to sell the cocaine. (R6:165-66). In June 1999, the Coral Gables police stopped a car occupied by Arias and Andy which contained $63,000 in drug

proceeds. (R16:169-70; R18:92-93). Andy then contacted the movant about the problem. (R16:170). The movant agreed to monitor the case and make sure that Rivera did not cooperate. (R16:172). Suarez advised the movant and Andy that his DEA contacts had informed him that Andy was under surveillance. (R16:172,183-86). The movant and Suarez suggested that Andy flee to Colombia to take the heat off. (R16:172,183-86). He did so, and stayed in Colombia until September 2000 when the movant told him it was safe to return. (R16:186-88).

After Andy returned to the United States, the movant tried to obtain the return of the $63,000, notwithstanding Andy's desire to let the matter go. (R16:188-89). Expecting to get a portion of the drug money, the movant persuaded Andy to file a false affidavit, which the movant prepared, in which Andy swore that the $63,000 represented the proceeds of jewelry sales. (R16:192-95; R17:23-27; R18:95-96). Andy expressed concern because he had no legitimate employment that would back up his attestation, but the movant told him not to worry. (R16:195-96).

Meanwhile in January 2001, Rudy was arrested on a 1989 case. (R16:197-98; R18:83,97). The movant was retained by the Diazes to represent Rudy.[10] (R16:198; R18:102-03). In April 2001, the case was dismissed on staleness grounds, and Rudy was released from jail. (R16:198-99; R18:107-08). Andy gave the movant $50,000 in cash, consisting of $100 bills in stacks of $10,000, as payment for his services. (R16:199; R18:108-09). Andy also paid the movant's investigator $7,000 in cash. (R16:200). All of the cash was derived

---

[10]Rudy and the movant had often discussed Rudy's fugitive status and his use of an alias, but the movant always advised Rudy not to surrender. (R16: 153-54, 156-57; R18:86-87).

from drug proceeds.[11] (R16:200).

Just after Rudy was released in April 2001, the movant introduced the Diazes to El Cabezon ("Big Head") after the brothers asked the movant to recommend a reliable transporter. (R16:201-05; R18:128). The introduction took place in the movant's office, where the Diaz brothers and El Cabezon, in the movant's presence, discussed a cocaine shipment. (R16:205-06; R18:128). The movant expected a commission of $500 per kilogram for his assistance in the deal, which fell through. (R16:207).

Sometime after Rudy's 2001 arrest, the movant phoned Andy and stated that he was sitting in his office with Wlberth Gaviria, a drug dealer whom Andy and Rudy had met in 1998-99 through a drug dealer named "Saul." (R16:209-11; R18:126; R19:163-64; R21:46,50). The movant passed the phone to Wlberth. (R16:212). As a result of their conversation, Andy and Wlberth met to discuss a cocaine deal, which also never transpired. (R16:212-13). However, their later dealings, including the deal that ultimately led to the movant's arrest, were far more successful.

First, the movant's relationship with Wlberth and his brother Heiner began in the early 1990's because Miguel Betancourt, the movant's law partner, represented both brothers on drug charges and introduced the movant to them. The movant became Wlberth's attorney after Betancourt died in 1997. (R19:152-58,165; R21:99,129; R22:60-62). Between 1997 and 2001, while Wlberth was a fugitive, the movant advised him against surrendering on the drug charges

---

[11]The Diazes always dealt in cash because they feared an IRS investigation if they placed their ill-gotten gains in a bank account. (R16:201). All their payments to the movant for his services on various cases were made in cash, for which they received no receipts. (R18:109).

which were dismissed in 2001. (R21:108-10). While Wlberth was a fugitive, he used his common-law wife, Elizabeth Garcia, to maintain contact with the movant. (R19:166-68; R21:107).

During those years, Elizabeth, who was aware of her husband's drug activities, befriended the movant and utilized his services to conceal Wlberth's ill-gotten gains. (R21:100-04,107). On one occasion, when her accountant refused to take cash for payment that she owed for delinquent taxes, she gave the movant $6,442 in cash. (R21:104-06). The movant knew the monies were derived from drug proceeds, but he nevertheless wrote her a check, drawn on his law office trust account, which she used to pay the taxes. (R21:104-06).

It was established that Elizabeth was also personally involved in the drug trade. (R21:116). During 1998 and 1999, Elizabeth laundered cash for Heiner, by making wire-transfers of drug proceeds to Colombian cocaine suppliers in a manner designed to conceal the source and nature of the funds. (R21:116; R22:64-65). Heiner was at that time laundering money for Horacio Uribe, a Colombian drug dealer. (R22:60, 64-66). He sought Elizabeth's help when he found himself with increasingly larger amounts of cash to launder. (R22:60,64-69,72). Elizabeth received a 2% commission for her services. (R21:116-17).

In 1999, Heiner gave Elizabeth $200,000 in cash derived from drug sales. (R21:116-17; R22:76-77). Elizabeth distributed it to various people for deposit into legitimate bank accounts, in increments of less than $10,000 to avoid federal currency regulations, which were later wire-transfered to accounts specified by Heiner. (R21:117-20; R22:31). The movant was one of several

17

individuals who helped Elizabeth launder that drug money.[12] (R21:118).

Specifically, Elizabeth delivered $10,000 in cash to the movant at his office. (R21:120-21). The movant retained $200 as his commission, and deposited $9,800 into his law office trust account. (R21:120-21, 155-62; R22:31, 33-34, 56). He then wire-transferred the $9,800 (minus a $20 bank fee) on July 10, 1999, to an account at Gulf Bank held by Jairo Bethes, an employee of the Colombian suppliers. (Id.). The movant, however, filed no currency reports. (R22:31).

Ironically, Heiner, who did not know that Elizabeth was using the movant to launder Uribe's drug money, approached the movant and asked for his help in laundering Uribe's drug proceeds. (R22:76-77, 95). The movant agreed and transferred $50,000 to Uribe, in conformity with Heiner's instructions to make sure the deposits were made in increments of less than $10,000. (R22:73-75,78,81-82). The movant also received a percentage of the funds. (R22:81-82).

The movant also told Heiner at that time that he could introduce him to a money-laundering "expert." (R22:76). Although the movant did not immediately provide the individual's name to Heiner, he did so in 2002 after Paul Matos, who had laundered money for both Heiner and Elizabeth, asked Heiner to help him launder $10,000,000 in cash and $4,000,000 in travelers' checks. (R22:99-100; R23:10-12). Heiner contacted the movant, who then introduced him to Francisco Gato. (R22:102-03; R23:11-12). Gato and

_____

[12]Others at the movant's law firm who participated in the scheme were attorney Teresita Davila, Davila's father, Davila's husband, and secretary Lucinda Smith. (R22:25-30). A mortgage broker named Paul Matos also helped Elizabeth launder funds. (R22:26-30,166).

Heiner then discussed the money-laundering scheme in the movant's presence.[13] (Id.). The deal with Gato ultimately landed Heiner in trouble, because the travelers' checks turned out to be stolen (R22:103; R23:12-13). Heiner was arrested and the movant represented him. (R22:103; R23:12-13). Heiner and the movant later learned that Gato was an informant. (R22:105; R23:13-16).

Addtionally, the evidence established that records of the $9,800 wire-transfer the movant made for Elizabeth in 1999 were found by law enforcement when they searched Uribe's office in Colombia. (R21:152-56; R22:82). Federal agents involved in the prosecution of Uribe, who had been indicted in Miami in 1999 and extradited to the United States in 2001, examined the records and compared them to bank records related to the Colombian suppliers. (R21:170-81; R22:33-37). At that time, they discovered that the movant was one of the transferors of the Colombians' drug proceeds. (Id.).

The movant learned that his involvement in the scheme was known to the government during his representation of Uribe (who had been referred to him by Heiner). (R22:83-95, 157). The movant enlisted Heiner's assistance in examining the government's discovery materials. (Id.). During his examination, Heiner advised the movant that the wire transfers he had made for both Elizabeth and Heiner were among the discovery materials. (R22:83-95). The movant then ceased representing Uribe when Uribe decided to cooperate. (R22:157).

Around the same time, and after Rudy was released from jail in

---

[13]Gato knew the movant since 1994 and retained him in 1999 to represent his wife in a cocaine conspiracy case. (R23:4-6). In 2000, the movant represented Gato in an insurance fraud case. (R23:6-7).

April 2001, the Diazes renewed their relationship with Wlberth and his wife Elizabeth, with whom they met at the movant's office to discuss a cocaine deal. (R16:213-214; R18:114-19; R19:169-77; R21:107-08). Later, Wlberth and the Diazes moved the conversation into the parking lot in case the movant's office was bugged. (R16:216-17; R19:177-79; R21:108).

During the spring of 2001, at a weekend get-together at the home of Wlberth and Elizabeth in Naples, Florida, attended by the movant and Yolanda Martinez, Wlberth's sister-in-law, the movant told Wlberth to call Andy because "he's got work." (R19:178-84). The movant then called Andy and passed the phone to Wlberth, who made arrangements to meet with Andy.[14] (R19:184-87; R21:111). Andy and Wlberth's later meeting culminated in several successful importations, the last being a 300-kilogram transaction. (R19:184-87; R21:3-7). Wlberth sold 44 kilograms of cocaine from that deal and delivered the remainder to distributors specified by Andy. (R16:219-20; R21:5-7).

Meanwhile, the Colombian suppliers' profits from those sales were to be delivered by Wlberth to the Colombian's emissary, but several delays occurred before it was finally scheduled to take place on November 15, 2001. (R17:30; R21:10-20). On that date, Wlberth advised Andy that he was too ill to make the delivery, so Andy decided to conduct the transaction himself. (R17:30-31,37-38; R21:20-22). Early that morning, El Muelon ("Big Tooth"), the Colombian contact, gave Andy instructions for a $500,000 delivery. (R17:31-33).

---

[14]Wlberth maintained a marijuana grow-house at his Naples residence. (R19:183-84; R21:110-11). The movant toured the facility that weekend and smoked pot along with the others. (Id.).

Uncomfortable with the delivery delays, Andy sought and received assurances from El Muelon that the individual to whom he was to deliver the money was not a police officer. (R17:33). Still concerned, Andy called Suarez at the County Clerk's office and asked him to investigate whether there was any surveillance on him (Andy).[15] (R17:34). After Suarez told him that everything was "cool," Andy decided to go ahead with the delivery. (R17:34).

Andy retrieved the cash, bundled in $10,000 stacks, and drove to a K-Mart parking lot at 8th Street and 122nd Avenue, where he called the transferee. (R5:74-81; R16:75-76; R17:34-39). The transferee arrived and the two men made a quick transfer of a backpack containing $499,700 in cash. (R15:62-63,75; R16:76-81; R17:39).

The transferee, however, was undercover Detective George Martinez, who notified other agents that the transfer had occurred. (R15:61; R16:72-77). Surveillance agents followed Andy onto the turnpike where Andy realized he was being tailed. (R15:75-76; R16:76-77; R17:40-41). Surmising that he was in danger of imminent arrest, Andy called the movant's beeper, but got no response. (R15:64,75-76; R17:41,104-08). Consequently, Andy headed straight for the movant's Miami office located at 3780 Flagler Street. (R15:65,76; R17:42). When he arrived there, Andy parked near the movant's office building, went inside, and told Maricarmen, the movant's close friend and secretary, that he urgently needed to see the movant because he was being pursued by the police who had followed him to the movant's office. (R17:44-45; R18:143; R19:122-27). Andy said nothing to Maricarmen about being there to pay a legal fee. (R19:127). Maricarmen then contacted the movant,

---

[15]Telephone records confirm Andy's calls to Suarez (R23:112-16).

21

who was out of the office. (R17:45; R19:127). When the movant arrived, Andy informed him of the delivery of drug money and the subsequent surveillance. (R17:45; R19:127). The movant said that he would handle everything. (R17:45).

The movant then took Andy's truck keys and told Andy he was going to move the vehicle. (R17:46). Nearby surveillance officers did not see the movant get into the truck, but they noticed that the vehicle had been moved. (R15:67-68,78). Fifteen minutes later, the movant was laughing as he returned to the office, and then said "f- them," referring to the police. (R17:47-48).

Next, Andy told the movant that he had about $280,000 in drug profits concealed in a floor safe in his bedroom and expressed concern that the police might obtain a warrant and seize the cash. (R17:47,49, 50,59). The movant stated that he would go over to Andy's house and retrieve the money. (R17:49,59). Andy provided the movant with the combination to the safe which contained plastic bags full of cash. (R17:51-52).

Elso left the office in his BMW, and Andy did not see him again that day. (R17:54). As time passed and the movant did not return, an attorney in the movant's office took Andy to a restaurant where they awaited news of the movant's fate. (R17:56; R18:144). When they learned that the movant had been arrested, Andy decamped to the home of Maricarmen, who kept the Diazes apprised of the movant's situation. (R17:56-58; R18:144-45; R19:128-29).

The movant's arrest on November 15, 2001, came about after he drove to the home of Andy's parents at 826 Capri Street in Coral Gables, where Andy lived and maintained his stash of drug money. As Andy suspected, police officers had followed Andy to the movant's

office. (R15:67-68). When they realized that Andy's vehicle had been moved, the case agent ran the tag on Andy's truck, which came back registered at a residence located at 826 Capri. (R15:68-69). The agent directed the officers to proceed to that location. (R15:68-69,78).

As the movant drove to 826 Capri, he called Rudy and told him to meet him there. (R18:129-30). Surmising that Andy was in trouble, Rudy agreed. (R18:130-31). He pulled into the driveway and waited for the movant.(<u>Id</u>.). Surveillance agents were positioned on both ends of the dead-end street. (R15:80-87). As Rudy waited, he noticed a white Ford drive down the street, make a u-turn, and drive back down the street. (R15:88; R17:60; R18:133-34). Rudy realized immediately that the house was being watched, and advised the movant of this fact. (<u>Id</u>.). The movant was unconcerned and got out of his car with a black embossed briefcase that had been a gift from the Diazes. (R18:135; R19:83-84).

As they walked to the house, the movant told Rudy that Andy had been followed by the authorities after making a delivery of $500,000 to the Colombians. (R15:89-92; R18:136). Although Rudy continued to remonstrate that they were under surveillance, the movant told him not to worry and stated that he needed to pick up something in the closet of Andy's bedroom. (R18:136).

Rudy and the movant then went to Andy's room and the movant entered the closet, retrieving a shopping bag filled with ziplock baggies full of cash. (R18:136). The movant next went to the floor safe, and with the combination provided by Andy, extracted more bags of cash. (R17:60; R18:138). Because the cash would not fit into the movant's briefcase, he stuffed the remainder into a bag he found in the closet. (R17:60-61; R18:138).

23

The movant told Rudy that he had assuaged Andy's fear that the drug money in his bedroom would be seized by telling him that he would pick up the money and that "since he was an attorney, [the authorities] couldn't stop him." (R18:139). When Rudy again expressed concern that there were police outside 826 Capri and that it might be better to leave things as they were, the movant said "Don't worry about it. I can handle it. They're not going to stop me." (DE18:138).

As the movant and Rudy left the house, the movant told Rudy to act as a decoy by following him closely. (R18:140). The movant then placed the money in the trunk of his BMW, drove half-way down the street, and waited for Rudy to catch up. (R18:140). The movant next turned onto Mariana Street, where Rudy saw the white Ford that he had previously identified as a police car. (R18:140-41). That car, which was occupied by Detective Phillips, met the movant's BMW as it reached the intersection of Capri and Mariana. (R15:92). Phillips held his badge out of the window, 4-5 feet from the movant's driver's side window, and made eye contact with the movant, who ignored him. (R15:92-94). As the movant turned at the intersection of Mariana and Granada, Rudy noticed a second undercover vehicle. (R18:142). Rudy then lost sight of the movant. (R18:142).

Meanwhile, Detective Phillips had advised Sgt. Kahn to pick up the surveillance at the Granada/8th Street intersection. (R15:94-95). The movant coincidentally pulled up right next to Kahn at that intersection, at which point the movant then accelerated rapidly as he turned east. (R15:94, 137-39). The movant led surveillance officers on a high-speed chase, ignoring the flashing lights of the pursuing officers, who observed him run red lights and stop signs (almost causing a collision at a major

intersection), and taking a circuitous route through back streets in an effort to lose the officers. (R15:143-56,170-75; R16:16-17, 82-100,139). The officers finally stopped the movant not far from his office, when he got stuck in traffic, and Detective Martinez drove his vehicle in front of the movant's BMW. (R16:101).

In the interim, the movant was talking on a cell phone as Detective Martinez and another officer approached him. (R15:184; R16:101). Detective Martinez held out his badge and ordered the movant four times to get out of the car, but the movant repeatedly ignored him, making phone calls for at least a minute. (R16:101-02,138). Within minutes, the movant's attorney, Arthur Hernandez, and attorney Guy Turner arrived. (R15:184-85). Turner told the officers that he wanted to take custody of the movant's BMW, but the officers refused Turner's request. (R15:185-86).

The movant was arrested for reckless driving and fleeing and eluding police, was released the next day, with the charges later being dropped by the state. (R15:186-88; R18:145). His BMW, however, had been impounded and a search warrant for it was obtained and executed the following day. (R15:188). In the trunk, officers discovered several $10,000 bundles of cash totaling $266,800. (R16:19-21, 104-06). The cash was packaged the same way as the bundles Andy had delivered to Detective Martinez earlier that day. (Id.).

The day after his arrest, the movant met with Gato. (R23:36). With regard to the events of the previous day, the movant told Gato that Andy, a drug dealer, was being followed by police and that he had tried to do him a favor by going to a house in Coral Gables to get some money for him. (R23:37). The movant also stated that he had noticed that police were following him after he placed the

money in the trunk of his car and he was trying to get back to his office when he was stopped. (R23:37-38). The movant, who seemed "spooked," also met with Rudy on November 16th. (R17:62; R18:146). Andy later learned that the movant was concerned that the Diazes had set him up. (R17:62-63; R21:23,115).

Sometime later, the movant asked Andy to meet him at his office. (R17:63-64). During that meeting, the movant told Andy that he was going to claim ownership of the money and that Andy needed to fill out an affidavit stating that the $266,800 was payment for the movant's legal representation of Rudy in 2001. (R17:64,150; R18:147-48,150). Both Rudy and Andy questioned the wisdom of the movant's plan because neither had a legitimate job that would account for that amount of cash. (R17:64-68,155-64; R18:150-51; R19:110-12). However, the movant assured them that "everything is going to be fine," so Andy reluctantly agreed to make the requested attestation to help get the movant out of trouble with the authorities. (Id.).

The cash seized from the movant's vehicle was, in fact, Andy's drug proceeds which the movant had offered to retrieve for him so that it would not be seized. (R17:70-72,78,147; R18:148,152). The Diazes owed no fees to the movant, who had already been paid $50,000 in cash ($35,000, plus a $15,000 bonus) for his representation of Rudy. (R17:64-68,148-49; R18:148-49,151-52). To appease the movant, however, Andy later made a sworn statement in which he made false averments at the movant's request.[16]

---

[16]After November 15th, the movant and the Diazes continued to socialize. (R18:154). The movant took advantage of the Diaz brothers' munificence by vacationing with his girlfriend at their Colorado condominium in 2002, with airline tickets purchased by the Diazes with drug proceeds. (R17:96). The movant also attended Rudy's birthday celebration in 2002. (R17:103-04; R18:156).

(R17:67-72).

Thereafter, on December 21, 2001, the movant was served with a forfeiture complaint relating to the $266,800 seized from his vehicle. (R19:134-40). On February 6, 2002, the movant filed an answer, with an accompanying sworn affidavit, in which he averred that he was an attorney in good standing with the Florida Bar. (R19:145-47). He stated that he went to 826 Capri Street on November 15, 2001. (Id.). According to the movant, he "received an amount of cash in the [approximate] amount of $266,000" which was paid to him as attorney's fees and costs for his representation of Rodolfo Diaz, in United States v. Rodolfo Diaz, Case Number 89-639-CR-Jordan, in the United States District Court for the Southern District of Florida. (Id.). He further stated that, after receiving the fee, he placed it in his briefcase and deposited it in the trunk of his vehicle. (Id.). He claimed he was stopped a short time later by police officers, who later searched the car and seized the briefcase and money. (Id.). The movant further averred that he was the owner and had a proprietary interest in the seized funds, was not a money courier, but a duly licensed attorney, who was entitled to the immediate return of the funds in which he held a superior interest to any other person. (Id.).

At trial, the defense called a private investigator to testify about the distances and driving time of the route the movant took on November 15, 2001. (R24:40-54). Defense attorney Michael Petit and a private investigator also testified about a meeting at the movant's office regarding Petit's potential representation of Ibanez. (R24:63-80, 94-108). Attorney Robert Rosenblatt testified that he represented the movant in the $266,800 forfeiture proceeding. (R24:108-113). During those proceedings, Attorney Rosenblatt recalled deposing Andy, whose deposition testimony he

believed to be non-coerced. (R24:108-113).

In an effort to impeach Andy's testimony regarding the telephone conversation that occurred while Wlberth and the movant were in Naples, which Andy recalled to have occurred on Mother's Day weekend in 2001, the movant called his mother-in-law to testify as a defense witness. (R24:131-34). According to the movant's mother-in-law, she and the movant had spent that day together, and visiting the grave of the movant's wife. (R24:131-34). The movant also called attorney Ron Denis, who testified that the movant was with him in Europe from May 24-June 10, 2001. (R24:145-49).

Yet another private investigator testified to work he and the movant performed on Rudy's behalf regarding the 1989 case. (R24:135-45). Specifically, Attorney Tom Payne testified that Lucinda Smith, who worked for the movant after Betancourt's death, handled many of the bank deposits and that her handwriting appeared on the fax regarding the $9,800 wire-transfer, and on the check payable to the IRS for Elizabeth's taxes. (R24:150-69). In an effort to discredit the testimony of Gato and Rudy regarding their meetings with the movant on November 16, 2001, attorney Guy Turner testified that he spent most of that day with the movant.(R24:172-75).

Likewise, Miriam Suarez, who is John Suarez's sister, Rudy's wife, and Andy's sister-in-law, testified that her brother and the movant were close friends. (R25:31-61). Miriam also testified she never knew why Rudy used an alias and denied knowing that he was a fugitive. (Id.). She was also unaware of Rudy's involvement in the drug trade. (Id.). She also stated that she knew of no relationship between Rudy and the movant prior to Rudy's 2001 arrest. (Id.). Moreover, Miram also testified that between 2001 and 2003, she

28

overheard Andy say that the movant was owed attorney's fees. (<u>Id</u>.).

John Suarez testified as a defense witness that his job did not provide him with access to confidential information, and he did not learn until 2001 that Rudy, whom he knew initially as Joe Navallo, was a fugitive. (R25:108-29). John testified that he was unaware that the Diazes dealt in drugs. (<u>Id</u>.). According to John, he introduced "Joe" to the movant in 1997. (<u>Id</u>.). During a meeting in a McDonald's parking lot, Rudy never let on that he was a fugitive. John also testified that he had no idea why Andy tried to call him five times on November 15, 2001. (<u>Id</u>.). John further recalled that he had heard Rudy tell the movant in 2001 that he owed the movant attorney's fees, and that a $23,000 check the movant gave him in October 2001 was a loan that enabled Suarez to take advantage of a rebate. (<u>Id</u>.).

However, during cross-examination, John admitted that he had access to a law enforcement network at work and that he had used it to learn the identity of an individual who was "saying stuff" about him. (R25:131-32). He also admitted that the money the movant "loaned" him was nearly as great as his yearly salary of $29,000, and that he had been unable to pay it back so it became a gift. (R25:134-35,147-48). He admitted that the ostensibly-legitimate meeting at a McDonald's occurred in the middle of the night. (R25:140-42).

Attorney Barbara Munoz testified that she was at the movant's office on November 15, 2001, conferring with him on a case. (R26:69-70). They broke for lunch and intended to resume their work afterwards. (R26:69-71). Andy was there upon their return and the movant left the office, telling her that he had to collect "some fees." (R26:82-84, 91).

29

On cross-examination, however, Munoz denied the government's suggestion that she was an intimate friend of the movant's and volunteered that, although the movant "is a nice person[,] a great father[,] a great attorney[,] and a respected professional," he was too distraught over his wife's 1997 death to date, and, therefore, their social contacts were limited to attending their childrens' events, discussing religion, and going to church. (R26:84-91).

In rebuttal, the government called Yolanda Martinez who testified that she accompanied the movant to Naples for a weekend get-together at the home of Wlberth and Elizabeth in May 2001. (R26:103-13). According to Martinez, she and the movant had a romantic liaison. (Id.). She further testified that all of them, including the movant, smoked pot that weekend. (Id.).

## Discussion

As will be demonstrated in more detail *infra*, the movant is not entitled to vacatur on any of the claims presented. When viewing the evidence in this case in its entirety, the alleged errors raised in this collateral proceeding, neither individually nor cumulatively, infused the proceedings with unfairness as to deny the movant a fundamentally trial and due process of law. The movant therefore is not entitled to habeas corpus relief. See Fuller v. Roe, 182 F.3d 699, 704 (9 Cir. 1999)(holding in federal habeas corpus proceeding that where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation), overruled on other grounds, Slack v. McDaniel, 529 U.S. 473, 482 (2000). See also United States v. Rivera, 900 F.2d 1462, 1470 (10 Cir. 1990)(stating that "a cumulative-error analysis aggregates only actual errors to determine their cumulative effect."). Contrary to the movant's

apparent assertions, the result of the proceedings were not fundamentally unfair or unreliable. See Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993).

## Jurisdictional Challenge

In **claim 1,** the movant asserts that the court lacked subject matter jurisdiction as to Count 4, because it failed to state a federal offense. (Cv-DE#1:6).

Review of the record reveals that Count 4 of the Indictment charged the movant as follows:

> On or about November 15, 2001, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,
>
> JUAN CARLOS ELSO
> a/k/a J.C. Elso,
> and
> ANDREW DIAZ,
> a/k/a Andres Diaz,
>
> did knowingly and intentionally conduct a financial transaction, that is, the delivery and transfer of $266,800.00 in United States currency, which were the proceeds of a specified unlawful activity, that is, the distribution and sale of cocaine, in violation of Title 21, United States Code, Section 841(a)(1), knowing that said transaction was designed in whole and in part to conceal and disguise, the nature, location, source, ownership and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct said financial transaction, the defendants knew that the monetary instruments were the proceeds of some form of unlawful activity.
>
> In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

(Cr-DE#2).

Lack of Subject Matter Jurisdiction. The movant's argument that the court lacked subject matter jurisdiction as to this offense fails. It is noted that challenges to the court's subject-matter jurisdiction can be raised at any time. See Harris v. United States, 149 F.3d 1304, 1306 (11th Cir. 1998). However, in this case, the court did not lack subject matter jurisdiction over the offense. A court's power to adjudicate a federal criminal prosecution comes from 18 U.S.C. §3231, which gives federal courts original jurisdiction over "all offenses against the laws of the United States." See 18 U.S.C. §3231.

As noted above, review of the Indictment as to Count 4 reveals that the movant violated one or more federal criminal statutes, and thus stated an "offense against the laws of the United States," tracking the language of the statute and setting forth the essential elements of the crime. The Indictment sufficiently apprised the movant of the charges against him.[17] Thus, any challenge to the court's lack of subject matter jurisdiction fails.

Failure to State a Claim. Alternatively, the movant appears to argue that the court lacked jurisdiction as to Count Four of the Indictment, a violation of 18 U.S.C. §1956(a)(1)(B)(i), because it

---

[17]Due process and the Sixth Amendment require that an Indictment state the elements of an offense charged with sufficient clarity to apprise a defendant of the charges against him. Russell v. United States, 369 U.S. 749, 763-64 (1962). An Indictment is sufficient if it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defendant and enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." See Hamling v. United States, 418 U.S. 87, 117 (1974)(citations omitted); Government of Virgin Islands v. Moolenaar, 133 F.3d 246 (3 Cir. 1998), citing Russell, supra; Hamling v. United States, supra. Consequently, the movant has failed to establish any Due Process or Sixth Amendment violations as to elements charged in Count Four of the Indictment.

did not state a claim. (Cv-DE#1:7). He claims that the Indictment failed to charge conduct affecting interstate or foreign commerce. (Cv-DE#1:7).

First, this claim is procedurally barred due to defendant's failure to raise it on appeal. There are three types of issues that a section 2255 motion cannot raise: (1) issues that were raised on direct appeal, absent a showing of changed circumstances; (2) nonconstitutional issues that could have been but were not raised on direct appeal; and (3) constitutional issues that were not raised on direct appeal, unless the section 2255 petitioner demonstrates cause for the procedural default as well as actual prejudice from failure to appeal. Belford v. United States, 975 F.2d 310 (7th Cir. 1992), overruled on other grounds by Castellanos v. United States, 26 F.3d 717 (7th Cir. 1994). The claim is thus procedurally barred unless the movant can show cause for the default and actual prejudice, Wainwright v. Sykes, 433 U.S. 72 (1977), or a fundamental miscarriage of justice, Engle v. Isaac, 456 U.S. 107 (1982). No such showing has been made here.

Second, the claim is procedurally barred as it could have been, but was not made on a timely basis before trial. See Fed.R.Cr.P. 12(b)(3)(B); United States v. Ramirez, 324 F.3d 1225, 1228 (11th Cir. 2003). Rule 12(b)(3)(B) provides generally that motions alleging a defect in the Indictment must be made before trial, although a claim that the Indictment fails to invoke the court's jurisdiction or fails to state an offense may be made at any time while the case is pending. Absence of affirmative proof in the record that Fed.R.Cr.P. 6(f) was followed does not prove that it was not. See United States v. Pinero, 948 F.2d 698 (11th Cir. 1991); United States v. Hopkins, 458 F.2d 1353, 1354 (5th Cir. 1972); see also United States v. Joseph, 205 Fed.Appx. 765, 767

(11th Cir. 2006)(in reviewing a rule 35 motion, court was "not persuaded by [defendant's] contention that his sentence should be vacated because the record lacks evidence that his indictment was returned in open court"). Here, as previously narrated in this Report, the movant raised this precise issue in a post-trial motion, denied as untimely by the trial court, which denial was affirmed on appeal. Thus, no change of circumstances has been established sufficient to warrant relitigation of this claim here.

Regardless, the movant's arguments fail on the merits. An indictment must be sufficiently specific to inform the defendant of the charge against him and to enable him to plead double jeopardy in any future prosecution for the same offense. An indictment satisfies these requirements as long as the language therein sets forth the essential elements of the crime. United States v. Cole, 755 F.2d 748, 759 (11th Cir. 1985). Here, the Indictment is sufficient. It tracked the wording of the charging statute, cited to that statute, and sets forth all elements of the crime.

The Indictment was sufficiently specific to inform movant of the charges against him and enabled him to plead double jeopardy in any future prosecution for the same offense. "It is not necessary for an indictment ... to allege in detail the factual proof that will be relied upon to support the charges. That information, if essential to the defense, can be obtained by a motion for a bill of particulars." United States v. Sharpe, 438 F.3d 1257, 1263, n. 3 (11th Cir. 2006)(citation omitted).

Moreover, the movant cites no authority that the challenged statute must specifically state that the accused "travel[ed] in interstate commerce with the intent to commit" a specified crime, or that the travel "affected interstate commerce," or that the

34

travel "affected the instrumentalities of interstate commerce" in order to constitute a valid exercise of Congress's power under the Commerce Clause. Nowhere, however, has the movant supported his contention that a statute passed under Congress's Commerce Clause authority must include the words "travel[ed] in interstate commerce with the intent to commit" a specified crime or words requiring that the travel "affected interstate commerce, "affected the instrumentalities of interstate commerce," or similar language to pass constitutional muster. Rather, the question is whether a nexus does, in fact, exist between the statute at issue and interstate commerce sufficient to sustain Congress's authority under the Commerce Clause. Because movant has not properly asserted or developed this argument in his request for dismissal, this claim is subject to dismissal on that basis alone.

However, even if movant had properly asserted a Commerce Clause challenge, §1956(a)(1)(B)(i) is still a proper exercise of Congress's Commerce Clause power because "Congress may regulate those individuals or things that travel in interstate commerce without regard to the reason for their movement" under the second prong of <u>Lopez</u>.[18] <u>United States v. Mason</u>, 2007 WL 1521515, *7 (M.D. Fla. 2007)(<u>citing</u> <u>United States v. Lopez</u>, 514 U.S. 549, 558 (1995)) ("Congress may properly regulate ... (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce ..."). The Eleventh Circuit has specifically recognized that the money laundering statute challenged here is within Congress' Commerce Clause power. <u>See</u> <u>United States v. Oliveros</u>, 275 F.3d 1299, 1303 (11th Cir. 2001). Under these circumstances, the statute on its face, is a valid exercise of Congress's power under the Commerce Clause. This argument must therefore fail.

---

[18]<u>United States v. Lopez</u>, 514 U.S. 549, 558 (1995).

Notwithstanding, in order to prove that the movant committed money laundering, in violation of 18 U.S.C. §1956(a)(1)(B)(i), the government must show: (1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of a statutorily specified unlawful activity; (3) the defendant knew the proceeds were from some form of illegal activity; and (4) the defendant knew a purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the proceeds. See United States v. Miles, 290 F.3d 1341, 1354-55 (11th Cir. 2002)(*per curiam*)(citation omitted).

Moreover, contrary to the movant's assertion here, courts have held that an Indictment charging an offense under §1956 does not need to allege effect upon interstate or foreign commerce. See United States v. Burgos, 254 F.3d 8, 11 (1st Cir. 2001). Other circuits have found that the interstate commerce element can be inferred from the allegations in the Indictment even if not set forth expressly in the Indictment. See United States v. Sabbeth, 262 F.3d 207, 218-19 (2nd Cir. 2001); United States v. Goodwin, 141 F.3d 294, 401-02 (2nd Cir. 1997). As to the movant, Count 4 charged that the offense involved the delivery and transfer of $266,800 in United States currency, which were the proceeds of the distribution and sale of cocaine. Courts have found that narcotics trafficking is an activity which inherently impacts interstate and foreign commerce. See United States v. Westbrook, 119 F.3d 1176, 1191-92 (5th Cir. 1997); United States v. Gallo, 927 F.2d 815, 822-23 (5th Cir. 1991)(holding that transportation of $300,000 in drug cash satisfied the interstate commerce nexus for purposes of reviewing the sufficiency of the evidence).

At trial, it was established that Andrew and Rodolfo Diaz were

36

long-time Miami drug traffickers who, over nearly two decades, imported thousands of pounds of illegal drugs and, with the help of their family, laundering millions of dollars. Specifically, as to Count 4, it was established that Andrew Diaz became concerned when he discovered undercover agents were surveilling him. (R17:17-41). He went to the movant's office, explaining he was concerned with $280,000 cash he had stored in the safe at his parents' house. (R:17:48-51). According to Diaz, the movant told him to relax, that he would pick up the money for Diaz. (Id.). The movant then went to the house, retrieved the money, advising Andrew Diaz' parents that he would not be subject to police action. (R18:130-140). After he was observed leaving the house, agents attempted to stop the movant, but he fled, driving erratically and dangerously. (R15:93-94,173-74). It is clear that the evidence adduced at trial was sufficient to establish the movant's guilt as to the charged offense.

The movant next alternatively appears to argue that as to Count 4, the evidence was insufficient to establish that the transaction that was the subject of this charge affected interstate or foreign commerce, nor was it designed to "conceal and disguise" the nature and source of the transactions. See Cuellar v. United States, 553 U.S. 550 (2008); United States v. Majors, 196 F.3d 1206, 1213-14 (11th Cir. 1999). This claim is without merit. Moreover, the appellate court found that government had established the movant transported the monies, in order to conceal the illegal nature of the funds.

The four elements of this offense are that the defendant (1) knowingly conducted a "financial transaction," (2) which he knew involved funds that were the proceeds of some form of unlawful activity, (3) where the funds involved in the financial transaction

in fact were the proceeds of a "specified unlawful activity," and (4) that the defendant engaged in the financial transaction knowing that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such unlawful activity. See United States v. Majors, 196 F.3d 1206, 1212 (11th Cir. 1999) (listing elements of 18 U.S.C. §1956(a)(1)(B)(i) offense). Here, the evidence was more than sufficient to prove that the movant knew the funds he retrieved from the Diaz' home were the proceeds of Andy's drug activities, and that he was purportedly receiving these monies for payment of attorney's fees and/or to assist Diaz in conceal or disguise the nature, location, source, ownership, or control of the proceeds. See United States v. Tarkoff, 242 F.3d 991, 994 (11th Cir. 2001).

Here, the language of the Indictment does not allege specifically that the transaction affected interstate commerce. However, "financial transaction" is defined as "a transaction which in any way or degree affects interstate or foreign commerce." See 18 U.S.C. §1956(c)(4)(A). Moreover, the indictment specifically alleged that the financial transaction at issue was the movant's attempt to conceal monies from drug trafficking. It is well-settled that drug trafficking is an activity that affects interstate commerce. See United States v. Zorrilla, 93 F.3d 7, 8 (1st Cir. 1996); see also United States v. Owens, 167 F.3d 739, 755 (1st Cir. 1999); United States v. Gonzalez-Maldonado, 115 F.3d 9, 21 (1st Cir. 1997).

Here, the Indictment sufficiently alleged interstate commerce as an element, and the movant was thus on notice of that element.[19]

---

[19]Moreover, the government only needed to show a *de minimus* affect on interstate or foreign commerce, which is clearly did in this case. See cf. United States v. France, 164 F.3d 203, 208 (4th Cir. 1998); United States v. Gallo, 927

See cf. United States v. Cefaratti, 221 F.3d 502, 507 (3d Cir. 2000)("[A]n indictment that charges a legal term of art sufficiently charges the component parts of that term." (internal quotation marks omitted)); United States v. Kovach, 208 F.3d 1215, 1219 (10th Cir. 2000)(finding that the indictment adequately charged the interstate commerce element by using the word "organization," a term of art defined by statute as an entity that affects interstate commerce); United States v. Wicks, 187 F.3d 426, 428 (4th Cir. 1999) (same). For all of the foregoing reasons, the movant's challenge to Count 4 must fail, and he is entitled to no relief on this claim.

Cuellar Challenge. The movant also appears to argue that, in light of the Supreme Court's decision in Cuellar, supra, there was insufficient evidence to establish that the transportation of these monies, which were the subject of his charges, were designed to "conceal and disguise" the nature and source thereof. For the reasons previously stated, this claim fails on the merits. In Cuellar, the Supreme Court addressed the elements of a provision of the federal money laundering statute that prohibits international transportation of the proceeds of unlawful activities, 18 U.S.C. §1956(a)(2)(B)(i). Regarding the defendant's knowledge that the transportation of such monies was designed to "conceal or disguise the nature, the location, the source, the ownership, or the control" of the funds, the Supreme Court held that merely hiding or concealing funds during transportation was insufficient. Id. at 2006. In Cuellar, the government failed to present evidence

---

F.2d 815, 822-23 (5th Cir. 1991). The movant knowingly went to the residence to retrieve drug proceeds for Diaz, who specifically told him that he was being followed and was concerned that the funds would be seized. As set forth at trial, the movant's actions also clearly impacted the investigation into the Diaz drug-trafficking organization, enabling Rudy Diaz to transport funds to Colombia. (Cr-DE#267:73-74; Cr-DE#268:10-12).

sufficient for a reasonable jury to find this element, and thus, the conviction could not be sustained.

Here, the movant's case is easily distinguishable from Cuellar. The defendant in Cuellar went to trial and the United States failed to present sufficient proof of his knowledge that the transportation was designed to conceal a listed attribute of the funds. In the instant case, there was evidence adduced at trial, including the testimony of cooperating witnesses, that the movant knew the funds were derived from unlawful drug activities, and belonged to other coconspirators.

To the extent the movant means to argue that appellate counsel was ineffective for failing to seek a stay and/or recall of the mandate, in order to raise the Cuellar issue, no showing has been made that such a request would have been granted. Regardless, even if it had been granted, no showing has been made that this would have affected the outcome of the appeal. Consequently, no prejudice pursuant to Strickland has been established arising from appellate counsel's failure to pursue this claim on direct appeal. See Matire v. Wainwright, 811 F.2d 1430, 1435 (11 Cir. 1987).

### Challenges to Counsel's Effectiveness

In this collateral proceeding, the movant next raises a multitude of claims which challenge counsel's effectiveness, as listed in detail above. Ineffective assistance of counsel claims are subject to the two-part test enunciated in Strickland v. Washington, 466 U.S. 668 (1994), which is not a favorable standard to the movant. See Massaro v. United States, 538 U.S. 500, 505 (2003). To prevail on a claim of ineffective assistance, the movant must demonstrate both that his attorney's efforts fell below

40

constitutional standards, and that he suffered prejudice as a result. Strickland v. Washington, 466 U.S. 668 (1984). Counsel's performance is deficient only if it falls below the wide range of competence demanded of attorneys in criminal cases. Id. at 688; Heath v. Jones, 941 F.2d 1126, 1130 (11 Cir. 1991). "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. See also Massaro v. United States, 538 U.S. 500, 505 (2003).

In deciding whether counsel's performance was deficient, judicial scrutiny is "highly deferential" and the reviewing court is required to "'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Knowles v. Mirzayance, ___ U.S. ___, 129 S.Ct. 1411, 1418, 1420, 173 L.Ed.2d 251 (2009), quoting, Strickland, 466 U.S. at 689, 104 S.Ct. 2052. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, supra at 690, 104 S.Ct. 2052.

The courts "are not interested in grading lawyers' performances;" but rather, "are interested in whether the adversarial process at trial ... worked adequately." Rogers v. Zant, 13 F.3d 384, 386 (11 Cir. 1994)(quotation marks omitted). To be unreasonable, the performance must be such that "no competent counsel would have taken the action that [the movant's] counsel did take." Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001)(emphasis omitted). In other words, "[e]ven if many reasonable

41

lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." <u>Rogers</u>, 13 F.3d at 386.

Under the second prong of the test set forth in <u>Strickland</u>, the movant can be said to have been prejudiced by counsel's performance only if there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. <u>Strickland</u>, 466 U.S. at 693-94. It is not enough for the defendant to show that the error had some conceivable effect on the outcome of the proceeding. <u>Id</u>. <u>See also</u> <u>Knowles v. Mirzayance</u>, _____ U.S. ___, ___, 129 S.Ct. 1411, 1422, 173 L.Ed.2d 251 (2009). Rather, the movant must demonstrate that "there is a reasonable probability that, absent [counsel's] errors, the jury would have had a reasonable doubt regarding [his] guilt." <u>Blackburn v. Foltz</u>, 828 F.2d 1177, 1186 (6th Circ. 1987), <u>cert. den'd</u>, 485 U.S. 970 (1988), <u>see also</u>, <u>Montgomery v. Petersen</u>, 846 F.2d 407, 416 (7th Cir. 1988).

Second-guessing of an attorney's performance is not permitted. <u>White v. Singletary</u>, 972 F.2d 1218, 1220 (11 Cir. 1992)("Courts should at the start presume effectiveness and should always avoid second-guessing with the benefit of hindsight."); <u>Atkins v. Singletary</u>, 965 F.2d 952, 958 (11 Cir. 1992). Moreover, the Eleventh Circuit will not "second-guess counsel's strategy." <u>Chandler</u>, 218 F.3d at 1314, n.14. Strategic choices, even those "made after less than complete investigation," are evaluated for their reasonableness and "counsel's reliance on particular lines of defense to the exclusion of others--whether or not he investigated

those other defenses--is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable." <u>Chandler</u>, 218 F.3d at 1318 (<u>quoting Strickland</u>, 466 U.S. at 690-91).

Bare and conclusory allegations of ineffective assistance of counsel which contradict the existing record and are unsupported by affidavits or other indicia of reliability, are insufficient to require a hearing or further consideration. <u>See</u> <u>United States v. Robinson</u>, 64 F.3d 403, 405 (8 Cir. 1995), <u>Ferguson v. United States</u>, 699 F.2d 1071 (11 Cir. 1983), <u>United States v. Ammirato</u>, 670 F.2d 552 (5 Cir. 1982); <u>United States v. Sanderson</u>, 595 F.2d 1021 (5 Cir. 1979).

In **claim 2A**, the movant asserts that trial counsel was ineffective for failing to investigate, challenge the indictment, and file pre-trial motions. (Cv-DE#1:7-8).

<u>Failing to Investigate</u>. The movant does not identify specifically what counsel should have investigated. Such a bare and conclusory allegation is subject to summary dismissal. <u>Machibroda v. United States</u>, 368 U.S. 487 (1962). If movant means to argue that counsel failed to proceed as suggested by the movant in this claim, as discussed *infra*, the claim fails on the merits. Consequently, no prejudice under <u>Strickland</u> has arisen arising from counsel's failure to pursue each avenue of complaint maintained by the movant. He is thus entitled to no relief on this claim.

<u>Failure Challenge Indictment</u>. The movant maintains counsel failed to challenge pre-trial the sufficiency of the Indictment as to Count 4 on the basis that the interstate commerce element was missing. (Cv-DE#1:7-8; Cv-DE#35:29). The arguments raised herein

43

are a mere reiteration of the arguments raised in relation to
claim 1 above and should be denied for the reasons expressed
therein. As discussed in relation to claim 1, the movant cannot
establish prejudice pursuant to <u>Strickland</u> arising from counsel's
failure to pursue this nonmeritorious claim. No showing has been
made that had counsel pursued the arguments posited here by the
movant, that any individually or cumulatively would have resulted
in dismissal of the charge. Thus, no further argument in this
regard is warranted.

   <u>Failure File Pre-Trial Motions</u>. The movant asserts counsel
failed to file motions seeking access to grand jury materials
pursuant to <u>Fed.R.Cr.P.</u> 6(e)(3)(E). (Cv-DE#1:7-8; Cv-DE#35:32). The
movant maintains he advised counsel there were potential grounds
for dismissal of the Indictment, including issues surrounding how
the government obtained the Indictment by alleging the movant was
concealing or disguising monies by falsely claiming them as
attorney's fees, when neither party to the fee arrangement
testified before the grand jury. (<u>Id</u>.).

   The law is clear that "the district court has substantial
discretion in determining whether grand jury materials should be
released." <u>United States v. Aisenberg</u>, 358 F.3d 1327, 1338, 1349
(11th Cir. 2004)(quotation omitted). "It has long been a policy of
the law that grand jury proceedings be kept secret." <u>Id</u>. at
1346-47. This secrecy principle is codified under <u>Fed.R.Cr.P.</u>
6(e)(2), which prohibits the disclosure of grand jury material
except in the limited circumstances described in Rule 6(e)(3). <u>Id</u>.
at 1347. The portion of that provision at issue is:

        The court may authorize disclosure-at a time,
        in a manner, and subject to any other

44

conditions that it directs-of a grand-jury matter:

    (i) preliminarily to or in connection with a judicial proceeding;

    (ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury.

See Fed.R.Cr.P. 6(e)(3)(E)(i) and (ii).

The Supreme Court has held that the Rule 6(e) exceptions apply only when a party seeking disclosure of grand jury material shows a "particularized need" for that material. See Douglas Oil Co. of Cal. v. Petrol Stops Nw., 441 U.S. 211, 222 (1979). The Supreme Court explained that a party meets this standard when he shows "that the material [he] seek[s] is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that [his] request is structured to cover only material so needed." Id. The Supreme Court stated that "[s]uch a showing must be made even when the grand jury whose transcripts are sought has concluded its operations." Id. Moreover, the Eleventh has explained that a party meets the particularized need standard when he shows that "circumstances created certain difficulties peculiar to this case, which could be alleviated by access to specific grand jury materials, without doing disproportionate harm to the salutary purpose of secrecy embodied in the grand jury process." United States v. Aisenberg, 358 F.3d at 1348-49.

In this case, the movant claims the grand jury materials support his claims that evidence presented to the grand jury

concerning his involvement in money laundering were falsified by the government, and that improper procedures were used to obtain his indictment. Here, the movant has not established the requisite particularized need to have merited disclosure under Rule 6(e). See Douglas Oil Co. of Cal., 441 U.S. at 222. Specifically, the movant has failed to describe any "difficulties peculiar to [his] case" that merited disclosure, instead presenting unsubstantiated allegations that the evidence presented before the grand jury was falsified. See United States v. Aisenberg, 358 F.3d at 1348-49. The Eleventh Circuit has held that unsubstantiated allegations do not satisfy the "particularized need" standard. United States v. Cole, 755 F.2d 748, 759 (11th Cir. 1985). Accordingly, because the movant has not shown he had a particularized need for the material sought, any request by counsel pre-trial in this regard would have failed. See United States v. Aisenberg, 358 F.3d at 1338, 1349. Even if such a showing had been made, and assuming further that counsel had made the request timely, there is nothing of record to suggest the court would have granted the movant's request. Consequently, no prejudice pursuant to Strickland has been established arising from counsel's failure to pursue this issue.

Regardless, the Fifth Amendment provides, "[N]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury" U.S. Const. amend. V. "A grand jury need find only that there is probable cause to believe that a crime was committed and that the defendant was the party who committed the crime." United States v. Jennings, 991 F.2d 725, 729 (11th Cir. 1993).

A court may not dismiss an indictment, even for prosecutorial misconduct, without a showing "'that the violation substantially influenced the grand jury's decision to indict.'" Bank of Nova

46

Scotia v. United States, 487 U.S. 250, 256 (1988), quoting, United States v. Mechanik, 475 U.S. 66, 78 (1986). The exception to this rule, however, involve those cases "in which the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice." United States v. Exarhos, 135 F.3d 723, 726-727 (11th Cir. 1998), quoting, Bank of Nova Scotia, 487 U.S. at 257. In Exarhos, the Eleventh Circuit concluded that the government's presentation of forged documents did not so compromise the grand jury proceedings so as to render them fundamentally unfair. Id. Additionally, the Supreme Court has noted that a petit jury's subsequent guilty verdict renders "any error in the grand jury proceeding connected with the charging decision [ ] harmless beyond a reasonable doubt." United States v. Mechanik, 475 U.S. 66, 70 (1986)(citing racial discrimination in the composition of the grand jury as an exception).

The movant has failed to demonstrate that the government suborned perjurious testimony before the grand jury, nor that the grand jury proceedings were unlawfully compromised. Even if he were able to demonstrate this, the movant is still entitled to no relief because he cannot establish that such prosecutorial misconduct substantially influenced the grand jury's decision to indict. Under these circumstances, no prejudice has been established arising from counsel's failure to pursue this issue. Thus, even if counsel had filed a pretrial motion to dismiss the indictment on the bases asserted by the movant in this collateral proceeding, no showing has been made that such a motion would have been granted. Therefore, no prejudice pursuant to Strickland has been established arising from counsel's failure to pursue the issue pretrial.

Moreover, the Superseding Indictment was not fatally

47

defective. No showing has been made that any argument by counsel in this regard would have resulted in dismissal of the charges. See United States v. Steele, 178 F.3d 1230, 1234 (11th Cir. 1999); Russell v. United States, 369 U.S. 749, 763-64 (1962). As will be recalled, the Indictment charged the movant with violating one or more federal criminal statutes, and each states an offense against the laws of the United States, tracking the language of the statute and setting forth the essential elements of the crime. The Superseding Indictment sufficiently apprised the movant of the charges against him. No deficient performance or prejudice has been established arising from counsel's failure to pursue this nonmeritorious claim.

Here, no showing has been made that the government knowingly provided false testimony to the grand jury, nor that it manipulated the grand jury proceedings. Notwithstanding, as previously narrated in this Report, there was more than sufficient evidence adduced at trial to support the charges. Consequently, the outcome of the grand jury proceeding and the trial proceeding would have been the same given the evidence against the movant. Even if some of the testimony before the grand jury was inaccurate, this is not sufficient to require dismissal of the indictment. See United States v. Cosme, 134 Fed.Appx. 391 (11th Cir. 2005). Under these circumstances, the movant has not demonstrated prejudice resulting from the grand jury's indictment or "grave doubt" that the decision to indict was free from substantial influence. Bank of Nova Scotia, 487 U.S. at 256. Additionally, the petit jury's guilty verdict renders any grand jury error harmless. Thus, the movant is entitled to no relief on this claim.

The movant next claims counsel should have argued that the movant was subject to malicious prosecution by the government. (Cv-

48

DE#35:33). According to the movant, the government circumvented and/or otherwise manipulated the law by circumventing the provisions of 18 U.S.C. §1957(f)(1) in its presentation of primarily hearsay evidence before the grand jury. (Id.). He claims the government was under a duty to present exculpatory evidence to the grand jury, but failed to do so. (Id.). Specifically, he maintains the government had the sworn statement of Andrew Diaz, as well as, evidence that the movant filed a claim in a civil forfeiture proceeding for Rodolfo Diaz, claiming the seized monies in this case represented attorney's fees and costs associated with Rodolfo Diaz' representation. (Cv-DE#35:33).

The law is clear that the government need not present exculpatory evidence to the grand jury. See, e.g., United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004)("The government is under no duty to bring exculpatory evidence to the grand jury's attention."); United States v. Gilbert, 198 F.3d 1293, 1304 (11th Cir. 1999)("To begin with, it is settled law that the prosecution is not required to include exculpatory evidence in its presentation to the grand jury."). Rather, the issue of exculpatory evidence applies only in the context of trial. See Gilbert, 198 F.3d at 1304 ("The obligation to disclose exculpatory evidence under Brady v. Maryland [] applies only in regard to trials.")(citations omitted). To require the government to present exculpatory evidence to the grand jury would transform it into a judicial body, rather than an "accusatory" one. See, e.g., United States v. Williams, 504 U.S. 46, 51 (1992)("[R]equiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body."). Consequently, even if the evidence suggested by the movant were viewed as exculpatory, the government was under no obligation to disclose this fact to the grand jury. Even if it

49

had been disclosed, no showing has been made that the grand jury would not have indicted if they were apprised of the information.

Under the circumstances present here, no deficient performance or prejudice under Strickland has been established arising from counsel's failure to pursue this claim pre-trial or a direct appeal following the movant's convictions and sentences. See Matire v. Wainwright, 811 F.2d 1430, 1435 (11 Cir. 1987).

The movant next asserts that the government provided perjurious testimony to the grand jury. (Cv-DE#35:34). He does not identify exactly what testimony was perjurious. This bare and conclusory allegation is subject to summary dismissal. Machibroda v. United States, 368 U.S. 487 (1962).

Regarding the movant's assertion that the government failed to disclose exculpatory evidence as to government informants Gato, Horacio Moreno, and Elizabeth Garcia (Cv-DE#1:8), in violation of Brady and Giglio, the claim warrants no relief. In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court established three criteria a criminal defendant must prove in order to establish a violation of due process resulting from the prosecution's withholding of evidence. Specifically, the defendant alleging a Brady violation must demonstrate (1) that the prosecution suppressed evidence, (2) that the evidence suppressed was favorable to the defendant or exculpatory, and (3) that the evidence suppressed was material. United States v. Severdija, 790 F.2d 1556, 1558 (11th Cir. 1986). Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Stewart, 820 F.2d 370, 374 (11th Cir. 1987), quoting, United States v. Bagley, 473 U.S. 667, 682 (1985).

In this collateral proceeding, the movant has failed to establish any of the prongs necessary to establish a <u>Brady</u> violation.

Even if we accept the movant's allegation as true that the government withheld certain facts and/or exculpatory evidence, the movant still is not entitled to relief as he cannot satisfy the remaining prongs of a <u>Brady</u> violation given the more than sufficient, independent evidence adduced at trial to support the convictions.

In fact, the evidence at trial reveals that Andrew Diaz testified on direct regarding the civil forfeiture case and the fact that the movant and he "hatched" a scheme wherein Diaz would provide an affidavit claiming the monies seized, that were the subject of a civil forfeiture proceeding in the Florida state courts, were derived from Diaz' sale of jewelry. (Cr-DE#266:25-31). Later, Diaz recalled meeting with the movant, at which time he agreed to retrieve monies he had earned from drugs sales from a safe. (<u>Id</u>.:45-51,64). Diaz explained that after the money was seized from the movant, he later met with the movant, at which time the movant indicated he was going to retrieve the funds, but needed Diaz to sign an affidavit for him. (<u>Id</u>:62-64). The movant explained, he was going to represent that the monies were for payment for attorney's fees arising from the movant's representation of Rudy Diaz back in 2001. (<u>Id</u>.:64). According to Diaz, however, that was not the truth, as in fact, the monies belonged to Diaz and was profit from drug sales. (<u>Id</u>.). Although not comfortable with signing such an affidavit, Diaz did so because the movant assured him it was the right thing to do under the circumstances. (<u>Id</u>.:64-66).

Review of defense's cross-examination of Diaz reveals that he

was aware of and effectively cross-examined the witness regarding the nature of the monies and Diaz' representation regarding the affidavit he executed at the movant's direction in order to retrieve those funds. (Id.:149-152). In fact, Diaz acknowledged that he agreed to pay the movant for his representation of Rudy approximately $250,000.00 plus costs. (Id.:159-162). Moreover, counsel was able to effectively cross-examine Andrew Diaz' motive for testifying, including the benefits he expected to receive therefrom. In fact, Rodolfo Diaz ("Rudy"), Andrew's brother, testified that he was extremely upset that the movant had asked Andrew to sign a false affidavit, especially given the fact that his brother reported earning less than $20,000 a year. (Id.:150). Rodolfo was concerned that the movant was trying to inculpate them, while exculpating himself. (Id.).

Shortly thereafter, Rudy recalled meeting with the movant, during which a heated discussion ensued, at which time the movant advised there was no problem because he was going to retrieve the seized funds by claiming, through the civil forfeiture proceeding, that the monies represented payment of outstanding attorney's fees. (Id.:151). At that point, Rudy cautioned the movant that if things "blew up" he, Rodolfo, was not going to take the fall for the movant's actions. (Id.). According to Rudy, the money the movant retrieved from the safe, was proceeds from his brother's drug sales, not monies retrieved for payment of any alleged outstanding attorney's fees arising from the movant's prior representation of him. (Id.:151-52).

It is evident that no Brady violation has occurred. Even if it had occurred as alleged by the movant, no showing has been made here that it would have affected the outcome of the trial. Likewise, there has been no showing made that the government

suborned perjury. See United States v. Garate-Vergara,[20] 942 F.2d 1543, 1550 (11th Cir. 1991)(citing United States v. Rick, 817 F.2d 692, 695-96 (11th Cir. 1987)). Review of the record reveals that the government did not rely on grand jury testimony to seek the movant's convictions. A conviction beyond a reasonable doubt without the use of the alleged misconduct at trial makes it highly improbable that the grand jury indictment was based on insufficient probable cause. Id. Regardless, even if testimony before the grand jury were false, it does not automatically require dismissal of the indictment. See Id. (quoting United States v. DiBernardo, 775 F.2d 1470, 1475 (11th Cir. 1985)). Here, there existed ample evidence upon which a jury could base the movant's convictions. See e.g., United States v. Starrett, 55 F.3d 1525, 1554 (11th Cir. 1995).

Additionally, in order to prevail on a Giglio claim, the movant must establish that the prosecutor "knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony," and that the falsehood was material. Tompkins v. Moore, 193 F.3d 1327, 1339 (11th Cir. 1999)(quoting, United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995)). Under Giglio, "the falsehood is deemed to be material 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" Id. (quoting, United States v. Agurs, 427 U.S. 97, 103 (1976)).

The movant has failed to provide any objective evidence that the government suborned perjury. Notwithstanding, where a prosecutor knowingly uses perjured testimony, or failed to correct

---

[20]In Garate-Vergara, the Eleventh Circuit found that an agent did not commit perjury or intentional misconduct where he incorrectly testified before the grand jury from information provided to him by officers during a boarding of a vessel. Garate-Vergara, 942 F.2d at 1550.

what he subsequently learned was false testimony, the falsehood is deemed to be material "if there is any reasonable likelihood that the false testimony <u>could have</u> affected the judgment of the jury." <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976) (emphasis added); <u>accord</u>, <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972); <u>Napue v. Illinois</u>, 360 U.S. 264, 271 (1959). No such showing has been made here. Consequently, the movant cannot demonstrate prejudice stemming from counsel's alleged deficient performance in failing to pursue these nonmeritorious claims.

Under the totality of the circumstances present here, the movant has failed to establish prosecutorial misconduct. The standard for federal habeas corpus review of a claim of prosecutorial misconduct is whether the alleged actions rendered the entire trial fundamentally unfair. <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 642-45 (1974); <u>Hall v. Wainwright</u>, 733 F.2d 766, 733 (11 Cir. 1984). In assessing whether the fundamental fairness of the trial has been compromised, the totality of the circumstances are to be considered in the context of the entire trial, <u>Hance v. Zant</u>, 696 F.2d 940 (11 Cir.), <u>cert.</u> <u>denied</u>, 463 U.S. 1210 (1983); and "[s]uch a determination depends on whether there is a reason- able probability that, in the absence of the improper remarks, the outcome of the trial would have been different." <u>Williams v. Weldon</u>, 826 F.2d 1018, 1023 (11 Cir.), <u>cert. denied</u>, 485 U.S. 964 (1988). Moreover, none of the errors complained of either individually or cumulatively had a substantial and injurious effect or influence in determining the jury's verdict. <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993). Consequently, no prejudice has been established arising from counsel's failure to pursue this claim.

The movant next claims counsel should also have filed the

following motion(s): (1) for bill of particulars (Cr-DE#344), (2) to suppress post-arrest statements, including that of the government informant, Francisco Gato, (3) for specific <u>Brady</u> material regarding Gato, Horacio Moreno, and Elizabeth Garcia, (4) to preserve and/or for in camera inspection of all Federal Detention Center ("FDC") calls for Andrew and Rudy, (5) to challenge the use and reliability of a money detecting canine to determine probable cause,[21] and (6) to recuse Judge Seitz. (<u>Id</u>.).

    <u>Bill of Particulars</u>. The movant asserts that counsel should have filed a motion for bill of particulars as to Count 4 of the Indictment. The law is clear that an indictment shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. <u>See</u> <u>Fed.R.Cr.P</u>. (7)(c)(1). Likewise, <u>Fed.R.Cr.P.</u>(7)(f) authorizes the Court to direct the government to file a bill of particulars. The grant or denial of a bill of particulars, however, rests within the sound discretion of the trial court. <u>United States v. Draine</u>, 811 F.2d 1419, 1421 (11th Cir. 1987). Regardless, the defendant bears the burden of showing that the information requested is necessary and that he will be prejudiced without it so as to justify granting a bill of particulars. <u>United States v. Barnes</u>, 158 F.3d 662, 666 (2d Cir. 1998). A mere statement that the defendant will be prejudiced without the bill is insufficient. <u>See</u> <u>Id</u>.

    The purpose of a true bill of particulars is threefold: "to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise

---

[21]Even if counsel had filed such a motion, no showing has been made that it would have been granted, nor that the outcome of the trial would have been affected given the testimonies of numerous cooperating witnesses implicating the movant in the offenses of conviction. Thus, he cannot satisfy the prejudice prong of <u>Strickland</u> and is entitled to no relief on this claim.

at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." United States v. Cole, 755 F.2d 748, 760 (11th Cir. 1985)(citations omitted). A bill of particulars, properly viewed, supplements an indictment by providing the defendant with information necessary for trial preparation. United States v. Anderson, 799 F.2d 1438, 1441 (11th Cir. 1986)(italics in original). Generalized discovery, however, is not an appropriate function of a bill of particulars and is not a proper purpose in seeking the bill. Id. at 1442; United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981). Similarly, the Eleventh Circuit has held that a bill of particulars should not "automatically [be] accorded the status of a supplement to an indictment." Anderson, 799 F.2d at 1442.

Furthermore, a defendant is not entitled to a bill of particulars "with respect to information which is already available through other sources." United States v. Martell, 906 F.2d 555, 558 (11th Cir. 1990); United States v. Rosenthal, 793 F.2d 1214, 1227 (11th Cir.), modified on other grounds, 801 F.2d 378 (11th Cir. 1986). A bill of particulars may be obtained to clarify an indictment, as long as it does not seek to determine in advance the government's proof. United States v. Johnson, 575 F.2d 1347 (5th Cir. 1978); United States v. Smith, 341 F.Supp. 687, 690 (N.D. Ga. 1972). However, the fact that an indictment conforms to the simple form suggested by the Federal Rules of Criminal Procedure, or accurately tracks the statutory or regulatory language, is no answer or defense to a motion for a bill of particulars, since Rule 7(f) presupposes a valid indictment or charge against the defendant. See United States v. Carrier, 672 F.2d 300, 303 (2d Cir. 1982)("A bill of particulars may not save an invalid indictment [.]"). Instead, it is proper for a defendant to be furnished with further information regarding the charge when it is necessary for

preparation of his defense and even though the granting of the motion requires the supplying of information "which in other circumstances would not be required because evidentiary in nature." United States v. Smith, 16 F.R.D. 372, 375 (W.D. Mo.1954); Carrier, supra ("[A bill of particulars] may provide the defendant with the evidentiary details needed to establish his defense.").

Notwithstanding, even if in providing those details in a bill of particulars, the government's evidence or theories are somehow disclosed, the bill of particulars still might be proper. United States v. Thevis, 474 F.Supp. 117, 123 (N.D.Ga. 1979); Smith, 16 F.R.D. at 375; Wright, *Federal Practice and Procedure Criminal 2d* §129. Finally, opposition to a bill of particulars is not properly made out by a claim that the defendant "'knows what he did, and, therefore, has all the information necessary.'" United States v. Moore, 57 F.R.D. 640, 643 (N.D. Ga. 1972)(quoting Smith, Id.).

Although not specified in his initial motion, in his traverse, the movant explains counsel should have requested information how the interstate or foreign commerce element was met based on the movant's actions in November 2001. (Cv-DE#35:37). According to the movant, he placed the briefcase containing Diaz' money in his trunk and then drove on a county road for less than five minutes before he was stopped by police. (Id.). First, no showing has been made that such a request would have been granted. As the record demonstrates, when counsel filed a bill of particulars as to Count 2, the court denied that request. Moreover, as previously discussed in relation to claim one above, even if such a request had been made, and assuming further it had been granted by the court, no showing has been made that disclosure of the requested information would have affected the outcome of the guilt phase portion of the trial. Regardless, review of the record reveals that the defense

was apprised with sufficient information to lodge a defense against the challenged charge. A bill of particulars was not warranted to obtain elucidation of the indictment. On the record before this court, the movant cannot establish deficient performance or prejudice arising from counsel's failure to further pursue this issue. See Strickland.

Suppression of Statements. In his traverse, the movant asserts that his post-arrest statement was obtained in violation of his Miranda v. Arizona, 384 U.S. 436 (1966) rights. (Cv-DE#35:38).

The facts as narrated by the court in its Report (Cr-DE#91) on the movant's motion to suppress physical evidence more than adequately establishes that officers had probable cause to stop and search the vehicle. Review of the suppression transcript reveals that with regard to the November 2001 stop of the movant, Detective Henry Oscar Fernandez with the Metro-Dade Police Department advised the movant of his rights, and thereafter the movant agreed to waive his constitutional rights. (Cr-DE#81:46-48). The movant then advised the detective that his attorney had been contacted, and that he wanted his vehicle released to his attorney. (Id.:48). When a money dog arrived, he alerted to the trunk area of the movant's vehicle. (Id.:49). Thereafter, the movant's vehicle was towed to police headquarters until a search warrant was had to search the vehicle. (Id.:50).

The evidence at the suppression hearing demonstrates that the movant was advised of his Miranda rights. The record further reveals that the movant understood those rights, and that he impliedly waived those rights by his subsequent conduct. See, e.g., United States v. Cardwell, 433 F.3d 378, 389-90 (4th Cir. 2005)("Because [the defendant] had been fully informed and

indicated his understanding of his <u>Miranda</u> rights, his willingness
to answer [the officer]'s question is as clear an indicia of his
implied waiver of his right to remain silent as we can imagine."
(citation omitted)). Here, there is nothing to suggest, other than
the movant's own self-serving declarations which the undersigned
finds disingenuous, that his statement to police was anything other
than knowing and voluntary.

Notwithstanding, the <u>Miranda</u> safeguards only come into play
when statements are made by a defendant in response to an
"interrogation." <u>See</u> <u>Rhode Island v. Innis</u>, 445 U.S. 291, 297-300
(1980). <u>Innis</u> defined interrogation as express questioning or words
or actions reasonably likely to elicit an incriminating response.
<u>Id</u>. at 300-01. Statements made by a defendant following a police
officer's remark that does not ask for a response does not fall
within this test. <u>Id</u>. at 302. Thus, <u>Miranda</u> is not triggered when
a defendant, after invoking his rights, make a voluntary statement
that is not responsive to questioning. <u>See</u> <u>United States v. Suggs</u>,
755 F.2d 1538, 1541-42 (11th Cir. 1985). As will be recalled, the
movant's statement that he wanted his vehicle turned over to his
attorney was not in response to direct interrogation. Regardless,
the movant has also not demonstrated that he was coerced into
making such a statement. <u>See</u> <u>Colorado v. Connelly</u>, 479 U.S. 157
(1986).

Nor is there any evidence that the movant's statement was
involuntary because there was some trickery involved in eliciting
it. The Eleventh Circuit has stated that "[i]t is clear [ ] that
the police's use of a trick alone will not render a confession
involuntary." <u>United States v. Castaneda-Castaneda</u>, 729 F.2d 1360,
1362-63 (11th Cir. 1984) (citations omitted); <u>See</u> <u>Id</u>. (holding that
defendant's waiver was voluntary, where agents told him that his

wife had already confessed when she had not). No objective evidence has been provided in this collateral proceeding to suggest that the officers used trickery or coercion to obtain the movant's statements. This is especially so where the totality of the evidence otherwise establishes that the statement was voluntarily made, free from any coercion. See Id. Because, taken as a whole, the totality of the circumstances supports the inference that the movant voluntarily waived his Miranda rights, the movant cannot satisfy the prejudice prong under Strickland arising from counsel's failure to seek suppression of the post-arrest statements.

Even if counsel had pursued the issue, there is nothing of record to suggest that the outcome of the suppression proceedings would have been different. Thus, on the record before this court, there has been no showing of prejudice stemming from counsel's failure to pursue this issue either pretrial or on appeal. The movant is therefore entitled to no relief on this basis. See Strickland v. Washington, supra.

Alternatively, if movant means to argue that the use of the statement in Detective Fernandez' application for a search warrant was unlawful, that claim also fails. Even if there was error, such error at best was harmless. See generally Arizona v. Fulminante, 499 U.S. 279, 306-12 (1991); see also, Report on Motion to Suppress (Cr-DE#91:18-19).

The movant next suggests counsel should have sought suppression of cooperating witness Gato's statements. Even if such a motion had been filed, no showing has been made here that it would have been granted. Gato testified as a witness at trial. He was cross-examined. The movant does not identify what information from Gato should have been excluded. Regardless, Gato was fully

60

cross-examined by counsel regarding his motive for testifying and the benefits he expected to receive therefrom. Thus, the movant cannot establish prejudice under Strickland and is entitled to no relief on this clam.

Brady Material. The movant next asserts that counsel erred in failing to request specific Brady information and/or to seek suppression based on a Massiah violation. (Cv-DE#35:40). He claims had counsel filed the motion as to Gato, Moreno, and Garcia, he would have been able to obtain relevant debriefing reports and then utilized them to discredit the testimonies of Garcia and Gaviria at trial concerning the wire transfers forming the basis for the conspiracy charged in Count 2. (Cv-DE#35:41-42).

A defendant's right to exclude confessions elicited by government informants in the absence of counsel, once the right to counsel has attached and been asserted, is governed by Massiah v. United States, 377 U.S. 201 (1964). In Massiah, the seminal case in this area, the Supreme Court held that the sixth amendment right to counsel applies to "extrajudicial settings" and "that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." Massiah, 377 U.S. at 206.

This case does not involve either intentional creation or knowing exploitation of an opportunity to confront the movant without his counsel. Instead, the government fortuitously received movant's statements. At trial, Gato testified regarding his conversations with the movant, who had represented him on several matters in the past. (Cr-DE#269).

61

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. Amend. VI. It guarantees criminal defendants an opportunity to impeach, through cross-examination, the testimony of witnesses for the prosecution. United States v. Baptista-Rodriguez, 17 F.3d 1354, 1366 (11th Cir. 1994). The importance of full cross-examination increases where the witness is the star government witness or participated in the crimes for which the defendant is being prosecuted. Taylor, 17 F.3d at 340. "The test for the Confrontation Clause is whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." United States v. Garcia, 13 F.3d 1464, 1469 (11th Cir. 1994).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). However, such a statement is not hearsay if it is being offered against a party and is (A) the party's own statement; (B) the party has adopted the statement; (C) a statement by a person authorized by the party to make the statement; (D) a statement by the party's agent; or (E) a statement of a coconspirator of the party that was made in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2). "When a hearsay statement, or a statement defined in [Fed.R.Evid.] 801(d)(2)(C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness." Fed.R.Evid. 806.

The record reveals that at trial, a side bar conference was had during which movant's counsel argued that permitting Gato's testimony would result in a <u>Messiah</u> violation. (Cr-DE#286:17-18). After hearing argument from the parties, the court, however, found the statements were admissible as that of a party opponent. (<u>Id</u>.:18). Here, it is evident the district court did not violate Rule 806 because it was not applicable. Rule 806 is, by its own terms, is only triggered when a hearsay statement, or a statement admitted pursuant to Rule 801(d)(2)(C), (D), or (E), has been admitted into evidence. <u>Fed.R.Evid</u>. 806; <u>United States v. Price</u>, 792 F.2d 994, 996-97 (11th Cir. 1986). No such statement admitted under one of those provisions was admitted here. Further, there was also no plain error regarding the Confrontation Clause. Even if there had been error, the movant's substantial rights were not affected.

As mentioned above, "'[H]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." <u>Fed.R.Evid</u>. 801(c). However, such a statement is not hearsay if it is being offered against a party and is, *inter alia,* the statement of a co-conspirator of the party that was made in furtherance of the conspiracy. <u>Fed.R.Evid</u>. 801(d)(2)(E). Generally, however, hearsay is not admissible. <u>Fed.R.Evid</u>. 802. Notwithstanding, there are a variety of situations in which a hearsay statement is admissible. <u>See</u> <u>Fed.R.Evid</u>. 805, 806.

The movant suggests that Gato's testimony was hearsay, not in furtherance of the alleged conspiracy charged in Count 2, to-wit, conspiracy to launder proceeds of the distribution and sale of cocaine for the purpose of avoiding a transaction reporting requirement under state or federal law, in violation of 18 U.S.C.

§1956(a)(1)(B)(ii) and (h). Here, however, the movant's statements were not hearsay because they were statements by a party [the movant] admitted by its opponent [the government]. See Fed.R.Evid. 801(d)(2)(A). It is irrelevant whether the movant's statements were in furtherance of a conspiracy, because the exception regarding statements of the party opponent need not be in furtherance of the conspiracy. See Fed.R.Evid. 801(d)(2)(C).

Moreover, Gato's testimony did not trigger a Massiah claim. The Sixth Amendment rights did not attach at the time Gato met with the movant. The law is clear that the Sixth Amendment right to counsel does not attach until a prosecution is commenced by way of formal charge, preliminary hearing, indictment, information, or arraignment. See McNeil v. Wisconsin, 501 U.S. 171, 175 (1991). At the time that Gato met with the movant, the movant had not been charged in this case. In fact, the movant was not charged until some seventeen months later. The fact that the movant had been charged the previous evening with a state-law reckless driving offense is irrelevant to the question of whether the Sixth Amendment rights had attached with respect to the money laundering offense at issue in this case. The fact that the movant was arrested on one offense does not trigger the Sixth Amendment rights for other as-of-yet uncharged offenses. McNeil v. Wisconsin, 501 U.S. 171, 175 (1991). Thus, even if counsel had filed such a motion, no showing has been made that it would have been granted. Consequently, the movant cannot establish prejudice pursuant to Strickland and is entitled to no relief on this claim.

Preservation of FDC Calls. Again, the movant does not identify what specific records counsel should have requested. Regardless, the record reveals that counsel did, in fact, file a motion to produce records from FDC regarding attorney visitation (Cr-DE#204)

64

and a motion to produce records from FDC regarding the location of inmates. (Cr-DE#205). Absent a showing of prejudice arising from counsel's failure to further pursue this issue, the movant cannot prevail on this claim. <u>Strickland</u>, <u>supra</u>.

The movant claims that calls made by Andy and Rudy Diaz would have shown they committed perjury in testifying that the government had not made them any promises regarding their sentence reductions in exchange for their testimonies. Again, even if counsel had argued as suggested by the movant here, no showing has been made that production of these records would have, as alleged, produced information that would have impeached the witnesses. Even if we assume, without deciding that it would have done so, there was still more than sufficient, independent evidence adduced at trial to support the movant's convictions. Consequently, the movant is entitled to no relief on this claim.

<u>Challenge to Canine Use</u>. The movant next claims counsel should have filed a motion to suppress on the basis that there was no probable cause to utilize the services of a money detecting canine. (Cv-DE#35:44). The movant claims counsel should have challenge the use, training, and reliability of the canine dog used to alert to the money found in the trunk of the movant's vehicle. (<u>Id</u>.:45).

In this case, the search of the movant's vehicle was based upon a warrant and the dog's alert was part of the probable cause used to obtain the warrant. Detective Fernandez' search warrant affidavit stated, in pertinent part, as follows:

> The U.S. Customs Service money detector dog Arrow alerted for the scent of money emitting from the trunk of "The Vehicle." Arrow is trained to alert on a threshold of 500 bills

regardless of denomination and has hundreds of positive alerts for currency over the last four years.

(Cr-DE#61:24-29,28).

In relation to drug detecting dogs, the law is clear that "[T]o establish [a] dog's reliability, the affidavit need only state the dog has been trained and certified to detect drugs." United States v. Sundby, 186 F.3d 873, 876 (8th Cir. 1999); United States v. Kennedy, 131 F.3d 1371, 1377 (10th Cir. 1997)("[A] search warrant based on a narcotics canine alert will be sufficient on its face if the affidavit states that the dog is trained and certified to detect narcotics."); United States v. Lingenfelter, 997 F.2d 632, 639 (9th Cir. 1993)("A canine sniff alone can supply the probable cause necessary for issuing a search warrant if the application for the warrant establishes the dog's reliability."); see also United States v. Anderson, 367 Fed.Appx. 30, 32 (11th Cir. 2010)("While a dog sniff must be sufficiently reliable in order to establish probable cause, we have held in dicta 'that training of a dog alone is sufficient proof of reliability.'"). The affidavit in this case confirms that Arrow, the money detecting canine, was trained to alert on a threshold of 500 bills. Moreover, Detective Fernandez averred that the dog had positively alerted for currency on hundreds of occasions during the last four years. (Cr-DE#61).

"[W]hile training and performance documentation would be useful in evaluating a dog's reliability," it is not necessary. United States v. Diaz, 25 F.3d 392, 396 (6th Cir. 1994)(finding that "the testimony of [the dog's handler] sufficiently established the dog's reliability."); see also United States v. Boxley, 373 F.3d 759, 761 (6th Cir. 2004) ("[I]n order to admit evidence of a dog's alert to an aroma of drugs, it is not necessary to provide the

dog's training and performance records, as it is similarly unnecessary to qualify a human expert in this way. Rather, testimony as to the dog's record is sufficient."). Thus, the lack of documentation is not, in-and-of-itself, proof that Arrow was unreliable. Consequently, on the record before this court, even if counsel had filed such a motion, no showing has been made that the motion would have been successful. Regardless, it is clear from the record that there existed more than probable cause to obtain the warrant to search the movant's vehicle, independent of the canine's alert. Thus, the movant cannot establish prejudice arising from counsel's failure to pursue this nonmeritorious claim. See Strickland, supra.

Failure to Request Immunity for Defense Witnesses. According to the movant, counsel had subpoenaed Lucinda Smith and Terry Davila to testify at trial, but both witnesses communicated their intent to invoke their Fifth Amendment privileges. (Cv-DE#1:Memo:31). Although the movant acknowledges that counsel made such a motion, which was denied by the court on the basis that it did not have the authority to do so, the movant suggests that if counsel had been better prepared, by researching the applicable law, it would have discovered the seminal case of Webb v. Texas, 409 U.S. 95 (1972) and its progeny of cases which would have established the test the court needed to apply in considering the issue. (Id.:31-32).

Webb, however, is inapplicable here. In Webb, the Supreme Court held that the court violated a defendant's due process rights by forcing the sole defense witness off the stand by giving the witness a lengthy admonition on dangers of perjury in which the court implied that it expected the witness, who had a prior criminal record and was then serving a prison sentence, to lie.

When the issue was raised by counsel here, the court denied the request finding the statements were not admissible under Fed.R.Evid. 804(b)(3). (Cr-DE#271:11). When asked to grant the parties immunity, the court denied the request, finding no authority to do so. (Cr-DE#271:13). The denial of this request was raised by the movant on direct appeal. See United States v. Elso, 2004 WL 4996856 (11th Cir. 2004)(see also Cv-DE#30:Ex.1-Movant's Brief on Appeal:27-28). The Eleventh Circuit rejected the claim without discussion, finding no reversible error. See United States v. Elso, 422 F.3d at 1308; (Cr-DE#332).

Thus, the movant has failed to demonstrate a change in circumstance sufficient to justify relitigation of the claim in the guise of an ineffective assistance of counsel claim. See Hobson v. United States, 825 F.2d 364, 366 (11th Cir. 1987)(claim raised and considered on direct appeal precludes further review of the claim in a §2255 motion), vacated on other grounds, 492 U.S. 913 (1989); United States v. Nyhuis, 211 F.3d 1340, 1343 (11th Cir. 2000); Webb v. United States, 510 F.2d 1097 (5th Cir. 1975); Belford v. United States, 975 F.2d 310, 313 (7th Cir. 1992), overruled on other grounds by Castellanos v. United States, 26 F.3d 717 (7 Cir. 1994); Graziano v. United States, 83 F.3d 587 (2d Cir. 1996)(Collateral attack on a final judgment in a criminal case is generally available under §2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in complete miscarriage of justice.).

Regardless, the law is clear that the district court have no authority to grant immunity to defense witnesses even if the witness may possess exculpatory information unavailable from other sources. See United States v. Cuthel, 903 F.2d 1381, 1384 (11th Cir.

68

1990); <u>United States v. Valera</u>, 845 F.2d 923, 931 (11th Cir. 1988); <u>United States v. Sawyer</u>, 799 F.2d 1494, 1506-07 (11th Cir. 1986); <u>United States v. Gottesman</u>, 724 F.2d 1517, 1523-24 (11th Cir. 1984); <u>United States v. Thevis</u>, 665 F.2d 616, 639 (5th Cir. 1982).

Moreover, the movant has not provided any affidavits or other objective evidence to establish that these two witnesses would have testified even if granted immunity, much less that they would have exonerated the movant. The interview reports which the movant filed as part of his motion (<u>see</u> Cr-DE#219:12-20) demonstrates that none of the information contained therein was exculpatory. The court properly concluded that this information was not exculpatory. (Cr-DE#271:11). On the record before this court, the movant has failed to demonstrate what counsel should have done further in this regard. Even if counsel had requested, as movant suggests, an evidentiary hearing on the issue prior to trial, no showing has been made that this would have resulted in the grant of immunity, nor that the witnesses would have testified. Consequently, he cannot demonstrate either deficient performance or prejudice under <u>Strickland</u> and is entitled to no relief on this claim.

<u>Motion to Recuse</u>. The movant claims counsel should have sought recusal of the district judge. It should first be noted that the movant's request for recusal of the district judge has been the subject of continued litigation both in the underlying criminal case, as well as, in this §2255 proceeding. In affirming the district court's denial of the motion for recusal on appeal in the underlying criminal case, the Eleventh Circuit found the criminal case was no longer pending when the movant filed the motion, and thus the court lacked jurisdiction to rule upon it. <u>United States v. Elso</u>, 571 F.3d 1163 (11th Cir. 2009); (Cr-DE#418).

Likewise, the movant has again sought recusal of the district court judge in this collateral proceeding, which has been recently denied by the Chief Judge in its December 2, 2010 lengthy, detailed order. (Cr-DE#46). For the reasons set forth therein, it is clear that the movant cannot establish prejudice arising from counsel's failure to seek the district court judge's recusal in the underlying criminal case. Thus, even if counsel had filed a motion to recuse, no showing has been made that the motion would have been granted. Consequently, no prejudice pursuant to Strickland has been demonstrated in this regard.

In **claim 2B**, the movant asserts that trial counsel was ineffective for failing to lodge a Batson challenge to the government's use of peremptory challenges to remove Hispanic venirepersons from the jury panel. (Cv-DE#1:8).

The Supreme Court in Batson[22] established the now-familiar three-part inquiry for evaluating whether a peremptory strike was motivated by racial or ethnic discrimination. Batson v. Kentucky, 476 U.S. at 79; United States v. Ochoa-Vasquez, 428 F.3d 1015, 1038-1039 (11th Cir. 2005). The Supreme Court also reaffirmed that standard in Johnson v. California, 545 U.S. 162 (2005), and Miller-El v. Dretke, 545 U.S. 231 (2005).

First, the district court must determine whether the party challenging the peremptory strikes has established a prima facie case of discrimination by "establishing facts sufficient to support

---

[22] In Batson, the Supreme Court reasoned that a prosecutor can ordinarily exercise peremptory challenges for any reason related to his or her view concerning the outcome of the case to be tried, but is precluded by the Equal Protection Clause from excusing jurors solely because of race or an assumption that members of that race will be unable to consider the state's case against a person of that race with impartiality.

an inference of racial discrimination." <u>Johnson</u>, 545 U.S. at 168; <u>Central Alabama Fair Housing Ctr. v. Lowder Realty Co.</u>, 236 F.3d 629, 636 (11th Cir. 2000). The Eleventh Circuit has made clear that "the establishment of a prima facie case is an absolute precondition to further inquiry into the motivation behind the challenged strike." <u>Central Alabama Housing Ctr. v. Lowder Realty Co.</u>, 236 F.3d at 636.

If the objector makes a prima facie showing, the burden then shifts at step two to the striker to articulate a race-neutral explanation for the challenged strike. <u>Johnson</u>, 545 U.S. at 168; <u>United States v. Allen-Brown</u>, 243 F.3d 1293, 1297 (11th Cir. 2001). However, the ultimate burden of persuasion "rests with, and never shifts from, the opponent of the strike. Thus, even if the [striker] produces only a frivolous or utterly nonsensical justification for its strike, the case does not end-it merely proceeds to step three." <u>Johnson</u>, 545 U.S. at 169 (quotes and cite omitted). At step three, the district court determines the persuasiveness of the justification offered by the striker and decides whether the objector has carried its burden of proving purposeful discrimination. <u>Johnson</u>, 125 S.Ct. at 2416; <u>United States v. Novaton</u>, 271 F.3d 968, 1002-03 (11th Cir. 2001).

Here, the movant has failed to establish a prima facie case of purposeful discrimination based on <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986). Counsel was not ineffective for failing to pursue this nonmeritorious claim. <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

In **claim 2C**, the movant asserts that trial counsel was ineffective for failing to call witnesses and for failing to present readily available defenses and evidence at trial. (Cv-DE#1:8-8;Memo:33-34).

71

Failure to Call Witnesses. The movant asserts counsel should have called DEA Special Agent Jane Anglestad, IRS Special Agent Jerome Lewis, Miami-Dade Police Officer Henry O. Fernandez, George Lee, and Kimberly Simms as defense witnesses at trial.[23] (Cv-DE#1:9).

First of all, no affidavits or other objective evidence has been provided to establish that these witnesses would have testified as defense witnesses, nor has he shown as to Simms, specifically, that she would have testified as proffered by the movant.[24] Such a bare and conclusory allegation, without record support, must fail. Machibroda v. United States, 368 U.S. 487 (1962).

Moreover, the movant cannot prevail on this claim as counsel's strategic decision cannot be second-guessed. It is possible that calling these witnesses would merely have corroborated the government's evidence. As to Simms, it is arguable that she may have invoked her Fifth Amendment rights, and hurt, rather than aided the defense. The law is clear that scrutiny of an attorney's performance is highly deferential, therefore, reviewing courts will not second-guess strategic decisions; rather, the attorney's performance is evaluated in light of all the circumstances as they existed at the time of the conduct, and is presumed to have been adequate. Strickland v. Washington, 466 U.S. 668, 689-90 (1984).

---

[23]It should also be noted that the movant called numerous defense witnesses to provide alibis and otherwise discredit the government witnesses. (Cr-DE#s270,271). Thus, many of the subject witnesses he claims should have been called may have arguably provided cumulative testimony to those witnesses that did, in fact, testify on the movant's behalf. For this alternative reason, the movant cannot establish prejudice arising from counsel's alleged deficient performance.

[24]To the contrary, as to Detective Fernandez, he testified extensively as a government witness at trial.

Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. Id. at 690-91. Even if in retrospect the strategy to pursue one line of defense over another appears to have been wrong, the decision will be held ineffective only if it was so patently unreasonable that no competent attorney would have chosen it. Adams v. Wainwright, 709 F.2d 1443, 1445 (11 Cir. 1983). Accordingly, tactical or strategic choices by counsel cannot support a collateral claim of ineffective assistance. United States v. Costa, 691 F.2d 1358 (11 Cir. 1982); Coco v. United States, 569 F.2d 367 (5 Cir. 1978).

Review of the record here reveals that counsel called numerous defense witnesses at trial and pursued the best defense possible under the facts of the case. The movant has thus failed to establish deficient performance or prejudice stemming from counsel's failure to call the foregoing witnesses at trial.

Failure to Present Readily Available Defenses. The movant faults counsel for pursuing the affirmative defense that the money the movant removed from Diaz' home represented attorney's fees owed to the movant. (Cv-DE#1:Memo:33). The theory presented at trial was in conformity with the version of the movant's facts and his explanation as to why he was at the Diaz residence picking up a briefcase full of cash. Even if, in hindsight, the movant believes the defense employed at trial was not effective, this does not constitute deficient performance or prejudice under Strickland. In fact, as noted by the jury's verdict as to Count 2, the jury found the object of the conspiracy to be the laundering of monies for the purpose of avoiding a legal requirement under Federal law to provide a financial report, but did not find that it involved laundering with the intent to conceal the nature, location, source,

73

ownership, or control of the proceeds. (Cr-DE#235).

Specifically, as to Counts 1 and 4, the movant asserts that counsel should have investigated and pursued a "good faith" defense to these charges. (CV-DE#1:Memo:33-34). Good faith constitutes a complete defense to the charge of conspiracy to launder money, because it negates the *mens rea* element of willfulness. See Eleventh Circuit Pattern Jury Instructions, Special Instruction No. 17, "Good Faith Reliance Upon Advice of Counsel". To raise a defense of good faith based upon reliance on counsel, the movant must show that (1) he fully disclosed all material facts to his attorney; and (2) he relied in good faith on advice given by his attorney. See United States v. Petrie, 302 F.3d 1280, 1287 (11th Cir. 2002); United States v. Johnson, 730 F.2d 683, 686 (11th Cir. 1984). The movant offers no evidence which would have enabled him to pursue such a defense that in advance of committing the charged conduct, he fully disclosed material facts to his attorney and relied in good faith on the advice given by counsel. See Id.

The movant, argues, however, that he advised counsel prior to trial that he had consulted with criminal defense attorney, Arturo V. Hernandez, Esquire, regarding "the Moreno investigation and the seizure of money on November 15, 2001." (Cv-DE#35:56). During that meeting, the movant claims Attorney Hernandez advised him that a criminal defense attorney is exempt from prosecution for accepting a bona fide attorney's fee payment for representation in a criminal case, even if the fees emanated from an illicit source. (Id.). The movant conveniently does not provide any objective evidence, including an affidavit from Attorney Hernandez, evidencing when this purported meeting occurred, nor that all material facts were disclosed to that counsel. Consequently, the movant cannot satisfy the prejudice prong of Strickland arising from counsel's failure to

74

pursue a good faith defense.

Even if we assume, without deciding, that counsel had investigated and then pursued this defense, no showing has been made that it would have been successful, resulting in an acquittal of the charges. To the contrary, on the record before this court, there was more than ample evidence to support the movant's convictions.

Next, the movant maintains counsel should have also pursued an alibi defense as to the conspiracy offense charged in Count 2. (Cv-DE#1:Memo:34). He claims that travel and passport documents would have established that the movant was outside the country during the date the money laundering transaction occurred. (Cv-DE#1:8-9). First, the movant has not provided copies of the travel and passport documents which he claims purportedly establish an alibi defense.

Nothwithstanding, at trial, the government based its evidence as to Count 2 on the testimonies of cooperating witnesses Elizabeth Garcia, Heiner Gaviria, and Francisco Gato, as well as, evidence showing the $9,800 were wire-transferred from the movant's trust account to Jairo Bethes' account,[25] and the close relationship between the movant, Garcia and others. (Cr-DE#287:159-61; Cr-DE#269:131-33). Specifically, as to Count 2, the evidence showed that the money laundering conspiracy occurred from on or about July 1999 through September 19, 2002, between the movant, Heiner Gaviria

---

[25]The evidence of the wire-transfer made by the movant in 1999 were discovered by law enforcement when they searched Moreno's office in Colombia. (Cr-DE#287:152-56; Cr-DE#288:82). Agents involved in Moreno's prosecution examined records and compared them to bank records related to the Colombian drug suppliers, discovering that the movant was one of the transferors of the drug proceeds. (Cr-DE#287:170-81; Cr-DE#288:33-37).

(Wlberth's brother), and others. It was proven that the movant's relationship with Heiner began in the early 1990's, when Heiner was represented on drug charges by the movant's law partner, Miguel Betancourt. (Cr-DE#288:60-62). During 1998 and 1999, Wlberth's common-law wife, Elizabeth Garcia, laundered cash for Heiner, by making wire transfers of drug proceeds to Colombian cocaine suppliers in a manner designed to conceal the source and nature of the funds. (Cr-DE#287:116; Cr-DE#288:64-65). At the time, Heiner was laundering money for Horacio Moreno, a Colombian drug dealer. (Cr-DE#288:60,65-66).

When Heiner found himself with increasingly larger amount of cash to launder, he sought Garcia's help,[26] and gave Garcia a 2% commission. (Cr-DE#287:116-17; Cr-DE#288:60,64-69,72). In turn, Garcia distributed the monies to various people,[27] including the movant, who assisted Garcia in laundering the monies which were wire transferred and/or deposited into legitimate bank accounts, in increments designed to avoid federal currency regulations. (Cr-DE#s287:117-20; Cr-DE#288:31). Specifically, Garcia delivered $10,000 to the movant in cash, of which the movant retained $200 as his commission, depositing $9,800 into his law office trust account, which was then wire-transferred on July 10, 1999 to an account held by Jairo Bethes, an employee of the Colombian drug suppliers. (Cr-DE#287:120-21,155-62; Cr-DE#288:31, 33-34,56). The movant also failed to file any currency reports. (Cr-DE#288:31).

---

[26]Heiner also approached the movant, asking for his help in laundering Mreno's drug proceeds. (Cr-DE#288:76-77,95). At that time, Heiner was unaware that the movant was assisting Garcia in laundering funds. (Id.). In fact, the movant agreed to assist Heiner, for a percentage of the funds, transferring $50,000 to Moreno, in increments less than $10,000. (Cr-DE#288:73-75,78,81-82).

[27]Others in the movant's law firm, including Attorney Teresita Davila, Davila's father, husband, and the secretary, Lucinda Smith, all helped launder Garcia's funds. (Cr-DE#288:25-30).

Additionally, Paul Matos, who had laundered money for both Heiner and Garcia, asked Heiner to assist him in laundering $10,000,000 in cash and $4,000,000 in travelers' checks.[28] (Cr-DE#288:99-100; Cr-DE#269:10-12). Heiner, in turn, contacted the movant, who then introduced him to Francisco Gato, to help with the foregoing money laundering. (Cr-DE#269:4-7). Discussions were had in the movant's presence between Gato and Heiner regarding the laundering of these funds. (Cr-DE#288:102-03; Cr-DE#269:11-12).

Given the evidence adduced at trial, the movant has failed to demonstrate that an alibi defense would have been successful. In other words, that pursuit of such a defense would have resulted in acquittal of some, if not all, charges against the movant. There was an abundance of evidence adduced at trial to support the movant's convictions. On the record before this court, the movant is entitled to no relief because he cannot satisfy the prejudice prong under Strickland arising from counsel's failure to pursue this defense.

Failure to Present Evidence. The movant maintains counsel should have introduced records obtained from the government which purportedly establish that the Diaz brothers utilized their family, and not the movant, to launder their drug proceeds. (Cv-DE#1:9). Additionally, he claims counsel failed to present and/or otherwise utilize a video re-enactment of the November 2001 car chase, because counsel misplaced and/or otherwise lost the tape. (Id.). He asserts this evidence, as well as, his passport entries, together with documents provided pursuant to a court order (Cr-DE#271), in conjunction with Kimberly Simms' testimony, would have established

---

[28]Gato testified that it was $40 million in cash and checks. (Cr-DE#269:10-12).

77

that the movant was outside the country at the time Elizabeth Garcia claimed she was delivering $9,800, as alleged in Count 2. (Cv-DE#1:Memo:34). As will be recalled, no objective evidence has been provided to establish that the movant was, in fact, not involved in the $9,800 wire transfer alleged in Count 2. Even if this evidence had been introduced, no showing has been made here, and the court does not find that it would have affected the guilt phase portion of the movant's trial. Likewise, no showing has been made here that Simms would have testified as proffered. Under the circumstances present here, no prejudice under Strickland has arisen from counsel's failure to introduce the foregoing evidence, nor from failing to call Simms as a witness. Thus, the movant is entitled to no relief on this claim.

In **claim 2D**, the movant asserts that trial counsel was ineffective for failing to object to: (i) the erroneous jury instructions, (ii) the excessive security measures during trial, and (iii) the court's voir dire regarding outside influences. (Cv-DE#1:9).

Erroneous Jury Instructions. First, movant claims counsel should have objected to the court's improper §1956(a)(1)(B)(i) money laundering instruction, which he asserts required that the jury find, as an essential element, that the offense had an effect on interstate or foreign commerce. (Cv-DE#1:Memo:35-35). For the reasons previously set forth in relation to claim one above, no such instruction was required. Moreover, even if one had been requested, no showing has been made that giving such an instruction would have resulted in acquittal of the charges, especially in light of the evidence supporting the movant's convictions. Thus, no prejudice under Strickland has been established.

Next, the movant claims counsel should have objected to the aiding and abetting instruction on the basis that the movant was not indicted, notified, or charged with aiding and abetting. (Cv-DE#1:Memo:35). This claim is clearly refuted by the record which reveals that the movant was charged in Count 4 with aiding and abetting, pursuant to 18 U.S.C. §2. (Cr-DE#218). Regardless, the law is clear that the government need not cite the aiding and abetting statute in the Indictment to obtain a conviction on that theory. See United States v. Griffin, 705 F.2d 434, 436 (11th Cir. 1983)(citing United States v. Munoz, 681 F.2d 1372, 1375 (11th Cir.), modified on other grounds, 692 F.2d 116 (11th Cir. 1982)). Under these circumstances, no prejudice has been demonstrated arising from counsel's failure to pursue this nonmeritorious issue. See Strickland, supra.

Finally, the movant complains counsel failed to object to the flight instruction given to the jury. (Cv-DE#1:Memo:35). This claim is belied by the record which reveals that counsel did, in fact, object to the proposed instruction during the charge conference. (Cr-DE#272:24). After hearing argument in this regard, the objection was overruled. (Cr-DE#272:25-26).

As this court has previously stated: "People, including jurors, realize that while '[t]he wicked flee when no man pursueth,' Proverbs 28:1(KJV), they really flee when law enforcement is looking for them." United States v. Kennard, 472 F.3d 851, 855 (11th Cir. 2006). Here, the movant fled shortly after he picked up money from Diaz' residence, when he realized that undercover agents were following him. The testimony of the arresting officer during direct and cross-examination only bolsters this conclusion.

The law is clear that courts generally have broad discretion in formulating jury instructions as long as the charge as a whole accurately reflects the law and the facts. United States v. Kennard, 472 F.3d 851, 854 (11th Cir. 2006); United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000). Moreover, a conviction will not be reversed on the basis of a jury charge unless the issues of law were presented inaccurately or the charge improperly guided the jury in such a substantial way as to violate due process. Id. Courts consider "whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled." United States v. Starke, 62 F.3d 1374, 1380 (11th Cir. 1995) (quotation omitted). Moreover, the Eleventh Circuit has "consistently approved the inclusion of a jury instruction on flight." United States v. Borders, 693 F.2d 1318, 1327 (11th Cir. 1982). An appropriate jury instruction on flight should correctly caution the jury that it is up to it to determine whether the evidence proves flight and what weight should be accorded to such a determination. See Id. at 1328. Additionally, "[E]vidence of flight is admissible to demonstrate consciousness of guilt and thereby guilt." United States v. Blakey, 960 F.2d 996, 1000 (11th Cir. 1992).

Here, it is evident that the court did not err in instructing the jury regarding intentional flight because the jury instruction accurately reflected the law. The jury instruction in the instant case mirrors the jury instruction on flight that was upheld in Borders, and it correctly cautioned the jurors that it was up to them to determine whether the evidence proved flight and the weight, if any, to be accorded such a determination. See Id. at 1328; (Cr-DE#220:20). Moreover, the instruction was appropriate given the facts adduced at trial. As will be recalled, shortly after the movant retrieved the drug proceeds from Diaz' home,

Detective Phillips met the movant's vehicle as it reached an intersection. (Cr-DE#264:92). Phillips, whose car was a mere 4 to 5 feet from the movant's, held his badge out of the window, made eye contact with the movant, who continued driving and ignored him. (Cr-DE#264:92-94). Another undercover vehicle, driven by Sgt. Kahn pulled up next to the movant an intersection. (Cr-DE#264:94,137-39). Rather than stop, the movant then led surveillance officers on a high-speed chase, ignoring flashing lights, running red lights, and stop signs, almost causing a collision at a major intersection. (Cr-DE#264:143-56,170-75; Cr-DE#265:16-17,82-101,139). Thereafter, the movant tried to lose the officers by driving through back streets, but he was eventually stopped not far from his office, when he got stuck in traffic, and Detective Martinez was able to drive his vehicle in front of the movant's. (Id.). When Detective Martinez approached the movant's vehicle, he had to order the movant four times out of the car, before the movant finally exited the vehicle, and only after he had made phone calls for at least a minute. (Cr-DE#265:101-02,138).

From the foregoing, it is clear that the jury instruction on flight was proper and warranted in this case. Consequently, no showing has been made in this collateral proceeding that further argument in this regard would have been successful and that the objection to the instruction sustained. Thus, the movant cannot establish prejudice pursuant to Strickland and is entitled to no relief on this claim.

Likewise, to the extent the movant means to argue that the flight evidence should have been excluded under Rule 403[29] of the

---

[29]Rule 403 of the Federal Rules of Evidence provides that the relevant evdience "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury,

Federal Rules of Evidence, because it was unfairly prejudicial, that claim likewise warrants no relief. Here, the trial court did not abuse its discretion in admitting the evidence, as the evidence was admissible and necessary to complete the story surrounding the retrieval of the drug proceeds from the Diaz residence. Thus, no prejudice under <u>Strickland</u> has been established arising from counsel's failure to pursue this alternative argument at trial.

<u>Excessive Security Measures</u>. The movant claims counsel failed to object to the excessive security measures employed after an incident was reported to the judge, which resulted in the courtroom being locked when the court was not in session. (Cv-DE#1:Memo:35).

The record reveals that during trial the government complained that when they reconvened after a lunch break, a white powder had appeared on their files and boxes which had been located in the courtroom. (Cv-DE#1:Memo:35). As a result, after hearing from the defense, the court ordered that the courtroom be locked when court was not in session. (<u>Id</u>.). This was done in order to protect the movant so that there would be no further allegations against him arising from the fact that the movant and counsel had been using the courtroom during the lunch breaks. (Cr-DE#271:97-98). At that time, the movant expressed his gratitude for the judge's concern. (<u>Id</u>.).

On the record before this court, even if counsel had lodged an

---

or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Uncharged criminal activity is admissible "if it is inextricably intertwined with the evidence of the charged offense," or "concerns the context, motive, and set-up of the crime and is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." <u>United States v. Cancelliere</u>, 69 F.3d 1116, 1124 (11th Cir. 1995). "Evidence of flight is admissible to demonstrate consciousness of guilt and thereby guilt." <u>United States v. Blakey</u>, 960 F.2d 996, 1000 (11th Cir. 1992).

objection to the closure of the courtroom during lunch, when court was not in session, no showing has been made that the objection would have been sustained. Moreover, the movant's right to a fair and public trial was not compromised in this regard. The movant has made no showing here that he was unable to confer with counsel during breaks, or was otherwise precluded from preparing and assisting his attorney throughout the trial. Thus, no prejudice under Strickland has been proven. The movant is entitled to no relief on this basis.

Court's Voir Dire Regarding Outside Influences. The movant claims counsel failed to require that the court properly inquire of the jury, on December 22, 2003, when they returned from a weekend break, whether they had read articles printed in the local papers mentioning the courtroom incident of the white powder and references to it being related to "Santeria" rituals, as well as, flyers advocating the movant's guilt. (Cv-DE#1:Memo:35).

The record reveals that jury deliberations commenced on December 17, 2003. Before the jury reconvened on Friday, December 19, 2003, the court learned that close to a thousand copies of flyers and an article from The Herald had been dispersed throughout the courthouse. (Cr-DE#275:6-10). A conference was had with the court on the issue, at which time the U.S. Marshal advised that upon being informed of that fact, a team of Deputy Marshals canvassed the area, starting at 7:30 a.m., and by 8:30 a.m., had collected all of the documents. (Cr-DE#275:6-10). Thereafter, the jury was questioned regarding whether they had seen any articles or flyers or had heard anything on the radio or television regarding the movant's case. (Cr-DE#275:26-32). Each denied seeing any of the subject flyers, nor hearing anything about the case. (Id.).

On the record before this court, even if counsel had requested that the jury be questioned daily as to outside influences, there is nothing to suggest that they were exposed to outside influences over the intervening weekend. Moreover, before excusing the jury for the weekend, the court gave them the following cautionary instruction:

> Welcome become[sic] members of the jury.
> Please have a seat....
>
> As you go home this weekend, please take good
> care of your health, get plenty of rest.
> Please remember, you cannot talk to anyone
> about the case, or let anyone talk to you
> about the case, read anything about the case,
> let anyone hear anything about the case, watch
> anything about the case. If anyone is in a
> situation that they hear either on the radio,
> television, they receive something, they read
> something, anything like that, please, tell
> them to stop and let me know immediately about
> that.

(Cr-DE#275:81).

Given the court's colloquy and foregoing instruction, there is no evidence to suggest that the jury were exposed to outside influences. Thus, the movant cannot establish prejudice arising from counsel's failure to further pursue this issue. He is therefore entitled to no relief on this claim.

In **claim 2E**, the movant asserts that trial counsel was ineffective for failing to timely file post-trial motions for judgment of acquittal, arrest of judgment, or for new trial. (Cv-DE#1:9; Cv-DE#1:Memo:36). The movant acknowledges that the motions were filed, but they were filed late, and thus not considered on

84

the merits. (Cv-DE#1:9-10;Memo:36).

The movant assertion that the claims were not considered on the merits is erroneous. While it is true that the motions were filed untimely pursuant to Fed.R.Cr.P. 29(c)(1) and 33, the court denied the motion both as untimely and alternatively on the merits, stating as follows:

> Even if the Court still had jurisdiction, however, the Court would have denied the motion. The motion merely reasserted the Defendant's position on issues that were thoroughly and previously addressed during the trial and does not articulate either new facts or law which would cause the Court to change its prior rulings.

(Cr-DE#286:1-2).

It is clear after independent review of the motion for new trial/judgment of acquittal that the court's denial on the merits was not error. Thus, even if counsel had timely filed the motion, the movant cannot demonstrate that the court would have granted the motion. Consequently, he cannot establish prejudice under Strickland and is entitled to no relief on this claim.

In **claim 2F**, the movant asserts that trial counsel was ineffective because counsel was addicted to and/or otherwise using illegal drugs during the course of movant's trial, which prevented the lodging of proper objections, effective cross-examination of witnesses, and presentation of evidence, as well as, otherwise meaningful challenges to the government's proof. (Cv-DE#1:10).

It should first be noted, however, that the movant was

85

represented by two attorneys at trial, to-wit, Melvin S. Black, Esquire and Marlene C. Montaner, Esquire. The movant's allegations of drug use pertain only as to Attorney Montaner. However, the movant concedes that Attorney Montaner only cross examined one witness, but claims she did so ineffectively. (Cv-DE#35:60). He further maintains Attorney Montaner had extensive responsibilities which "are clearly not matters of record," and during trial, was also responsible for taking notes. (Id.).

Regardless, it is the movant's burden to provide the court with specific factual details in support of his claim. Such speculative allegations are subject to summary dismissal. Machibroda v. United States, 368 U.S. 487 (1962). Notwithstanding, as previously mentioned, the movant was represented throughout the proceedings by two attorneys, and was provided more than able representation under Sixth Amendment standards. Even if we assume, without deciding, that counsel was, in fact, under the influence of drugs as alleged, the movant has not shown that he suffered prejudiced therefrom.

This is not the first instance where ineffective assistance of counsel is alleged based on a defense counsel's drug addiction. While courts have not condoned this kind of behavior from defense counsel, and, in fact, reprimanded counsel who partake in these activities, courts have ruled that a drug addicted attorney does not automatically constitute a violation of Strickland. See Kelly v. United States, 820 F.2d 1173, 1176 (11th Cir. 1987)(finding that despite counsel's drug addiction, a review of the record did not reveal that counsel was acting under a diminished capacity); Berry v. King, 765 F.2d 451, 454 (5th Cir. 1985)(noting that the fact defense counsel used drugs while representing a defendant in a capital case was not, in and of itself, relevant to an ineffective

assistance of counsel claim); <u>United States v. Walker</u>, 2000 WL 353518 (6th Cir. 2000) (finding drug addicted defense counsel did not constitute ineffective assistance *per se*)(<u>citing</u> <u>Bonin v. Calderon</u>, 59 F.3d 815, 838 (9th Cir. 1995)).

Even if the movant were to provide documented proof from the subject drug-addicted attorney that she was using drugs and would have wished to have done things differently, this alone does not necessarily amount to a violation of <u>Strickland</u>. <u>Grayson v. Thompson</u>, 257 F.3d 1194, 1222 (11th Cir. 2001)(stating counsel's own hindsight does not establish deficient performance). Here, no showing has been made that counsel was either deficient or that the movant was prejudiced therefrom. To the contrary, the record in this case, particularly the transcript of the trial, demonstrates that the movant's case was subject to a meaningful adversarial process. Consequently, the movant is entitled to no relief on this claim.

In **claim 2G**, the movant asserts that trial counsel was ineffective for failing to: (i) object to judicial fact finding during the sentencing hearing, (ii) preserve the movant's Sixth Amendment rights, and/or (iii) challenge the constitutionality of the federal sentencing guidelines as applied. (Cv-DE#1:10). In essence, the movant asserts that his sentences were enhanced based on facts that were not charged in the Indictment nor proved beyond a reasonable doubt, in violation of <u>Blakely v. Washington</u>, 524 U.S. 296 (2004), and its progeny, <u>United States v. Booker</u>, 543 U.S. 220 (2005), together with <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000). (Cv-DE#1:10;Memo:37; Cv-DE#35:61-62).

Claims of <u>Apprendi</u> error cannot be raised for the first time in a motion to vacate. The Eleventh Circuit has held that <u>Apprendi</u>

does not apply retroactively on collateral review. See, McCoy v. United States, 266 F.3d 1245 (11 Cir. 2001). The court reasoned that claims raised under Apprendi in an initial §2255 motion are not jurisdictional, but barred under the non-retroactivity standard of Teague v. Lane, 489 U.S. 288 (1989), and that if a movant fails to raise his Apprendi claims on direct appeal, he will be procedurally barred from raising them in an initial §2255 motion. Id. The Court has since held that "the effect of McCoy's holding that Apprendi is not retroactively applicable to cases on collateral review--or more accurately, that Apprendi is not applicable to cases in which the conviction had become final before that decision was released--is to bar all Apprendi claims in such cases whether or not they are meritorious." Hamm v. United States, 269 F.3d 1247 (11th Cir. 2001).

Moreover, the movant is entitled to no relief on this substantive claim because the Eleventh Circuit has held that Blakely and its progeny, Booker, **do not** apply retroactively to §2255 cases on collateral review. See, Varela v. United States, 400 F.3d 864, 867 (11th Cir. 2005); In re Anderson, __ F.3d. __, 2005 WL 123923, 2-4 (11 Cir Jan. 21, 2005)(holding that the rules in Blakely and Booker are not applicable retroactively on collateral review because the Supreme Court has not expressly declared it to be, but instead expressly extended the holding "to all cases on direct review"), citing, Schriro v. Summerlin, 542 U.S. 348, 358 (2004)(holding that Ring v. Arizona, 536 U.S. 584 (2002), an extension of Apprendi v. New Jersey, 530 U.S. 466 (2000), is not retroactive to cases on collateral review)); see also, McCoy v. United States, 266 F.3d 1245, 1259 (11th Cir. 2001).

His ineffective assistance of counsel claim is without merit as well. At the time of his sentencing, May 28, 2004, neither

Blakely nor Booker had been decided.[30] Although the precursor of those cases, Apprendi v. New Jersey, 530 U.S. 466 (2000) had been decided, at that time, the Eleventh Circuit had held that Apprendi did not apply to judge-made determinations pursuant to the Sentencing Guidelines. See, e.g., United States v. Nealy, 232 F.3d 825, 829 n. 3 (11th Cir. 2000)("The Sentencing Guidelines are not subject to the Apprendi rule."); United States v. Harris, 244 F.3d 828, 829-30 (11 Cir. 2001)(holding that Apprendi does not apply to the relevant conduct provision of the Sentencing Guidelines); see also United States v. Diaz, 248 F.3d 1065, 1105 (11th Cir. 2001)(noting that "Sentencing Guideline issues are not subject to the Apprendi rule and, thus, there is no requirement that sentencing facts be submitted to a jury and found beyond a reasonable doubt").

Additionally, the law in the Eleventh Circuit is well established that it is not ineffective assistance for an attorney to fail to foresee a change in the law. See, United States v. Ardley, 273 F.3d 991 (11th Cir. 2001)(denial of suggestion for rehearing en banc)(our circuit law completely forecloses the contention that an attorney's failure to anticipate the Apprendi decision is ineffective assistance); Spaziano v. Singletary, 36 F.3d 1028, 1039 (11th Cir. 1994)("We have held many times that '[r]easonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop.'"). Counsel was not ineffective for failing to foresee the development in the law, which was contrary to then established Eleventh Circuit precedent.

---

[30]Blakely was decided on June 24, 2004. Booker was decided on January 12, 2005.

Moreover, it should be noted that the Eleventh Circuit has repeatedly held that offense level enhancements based on a sentencing court's findings do not violate a defendant's Sixth Amendment right to a jury trial so long as the sentence remains within the maximum set by the statute of conviction. See United States v. Reese, 2004 WL 1946076 (11th Cir. 2004); United States v. Sanchez, 269 F.3d 1250 (11th Cir. 2001)(en banc); United States v. Tinoco, 304 F.3d 1088, 1101 (11th Cir. 2002)(holding that 46 U.S.C. §1903, as incorporating 21 U.S.C. §960, is not unconstitutional under Apprendi because in most sentencing scenarios "the sentence actually imposed will fall below the prescribed statutory maximum.")(quotation omitted). Thus, in cases where a "defendant's actual sentence falls within the range prescribed by the statute for the crime of conviction" there is no Apprendi constitutional error. Id. (emphasis omitted).

Consequently, an Apprendi constitutional error occurs only where a defendant is sentenced beyond the statutory maximum for the offense. Sanchez, 269 F.3d at 1268-69; Tinoco, 304 F.3d at 1101. Here, the statutory range of imprisonment as to all three convictions for violation of 18 U.S.C. §1956(h), (a)(1)(B)(i), and (a)(1)(B)(ii), was zero to 20 years in prison. The movant was sentenced to 121 months in prison, well below the statutory maximum. (Cr-DE#s306,316). No constitutional error occurred, and the movant is entitled to no relief on this claim. See Strickland v. Washington, 466 U.S. 668 (1984).

In **claim 2H**, the movant asserts that trial counsel was ineffective for failing to request a minor role reduction, a downward departure under the aiding and abetting cross-reference section, or pursuant to U.S.S.G. §5K2.0. (Cv-DE#1:10).

90

<u>Minor  Role  Reduction</u>.  The  movant  claims  counsel  was ineffective for failing to request a minor/minimal role reduction to the movant's guideline range. (Cv-DE#1:11;Memo:38-39). He claims he was the "least culpable individual" for events surrounding the money laundering activities charged in Count 2. (<u>Id</u>.).  According to  the  movant,  Heiner  Gaviria  was  the  organizer/leader,  and Elizabeth Garcia and Paul Matos were the managers/supervisors. (<u>Id</u>.). This claim is clearly refuted by the record which reveals that  counsel  did,  in  fact,  request  a  reduction  based  on  the movant's role in the offenses. (Cv-DE#s294,297).

Under the U.S. Sentencing Guidelines, a defendant may receive a  minimum  of  two  and  up  to  a  four-level  reduction  to  the  base offense  level  where  his  role  in  the  offense  can  be  described  as minor,  minimal,  or  somewhere  in  between.  <u>See</u>  U.S.S.G.  §3B1.2.  A minor  participant  is  entitled  to  a  two-level  reduction  and  is someone  who  is  "less  culpable  than  most  other  participants,  but whose  role  could  not  be  described  as  minimal."  <u>See</u>  U.S.S.G. §3B1.2(b),  comment.  (n.5).  A  minimal  participant  is  entitled  to  a four-level  reduction  and  is  someone  who  is  "plainly  among  the  least culpable  of  those  involved  in  the  conduct  of  a  group."  <u>See</u>  U.S.S.G §3B1.2(a),  comment.  (n.4).  Defendants  who  are  more  than  a  minimal participant  but  less  than  a  minor  participant  qualify  for  a three-level  reduction.  <u>See</u>  U.S.S.G.  §3B1.2.  However,  the  proponent of  the  downward  adjustment  bears  the  burden  of  establishing  his role  in  the  offense  by  a  preponderance  of  the  evidence.  <u>United States v. De Varon</u>, 175 F.3d 930, 934, 939, 946 (11th Cir. 1999)(en banc).

In  this  case,  when  the  issue  was  addressed  at  sentencing,  the court  overruled  the  objection,  finding  in  part  pertinent,  as follows:

> I did pull out *De Varon* and took a look at it
> and analyzed it as to how one applies it. But
> given the number of -- I'm just talking for
> minor role -- considering the number of
> instances in which Mr. Elso [movant] was
> involved, we are not talking one instance, we
> are not talking just two instances, and the
> period of time over which he was involved, and
> given the amount of the laundered funds which
> I am considering for the purposes of the role,
> I can't say that he meets the Guideline
> language for the minimal role, nor can I find
> that he even meets it for the minor role....

(Cr-DE#316:76).

Moreover, the court went on to explain that the movant was being held accountable only for transactions or attempted transactions in which he was personally involved or otherwise played a significant role. (Cr-DE#316:76-79).

A district court's role determination "should be informed by two principles discerned from the Guidelines: first, the defendant's role in the relevant conduct for which [he] has been held accountable at sentencing, and, second, [his] role as compared to that of other participants in [his] relevant conduct." De Varon at 940. With respect to the first principle, "the district court must assess whether the defendant is a minor or minimal participant in relation to the relevant conduct attributed to the defendant in calculating [his] base offense level." Id. at 941. With respect to the second principle, "the district court may also measure the defendant's culpability in comparison to that of other participants in the relevant conduct." Id.

Here, the court clearly considered the movant's role in the conspiracy to launder funds. The record fully supports the district

court's findings and rejection of the role reduction. Moreover, contrary to the movant's argument here, he has not demonstrated that he was any less culpable than others involved in the unlawful activities. Consequently, the movant has shown neither deficient performance nor prejudice arising from counsel's failure to further pursue this issue. He is thus entitled to no relief on this claim.

Request for Downward Departure. According to the movant, counsel should have requested a downward departure based on familial hardship, pursuant to U.S.S.G. §5K2.0, as a result of his status as a widow and father of two minor children who depended on him as the sole provider and care giver. (Cv-DE#1:11;Memo:38-39).

While this court is mindful that the movant's family faced hardships arising from the movant's arrest and conviction, this does not form a basis for vacatur of this conviction. Pursuant to U.S.S.G. §5K2.0, a sentencing court may depart downward if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." U.S.S.G. §5K2.0, quoting 18 U.S.C. §3553(b); United States v. Smith, 289 F.3d 696, 710 (11th Cir. 2002). In determining whether to grant such a departure, the district court considers two questions: (1) whether any circumstance makes the case atypical, meaning that it takes the case out of the "heartland" of cases involving the conduct described in the applicable guideline; and, (2) whether that circumstance should result in a different sentence. United States v. Regueiro, 240 F.3d 1321, 1324 (11th Cir. 2001).

In this case, no showing has been made that, had the argument been articulated at sentencing, the court would have found that the

movant's imprisonment was such that it takes this case outside the heartland of cases. Under these circumstances, the movant cannot establish deficient performance or prejudice arising from counsel's failure to pursue this issue. He is thus entitled to no relief on this claim.

If the movant means to argue that counsel was ineffective for failing to request a downward departure in his guideline range pursuant to U.S.S.G. §5H1.6 based on family ties and responsibility, that claim likewise fails on the merits. Pursuant to U.S.S.G. §5H1.6, "[F]amily ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." The movant has failed to establish his entitlement to a downward departure based on his familial ties and responsibility.[31] In rejecting this claim, the court admonished that the movant should have been more careful to follow the law. (Cr-DE#316:152). In so finding, the court noted:

> [T]o grant a downward departure now...if someone loses their soul mate and has minor children, then I should suddenly create a special category for them to not hold them accountable for their acts when there is someone to take care of the children, albeit not Mr. Elso.

(Cr-DE#316:152).

Under the circumstances present here, the movant has failed to demonstrate what further argument should have been placed before the court. Even if we were to assume, without deciding, that

---

[31]In fact, there were other family members available to take care of his minor children.

counsel was not effective in the manner in which he raised the request for reduction, no showing has been made that had he argued as suggested by the movant here, that the court would have granted the reduction. To the contrary, the record shows it would not have done so. Consequently, he cannot establish prejudice arising from counsel's failure to pursue this claim.

Downward Departure Under Aiding and Abetting Cross-Reference. The movant does not identify any factual support for this claim. Consequently, it is subject to summary dismissal. Machibroda v. United States, 368 U.S. 487 (1962).

In **claim 3A,** the movant asserts that appellate counsel was ineffective for failing to challenge the sufficiency of the evidence on appeal. (Cv-DE#1:12). According to the movant, there was insufficient evidence of a financial transaction so that the first element of the money laundering statute was not met. (Cv-DE#1:Memo:40). On the one hand, the movant concedes that there was a transfer and delivery of $266,800, but argues this did not constitute a financial transaction.

In order to convict the movant of money laundering under 18 U.S.C. §1956(a)(1)(B)(i), the government had to prove beyond a reasonable doubt that: (1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of a statutorily unlawful activity; (3) the defendant knew the proceeds were from some form of illegal activity; and (4) the defendant knew a purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the proceeds. See United States v. Miles, 290 F.3d 1341, 1355 (11th Cir.2002) (per curiam). A person "conducts" a financial transaction by "initiating, concluding, or participating in initiating, or

concluding a transaction[.]" Id. §1956(c)(2). Evidence of concealment includes "unusual secrecy surrounding the transaction" and "structuring the transaction in a way to avoid attention." Miles, 290 F.3d at 1356 (quotation marks, citation, and bracket omitted).

As previously mentioned in relation to claim one above, the evidence adduced at trial was more than sufficient to establish that the transfer on November 15, 2001 of the $266,800 in drug proceeds from Diaz' floor safe sufficiently impacted interstate and foreign commerce. Regardless, even if the issue had been raised on appeal, no showing has been made that it would have succeeded, and resulted in vacatur of his convictions. Consequently, no prejudice has been established arising from counsel's failure to assign this as error on appeal. Matire v. Wainwright, 811 F.2d 1430, 1435 (11 Cir. 1987).

He further claims Count 4 was fatally defective from its inception for the reasons previously raised in relation to claim one above. (Cv-DE#1:Memo:40). He faults appellate counsel for failing to pursue this issue on appeal. For the reasons previously expressed in relation to claim one above, the claim fails on the merits. No deficient performance or prejudice has been established arising from appellate counsel's failure to pursue this issue on appeal. Matire v. Wainwright, 811 F.2d 1430, 1435 (11 Cir. 1987).

Regarding Count 2, the movant claims the government failed to establish that he was aware that the $9,800 at issue in that charge were proceeds of the sale or distribution of unlawful drugs. (Cv-DE#1:Memo:41). As will be recalled, in Count 2 the movant was charged with violating 18 U.S.C. §1956(a)(1)(B)(ii) and §1956(h). Neither require that the government prove the proceeds were derived

96

from the sale or distribution of drugs. The government need only show that the funds in question were derived from some unlawful activity. At trial, the government provided more than sufficient evidence to support this conviction. Regardless, the government also established that the laundered funds were monies from Colombian drug suppliers and from the Diaz brothers who were known drug dealers. Therefore, even if this issue had been raised on direct appeal, it would not have succeeded. He is thus entitled to no relief on this claim because he cannot satisfy Strickland's prejudice prong. See Matire v. Wainwright, 811 F.2d 1430, 1435 (11 Cir. 1987).

To the extent the movant means to argue that his money laundering conspiracy convictions must be set aside because the government failed to prove that he conspired to launder the "profits," as opposed to the "gross receipts," of an unlawful activity as required by United States v. Santos, 553 U.S. 507 (2008), that claim likewise fails. As the Eleventh Circuit has noted in United States v. Demarest, 570 F.3d 1232, 1242 (11th Cir. 2009), cert. denied, ___ U.S. ___, 130 S.Ct. 421, 175 L.Ed.2d 272 (2009), Santos has limited precedential value, limited to a holding that the gross receipts of an unlicensed gambling operation were not "proceeds" under section 1956. Id. Like the defendant in Demarest, the movant was accused of laundering and conspiring to launder the proceeds of illegal drug trafficking. Thus, Santos is not controlling, and the government was not required to show that he laundered the profits of a criminal operation. See Demarest, 570 F.3d at 1242. Consequently, no prejudice under Strickland has been established, and the movant is thus entitled to no relief on this claim.

In **claim 3B,** the movant asserts that appellate counsel was

ineffective for failing to raise a <u>Franks</u> issue, and issues pertaining to the government's improper comment on the movant's silence, which movant claims resulted in the shifting of the burden of proof. (Cv-DE#1:12).

<u>Franks Issue</u>. The movant claims he was denied effective assistance of counsel, where his lawyer failed to file a motion to suppress evidence on the basis that the evidence seized from his vehicle was the result of an unlawful arrest, search, and seizure, based on a warrant with a supporting affidavit that contained purported perjurious statements. (Cv-DE#1:Memo:41). The movant concedes the <u>Franks</u> issue was raised by counsel in a motion to suppress, and a hearing was had thereon. (<u>Id</u>.:42). He maintains, however, that after a Report was issued, "material misrepresentations were belatedly discovered because of the government's dilatory tactics in withholding canine Arrow's certification records." (<u>Id</u>.). The movant claims Arrow was not certified to detect large amount of currency. (<u>Id</u>.).

It should first be noted that a presumption of validity attaches to an affidavit supporting a search warrant application. <u>Franks</u>, 438 U.S. at 171. Under <u>Franks</u>, a defendant may attack a facially sufficient affidavit supporting a search warrant if (1) it contains statements or omissions that were deliberately false or demonstrated a reckless disregard for the truth and (2) those challenged statements or omissions are essential to the finding of probable cause. <u>United States v. Bell</u>, 2010 WL 841308 at *2 (W.D. Va. 2010); <u>Franks</u>, 438 U.S. at 171-72; <u>see also</u>, <u>United States v. Maharaj</u>, 2007 WL 2254559 at *6 (11th Cir. 1998). "'The <u>Franks</u> standard is a high one.'" <u>United States v. Nakouzi</u>, 2005 WL 3211208 at *5 (D.Conn. 2005)(<u>quoting</u> <u>Rivera v. United States</u>, 928 F.2d 592, 604 (2d Cir. 1991)). No such showing has been made here.

98

Moreover, negligent or innocent mistakes in a warrant application do not violate a defendant's Fourth Amendment rights. See Maughon v. Bibb County, 160 F.3d 658, 660 (11th Cir. 1998)(*per curiam*); Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th Cir. 1997); Franks, 438 U.S. at 171. As such, "'[i]nsignificant and immaterial misrepresentations or omissions will not invalidate a warrant.'" Maharaj, 2007 WL 2254559 at *7 (quoting United States v. Ofshe, 817 F.2d 1508, 1513 (11th Cir. 1987)). Indeed, every fact recited in an affidavit in support of an application for a search warrant does not necessarily have to be correct, but the affidavit must be truthful in the sense that it is believed or appropriately accepted by the affiant as true. Franks, 438 U.S. at 165; see also, United States v. Bradsby, 628 F.2d 901, 904 (5th Cir. 1980).

Where a defendant claims omissions of information from an affidavit violates Franks, a court must consider whether the omitted information was deliberate or reckless and intended to mislead, and whether the information the defendant claims should have been included, would have caused the issuing judge to conclude that the affidavit lacked probable cause. See Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997). "Omissions that are not reckless, but are instead negligent, ... or insignificant and immaterial, will not invalidate a warrant." United States v. Abbell, 963 F.Supp. 1178, 1995 (S.D. Fla. 1997)(quoting United States v. Reid, 69 F.3d 1109, 1114 (11th Cir. 1995), cert den'd sub. nom., Miller v. United States, [517 U.S. 1228], 116 S.Ct. 1866, 134 L.Ed.2d 964 (1996)).

Following an evidentiary hearing, a Report was entered finding that the movant had failed to establish that the affiant, Detective Fernandez, had made any deliberate false statements in the affidavit or swore to information with reckless disregard for its

truth. (Cr-DE#91). In so finding, the court recalled Detective Fernandez' testimony regarding his own personal observations and actions on the day of the movant's arrest which formed, in part, the basis of the statements in his affidavit. (Id.:91-92). Although inaccuracies were contained in that affidavit, the court found Detective Fernandez made a good faith effort to present relevant and accurate facts to support issuance of the search warrant. (Id.:92). Regarding the money alerting canine, Arrow, no showing was made below, nor is one made here, that the dog was not qualified to alert to the presence of money in the movant's car. Even if the dog were not so qualified, as noted by the court in its detailed report, there was more than sufficient evidence absent the errors and omissions suggested by the movant to find probable cause existed that the movant's vehicle contained evidence of criminal activity that would justify the issuance of the warrant. See United States v. Willis, 759 F.2d 1486, 1494 (11th Cir. 1985); see also, United States v. Gates, 462 U.S. 213 (1993).

Here, as well as, in the underlying criminal case, the movant has not made a substantial preliminary showing that Detective Fernandez knowingly and intentionally made false statements in his affidavit. Even if the court disregards those portions of the affidavit that the movant contends are erroneous, "there remains sufficient content in the warrant affidavit to support a finding of probable cause." United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009).

Thus, on the record before this court, the movant cannot prevail on this claim because he cannot show that appellate counsel was ineffective or that the movant suffered prejudice arising from counsel's failure to pursue this claim on appeal. See Matire v. Wainwright, 811 F.2d 1430, 1435 (11 Cir. 1987).

Prosecutorial Misconduct. According to the movant, the government committed prosecutorial misconduct during trial and closing argument, as set forth previously in his motion for new trial (Cr-DE#261). (Cv-DE#1:12,Memo:42-43). The movant claims that during trial and closing arguments, the government made several prejudicial and burden shifting remarks, including misstatements of the law. (Cr-DE#261:15). Specifically, he claims the government's statement, that an attorney is no different than any other person when accepting fees, denied the movant his right to a fair trial.[32] (Id.:15-16).

He next complains that the government shifted the burden of proof regarding the evidence defense counsel must address.[33] (Cr-DE#261:16). He also maintains the government improperly commented on his right to remain silent, thereby shifting the burden of

_____

[32]Specifically, the movant complains about the following statement:

...Mr. Black wants to tell you that's a fee. But when you go back to that jury room, you look in that Instruction sand you see if anywhere in those Instructions, it says that there's some excuse for a lawyer taking money which is drug money, as opposed to....

This is the law, ladies and gentlemen. Is there anything in those Instructions that says if a lawyer takes money that is dirty drug money in a financial transaction and conceals it, that it's any different than if a jeweler took it or a car dealer took it.

(Cr-273:124).

[33]Specifically, the objected to testimony is as follows:

Mr. Black is going to have an opportunity to talk to you. And I want you to listen to him...And as he's talking, ask yourself whether he's answering the evidence that shows that his client knowingly conducted a financial transaction; that his client knew that the funds were dirty; that the funds were dirty; and that his client acted with the – acted knowing that the transaction was designed to conceal or disguise the nature, source, location, ownership, and control of the funds. And if Mr. Black is talking to you about what a wonderful attorney his client is, he's not answering these questions.

(Cr-DE#273:47-48).

proof. (Id.). Additionally, he claims the government improperly altered the burden of proof from "beyond a reasonable doubt" to only requiring 25% proof of the elements of the charged offenses.[34] (Cr-DE#261:16). The movant also claims the government prejudicially referred to him as a "matchmaker of criminals,"[35] (Cr-DE#273:51), and inflamed the jury during its direct examination of Francisco Gato by eliciting from that witness that the movant's family members had verbally threatened Gato to such an extent that it was affecting his ability to testify.[36] (Cr-DE#261:17). Lastly, the movant claims his right to a fair trial was compromised when the government improperly commented on and/or otherwise elicited a comment from Heiner Gaviria during his cross-examination, regarding the movant's right to remain silent. (Cr-DE#261:18).

---

[34]In this regard, the objected to statements were as follows:

So when you go to weigh that scale, and you folks become that lady, you take 25 percent that's needed it in that scale, "the defendant knowingly conducted or caused to be conducted a financial transaction." Did that money change hands between Andrew Diaz and J.C. Elso? Sure did. You go J.C. Elso's briefcase with the money in it....

(Cr-DE#273:138-139).

In rejecting the movant's allegations as to the foregoing comment, the court properly noted that it had instructed the jury as to the government's burden and would do so again before the jury retired. (Cr-DE#273:139). At the conclusion fo the government's rebuttal argument, the court reminded the jury that the government's burden was to prove the charges beyond a reasonable doubt. (Id.:140-41).

[35]It should be noted that this was a fair comment on the evidence adduced at trial. As will be recalled, the evidence established that the movant attempted to match "El Cabezon" with the Diaz brothers to effect the importation of several thousand kilograms of cocaine. (Cr-DE#265:201-05). He also connected Gaviria with Andrew Diaz so that Gaviria could work as a local cocaine distributor for Andrew. (Id.:216-18). He further attempted and in fact did introduce Gato to Gaviria so that Gato could assist Gaviria in laundering drug proceeds for Horacio Moreno. (Cr-DE#269:10-13). As a result, Gato assisted Gaviria in laundering millions of dollars. (Id.).

[36]See Cr-DE#269:18-19.

102

The standard for federal habeas corpus review of a claim of prosecutorial misconduct is whether the alleged actions rendered the entire trial fundamentally unfair. Donnelly v. DeChristoforo, 416 U.S. 637, 642-45 (1974); Hall v. Wainwright, 733 F.2d 766, 733 (11 Cir. 1984). In assessing whether the fundamental fairness of the trial has been compromised, the totality of the circumstances are to be considered in the context of the entire trial, Hance v. Zant, 696 F.2d 940 (11 Cir.), cert. denied, 463 U.S. 1210 (1983); and "[s]uch a determination depends on whether there is a reasonable probability that, in the absence of the improper remarks, the outcome of the trial would have been different." Williams v. Weldon, 826 F.2d 1018, 1023 (11 Cir.), cert. denied, 485 U.S. 964 (1988).

The Supreme Court has held that direct comments by the prosecution on a defendant's silence violate the Fifth Amendment. Griffin v. California, 380 U.S. 609 (1965). When determining whether an impermissible comment on a defendant's right to remain silent has occurred, federal courts must consider the totality of the circumstances and evaluate whether the remark is "manifestly intended" by the prosecutor or "was of such a character" that it "would naturally and necessarily be understood by the jury" as a comment on the defendant's silence. Matire v. Wainwright, 811 F.2d 1430 (11 Cir. 1987), citing United States v. Vera, 701 F.2d 1349 (11 Cir. 1983), also citing United States v. Forrest, 620 F.2d 446, 455-56 (5 Cir. 1980); See also Baxter v. Thomas 45 F.3d 1501 (11 Cir. 1995); United States v. Beale, 921 F.2d 1412 (11 Cir. 1991).

If some other explanation for the remark is equally plausible, the Court cannot find that counsel 'manifestly intended' to comment on the defendant's failure to testify. United States v. Swindall, 971 F.2d 1531 (11th Cir.1992)(citing, Samuels v. United States, 398

F.2d 964, 968 (5 Cir. 1968)(Court declined to reverse when finding it "very possible" that the prosecutor's statement was "merely inadvertent")); United States v. Ward, 552 F.2d 1080, 1083 (5 Cir. 1977)(approving a prosecutor's remarks when they were "more likely" intended to "properly refer to the defendants' failure to produce evidence of any kind  to rebut the inference of knowledge that naturally follows from the possession of recently stolen property" than to comment on the defendants' failure to take the stand).

The prosecutor's remarks were essentially fair comment on the evidence presented in the case and the comments were in direct response to the strategy employed by the defense, which was essentially to forcefully attack the prosecution's witnesses. No Strickland prejudice arising from counsel's failure to object has been demonstrated as the outcome of the trial would not have been different, especially given the evidence adduced at trial, and the testimonies of the numerous officers and cooperating witnesses. See Donnelly v. DeChristoforo, 416 U.S. 637, 642-45 (1974); Hall v. Wainwright, 733 F.2d 766, 733 (11 Cir. 1984); United States v. Cannon, 41 F.3d 1462, 1466 (11 Cir. 1995); United States v. Cole, 755 F.2d 748, 767 (11 Cir. 1985).

Moreover, the trial court at the start of the trial and again immediately before closing argument clearly and correctly instructed the jury that what the lawyers said was not evidence in the case and should not be considered as such, and that the case must be decided only upon the evidence presented at trial. It is generally presumed that jurors follow their instructions. See, e.g., Richardson v. Marsh, 481 U.S. 200, 211 (1987).

Finally, it is apparent that the now-challenged actions of the prosecutor and statements were at worst no more than harmless

error. See Brecht v. Abrahamson, 507 U.S. 619, 623 (1993), quoting, Kotteakos v. United States, 328 U.S. 750, 776 (1946). On the record before this court, the movant suffered no prejudice from the alleged deficiency in that he was not deprived of a fundamentally fair trial as a result of the challenged actions and comments. See Harris v. Moore, 1999 WL 223167, *4 (M.D.Fla. 1999); Ford v. State, 2001 WL 1044912, *3 (Fla. 2001).

In **claim 3C and 3D,** the movant asserts that appellate counsel was ineffective for failing to assign as error the denial of the movant's motion for mistrial based on the erroneous admission of hearsay evidence, and for failing to challenge trial counsel's ineffectiveness on appeal. (Cv-DE#1:13; Cv-DE#35:65).

Failure to Challenge Motion for Mistrial Based on Hearsay. The movant claims appellate counsel should have argued on appeal that the court erred in denying his motion for mistrial. (Cv-DE#1:13:Memo:43; Cv-DE#35:65). According to the movant, trial counsel objected to admission of coconspirator statements under Fed.R.Evid. 801(d)(2)(E), but the objection was overruled. (Id.). The movant denies he was a member of any conspiracy involving John Suarez, nor did he harbor fugitives or obstruct justice. (Id.). The movant claims the judge erred in permitting Diaz to testify that Suarez made statements that the movant could assist in obtaining information to aid the Diaz brothers in obstructing justice. (Cv-DE#1:13). The movant alleges these statements were made in 1994, 1997, and 2000, outside the time frame of the money laundering conspiracy, and were not made during or in furtherance of the charged offenses. (Id.).

The record reveals that Suarez, the brother of Rudy Diaz' wife, introduced the Diaz brothers to the movant in 1994, after the

Diaz brothers lost a large shipment of cocaine. (Cr-DE#265:146-50). Suarez was present during a 1997 meeting with the Diaz brothers and the movant, shortly following the seizure of a shipment of 1000 kilograms of cocaine in Elliot Key. (Cr-DE#265:157-59). In June 1999, after seizure of $63,000 in drug proceeds from Andy Diaz ("Andy"), Suarez recommended that Andy get out of town because there was "a lot of heat" on him. (Cr-DE#265:172-73). Defense counsel objected when the government asked Diaz why he took Suarez' advice seriously. (Cr-DE#265:173). After a sidebar conference, during which the testimony was found admissible under Fed.R.Evid. 801(d)(2)(E), Andy testified that Suarez had indicated he had a source inside the DEA who could provide information regarding whether the Diaz' were under surveillance or were otherwise facing problems. (Cr-DE#265:183-86). Moreover, Andy also testified that before he delivered the $500,000 to a purported Colombian supplier, he called Suarez and asked him to confirm whether there was any surveillance on him. (Cr-DE#266:34; Cr-DE#269:112-116). After Suarez advised him everything was "cool," Andy decided to go forward with the delivery of the $500,000. (Cr-DE#266:34).

After counsel sought a mistrial, the court denied the motion, but requested corroboration that Suarez was a member of the conspiracy. (Cr-DE#266:20-21). During a break, the government provided the court with an October 17, 2001 check drawn on the movant's trust account, in the amount of $22,959, made payable to Midway Ford, bearing the notation "loan/J.S." (Cr-DE#266:72-75). Thereafter, the check was also admitted into evidence. (Cr-DE#268:113-21; Cr-DE#269:120-22).

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c).

Hearsay is inadmissible unless the statement is not hearsay as provided by Fed.R.Evid. 801(d), or falls into one of the hearsay exceptions enumerated in Rules 803, 804, and 807 of the Federal Rules of Evidence.

Under Rule 801(d)(2)(E), statements of co-conspirators made during the course and in furtherance of the conspiracy are not hearsay. For evidence to be admissible under Rule 801(d)(2)(E), the government must prove by a preponderance of the evidence the following three elements: (1) a conspiracy existed; (2) the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) the statement was made during the course and in furtherance of the conspiracy. See Bourjaily v. United States, 483 U.S. 171 (1987); United States v. Santiago, 837 F.2d 1545, 1549 (11th Cir. 1988).

In determining the admissibility of co-conspirator statements, the trial court may consider both the co-conspirator's statements and independent external evidence." United States v. Hasner, 340 F.3d 1261, 1274 (11th Cir. 2003).; See United States v. Delgado, 401 F.3d 290 (5th Cir. 2005)(involving statements admissible as statements of a co-conspirator); United States v. Hendricks, 395 F.3d 173 (3rd Cir. 2005)(involving, inter alia, co-conspirator statements); United States v. Saget, 377 F.3d 223 (2nd Cir. 2004)(involving statements of a co-conspirator admitted as statements against interest); United States v. Reyes, 362 F.3d 536 (8th Cir. 2004)(involving statements admissible as statements of a co-conspirator).

Here, the statements were admissible to show that they were provided in furtherance of not only the money laundering activity, but also a second conspiracy, that involved obstruction of justice.

107

Whether this second conspiracy was charged in the Indictment is irrelevant. <u>See</u> <u>United States v. Magluta</u>, 418 F.3d 1166, 1179 n.5 (11th Cir. 2005)(<u>citing</u> <u>United States v. Salisbury</u>, 662 F.2d 738, 740 (11th Cir. 1981)("Statements of a coconspirator may be introduced into evidence even though the government has not charged [the coconspirator] with conspiracy as long as the existence of the conspiracy has been properly established."). It is evident that the now objected to evidence was properly admitted at trial. The evidence at trial established that the movant was accepting unreported cash proceeds from the Diaz brothers, which he laundered through his trust account to pay a debt that Andy owed to an auto dealer. (Cr-DE#265:162-63). Likewise, the movant was involved in obstructing justice by meeting with a known fugitive, Rudy Diaz, counseling Andy to flee after the $63,000 seizure, and then following his return, having him swear to a false affidavit prepared by the movant claiming that certain monies were derived from jewelry sales and not the sale of drugs. (Cr-DE#265:187-96).

On the record before this court, even if counsel had raised the foregoing arguments on direct appeal, no show has been made here that it would have affected the outcome of the proceedings, resulting in a vacatur of the movant's convictions. Thus, the movant cannot establish prejudice arising from counsel's failure to pursue this nonmeritorious claim on appeal.

Notwithstanding, even if the objected to statements were improper, given the evidence adduced at trial, it was not so prejudicial as to warrant vacatur of the movant's convictions. Moreover, even if erroneous, the movant's substantial rights were not affected. For an error to affect substantial rights, "the error must have been prejudicial: it must have affected the outcome of the district court proceedings." <u>United States v. De La Garza</u>, 516

F.3d 1266, 1269 (11th Cir. 2008) (<u>quoting</u> <u>United States v. Olano</u>, 507 U.S. 725, 734 (1993)). No such showing has been made here.

Under the circumstances present here, even absent the challenged statements, there was sufficient evidence to support the convictions. In the course of a two-week trial, the government provided evidence sufficient to link the movant to the conspiracy and to show he was laundering drug proceeds. Thus, absent a showing that the movant's substantial rights were prejudiced by the improper admission of the now challenged statements, the movant cannot prevail on this claim. Consequently, the movant cannot establish prejudice arising from counsel's failure to preserve and/or otherwise pursue this issue.

<u>Failure to Raise Ineffective Assistance of Trial Counsel</u>. It appears the movant means to argue that appellate counsel had a duty to protect and/or preserve his Sixth Amendment rights by challenging on appeal the errors and omissions complained of by the movant in this collateral proceeding arising from trial counsel's representation. It should first be noted that the Supreme Court in <u>Massaro v. United States</u>, 538 U.S. 500 (2003) reaffirmed the general rule that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice. However, the <u>Massaro</u> Court excepted ineffective-assistance-of-counsel claims from the general procedural default rule. <u>Id.</u> at 1696 (noting that a §2255 motion is preferable to direct appeal for deciding claims of ineffective assistance of counsel and that "failure to raise an ineffective-assistance- of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under §2255"). <u>See</u> <u>also</u>, <u>United States v. Lynn</u>, 365 F.3d 1225, 1234 (11th Cir. 2004).

For the reasons which are set forth in this Report, the movant is entitled to no relief on any of the claims presented. Consequently, he cannot establish prejudice under <u>Strickland</u> arising from appellate counsel's failure to pursue these nonmeritorious claims on direct appeal, and is therefore entitled to no relief.

<u>Failure to Challenge 404(b) Evidence</u>. The movant claims counsel was also ineffective for failing to challenge on appeal the admission of evidence (Cv-DE#1:13). The movant provides no factual support whatsoever for this claim, and it is thus subject to summary dismissal. <u>Machibroda v. United States</u>, 368 U.S. 487 (1962).

In the Eleventh Circuit, the standard for admission of extrinsic bad act evidence under Rule 404(b) requires a showing that the evidence 1) is relevant to an issue other than the defendant's character; 2) is established by sufficient proof to permit a jury finding that the defendant committed the extrinsic act; and 3) the probative value of the evidence must not be substantially outweighed by unfair prejudice and must meet the other requirements of Rule 403. <u>United States v. Jernigan</u>, 341 F.3d 1273, 1280 (11th Cir. 2003); <u>United States v. Cancelliere</u>, 69 F.3d 1116 (11th Cir. 1995); <u>United States v. Delgado</u>, 56 F.3d 1357, 1365 (11th Cir. 1995), <u>citing</u> <u>United States v. Beechum</u>, 582 F.2d 898 (5th Cir. 1978).

Review of the record reveals that movant's counsel filed a pretrial motion <i>in limine</i> to exclude what he characterized as Rule 404(b) evidence. (Cr-DE#103). The government argued for its admission on the theory that the evidence in question was admissible because it was inextricably intertwined to that of the

charged conduct. (Cr-DE#111). Thereafter, the court entered an
order denying the motion in part, but granting it as to some of the
challenged items. (Cr-DE#156).

It should be noted that the admission under 404(b) of some,
but not all of the evidence was challenged by the movant on direct
appeal. See Cv-DE#30:Ex.1:22-27:Mov't Brief on Appeal. The
admission was upheld by the appellate court without comment. United
States v. Elso, 422 F.3d at 1308. If movant means to argue that
counsel on appeal should have challenged admission of all the
404(b) evidence introduced at trial, the movant cannot prevail on
the claim. No showing has been made that had the issue been further
pursued that it would have resulted in vacatur of the convictions.
Consequently, he cannot satisfy the prejudice prong under
Strickland and is entitled to no relief on this claim.

In **claim 3E,** the movant asserts that appellate counsel was
ineffective for failing to challenge the improper enhancements to
the movant's guideline sentence for abuse of trust/special skills
and obstruction of justice. (Cv-DE#1:14).

Abuse of Trust/Special Skills Enhancement. The movant claims
the facts adduced at trial do not support this enhancement. Prior
to sentencing, the probation officer prepared a PSI which included
a two level enhancement to the movant's base offense level,
pursuant to U.S.S.G. §3B1.3, based on the movant's abuse of a
position of public or private trust, and his use of a special skill
in a manner that significantly facilitated the commission or
concealment of the offense. (PSI ¶62).

A defendant's offense level is increased by two levels if the
defendant abused of a position of public or private trust "in a

111

manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. §3B1.3. For the enhancement to apply, the government must show: "(1) that the defendant held a place of public or private trust; and (2) that the defendant abused that position in a way that significantly facilitated the commission or concealment of the offense." United States v. Ward, 222 F.3d 909, 911 (11th Cir. 2000). The enhancement applies only when the victim of the offense conferred the trust. United States v. Walker, 490 F.3d 1282, 1300 (11th Cir. 2007).

In this case, the court tacitly agreed with the government's position that the movant, an attorney, abused his position of trust and/or otherwise used his special skills to circumvent, frustrate, or otherwise undermine the law. (Cr-DE#316:109-110). In so finding, the court noted that the movant prepared a May 2001 fraudulent affidavit to enable Andy to claim monies fraudulently. (Id.). The movant not only used his knowledge as an attorney, but further used his trust account to launder monies for clients. (Id.). Such conduct warrants the enhancement. See United States v. Shenberg, 89 F.3d 1461, 1477-78 (11th Cir. 1996)(attorney facilitated case fixing RICO conspiracy by reviewing legal documents created to advance conspiracy to ensure that documents did not raise "red flags"); United States v. Graham, 60 F.3d 463, 468-69 (8th Cir. 1995)(attorney committed offense of making false statements in bankruptcy matter by using skills as an attorney to create fraudulent trust that removed his only asset from the bankruptcy estate); see also, United States v. Atkin, 107 F.3d 1213, 1220 (6th Cir. 1997)(finding attorney-defendant engages in both abuse of trust and use of a special skill under U.S.S.G. §3B1.1 when attorney uses his trust account to further criminal activity); United States v. Foster, 868 F.Supp. 213, 216 (E.D. Mich. 1994).

112

Under the foregoing circumstances, the movant cannot establish prejudice arising from counsel's failure to pursue this nonmeritorious claim on direct appeal. He is thus entitled to no relief on this claim.

<u>Obstruction of Justice Enhancement</u>. According to the movant, he denies having obstructed or impeded the administration of justice. The PSI reveals that a two level enhancement, pursuant to U.S.S.G. §3C1.1 was recommended, because the movant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation and prosecution of the offenses of conviction.[37] (PSI ¶63).

Section 3C1.1 of the United States Sentencing Guidelines permits a two-level enhancement for obstruction of justice if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" and "the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense." U.S.S.G. § 3C1.1. The Eleventh Circuit has explained that:

> The district court must make an independent factual finding that the defendant gave perjured testimony on a material matter in order to apply the enhancement. It is preferable that the district court make specific findings as to each instance of obstruction by identifying the materially false statements individually. It is sufficient, however, that the district court makes a general finding of obstruction of justice that

---

[37]The movant also asserts that the district court should not have imposed this enhancement, because the jury did not determine whether his statements hindered the prosecution. For the reasons previously expressed in this Report in relation to the movant's <u>Booker</u> argument, this claim is without merit.

encompasses all of the factual predicates of perjury.

See United States v. Vallejo, 297 F.3d 1154, 1168 (11th Cir. 2002) (internal quotations and citations omitted). Statements are "material" when, "if believed, [they] would tend to influence or affect the issue under determination." U.S.S.G. §3C1.1, comment. (n.6). The commentary to §3C1.1 explains that "[t]his provision is not intended to punish a defendant for the exercise of a constitutional right." U.S.S.G. §3C1.1, comment. (n.2). Where a defendant denies his guilt under oath in a manner that constitutes perjury, however, the enhancement is appropriate. Id. The Supreme Court has held that a defendant commits perjury where he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993).

In determining that the §3C1.1 enhancement applied, the district court made an independent factual finding that the movant gave perjured testimony. Specifically, the court found as follows:

> The Court has had an opportunity to consider the issue on the obstruction of justice, and I will apply the obstruction of justice two-level enhancement, for the following reasons:
>
> > Although the perjury statements, they in and of themselves I would not apply the enhancement based upon the Eleventh Circuit case law, which even though it was in front of a judge, there was a difference of two versions, and the particular statements, although made in a suppression hearing where the whole purpose of it is to suppress the $266,000 which is the heart of it, so there is

a grounds or an argument for an obstruction or impediment of the prosecution of the case.

In analyzing the other case law, the particular statements in and of themselves I would not apply the willful obstruction of justice. It is another thing, though, with the affidavit. That affidavit obviously is not something which is simply said. People misspeak, even under oath; people can be confused when they are testifying. But the preparation of an affidavit, particularly by a lawyer, that is a bald-face lie, that is submitted in court, and that does have only the purpose of obstructing the prosecution, I can't ignore. And, so, based upon the statements in the affidavit, I would cite to the particular paragraph, the paragraph that says that this attorney's fees and it belongs to me, I can't ignore that. So, therefore I will apply the two-level enhancement.

(Cr-DE#316:101-102).

The forgoing finding was not error. See Vallejo, 297 F.3d at 1168. Review of the record reveals that the movant was given the two level enhancement based on the movant's submission of a false affidavit which he filed in state court. In that affidavit, it was claimed that the $266,800 seized from the movant's vehicle constituted legitimate attorney's fees. This representation alone was more than sufficient to warrant the enhancement. Thus, even if counsel had further pursued this issue on appeal, no showing has been made that it would have succeeded. Consequently, he cannot establish prejudice arising from counsel's failure to challenge the enhancement on appeal. See Matire v. Wainwright, 811 F.2d 1430, 1435 (11 Cir. 1987).

In **claim 3F,** the movant asserts that appellate counsel was ineffective for committing error during oral argument by conceding

115

movant's defense. (Cv-DE#1:14). The movant claims counsel should never have conceded during oral argument before the Eleventh Circuit Court of Appeals that the concealment prong of the money laundering statute would be violated even if the drug monies involved in the transaction represented payment for attorney's fees. (Cv-DE#1:15). The movant maintains the government was required to prove as to the concealment prong, for violation of 18 U.S.C. §1956, that the monies the movant retrieved were not "bona fide attorney's fees." (Cv-DE#1:Memo:45-46). However, the concession was not error. As correctly noted by the Eleventh Circuit on direct appeal:

> In order to convict Elso under §1956(a)(1)(B)(i), the government had to prove, among other things, that Elso knowingly intended to engage in a "transaction [that was] designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." **As Elso conceded at oral argument, this provision would be violated even if the drug money involved in the "transaction" was an attorney's fee, as long as the government proved all the elements of § 1956, including the requirement that the defendant knew that the transaction was designed to conceal the nature, location, source, ownership, or control of those funds.** It is true that §1957 exempts the receipt of certain attorney's fees from the conduct criminalized in § 1957. However, it does not follow that this exemption carries over into §1956. The issue of whether the money involved in this transaction was for an attorney's fee is not relevant to the question of whether Elso had the requisite knowledge and intent to support a conviction under §1956 because even if the transaction involved attorney's fees, it cannot defeat a conviction for §1956 if he knew and intended that the transaction was designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

United States v. Elso, 422 F.3d 1305, 1309 (11th Cir. 2005)

116

(emphasis added); (Cr-DE#332).

It is evident that counsel was not deficient nor was the movant prejudiced from counsel's concession. As has been discussed repeatedly in this case, the evidence at trial established that the movant lied in an affidavit claiming the funds were for bona fide attorney's fees. Regardless, as correctly noted by the Eleventh Circuit on direct appeal:

> ...[w]hether the money involved in the transaction was for an attorney's fee is not relevant to the question of whether Elso had the requisite knowledge and intent to support a conviction under §1956 because even if the transaction involved attorney's fees, it cannot defeat a conviction for §1956 if he knew and intended that the transaction was designed to disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

United States v. Elso, 422 F.3d 1305, 1310 (11th Cir. 2005); (Cr-DE#332).

On the record before this court, the movant cannot establish either deficient performance or prejudice arising from counsel's concession during oral argument. In fact, he cannot demonstrate that but for the concession, the result of the proceeding would have been different. Consequently, he is entitled to no relief on this claim.

In **claim 4A**, the movant asserts that his due process rights were violated when the government engaged in prosecutorial misconduct before the grand jury, and again by targeting the movant for selective prosecution. (Cv-DE#1:16).

117

Prosecutorial Misconduct Before Grand Jury. The arguments raised herein are a mere reiteration of arguments previously raised in relation to claims one and two above, and should be denied for the reasons expressed therein.

Notwithstanding, the claim is addressed briefly because the movant is entitled to no relief thereon. It appears the movant is again complaining that the government circumvented the law, presented perjurious testimony before the grand jury, and failed to present exculpatory evidence or testimony to the grand jury. (Cv-DE#1:Memo:45-47). His complaints generate from the fact that he had a bona fide belief that the $266,800 he was retrieving from the Diaz residence was for payment of outstanding attorney's fees. (Id.). As noted previously, the movant's belief regarding the monies was irrelevant for purposes of the grand jury and whether the government had sufficient proof of his guilt for violating §1956. See United States v. Elso, 422 F.3d 1305, 1310 (11th Cir. 2005)(issue of whether money involved was for an attorney's fee owed is not relevant to whether movant had the requisite knowledge and intent to support conviction under §1956). Additionally, as discussed previously, the government was under no obligation to present exculpatory evidence to the grand jury. See United States v. Williams, 504 U.S. 36 (1996). Likewise, his argument regarding the presentation of hearsay testimony also fails. See Costello v. United States, 350 U.S. 359, 362 (1956)(grand jury may indict solely on hearsay evidence).

Selective Prosecution. The movant appears to argue that he was the subject of selective and/or vindictive prosecution. (Cv-DE#1:16;Memo:47). According to the movant, the government deliberately charged him with violation of §1956 rather than §1957.

The decision whether to prosecute for an offense is vested solely in the discretion of the government. Wayte v. United States, 470 U.S. 598 (1985). A defendant arguing selective prosecution carries a heavy burden. United States v. Ramirez, 765 F.2d 438 (5 Cir. 1985), cert. denied, 474 U.S. 1063 (1986); United States v. Jennings, 991 F.2d 725, 730 (11th Cir. 1993). In order to demonstrate selective prosecution, the defendant must show 1) that he was singled out for prosecution although others similarly situated who committed the same acts were not prosecuted and 2) that the selective prosecution was based on race, religion, or other arbitrary or invidious classification. Wayte at 608; Jones v. White, 992 F.2d 1548, 1571 (11th Cir. 1993); United States v. Petit, 841 F.2d 1546, 1554 (11 Cir. 1988); United States v. Collins, 972 F.2d 1385, 1397 (5 Cir. 1992). A showing of discriminatory purpose requires the defendant to prove that the government selected a particular course of action because of and not merely in spite of its adverse effects on an identifiable group. Id.

The movant has failed to demonstrate that he is a victim of selective prosecution or that his constitutional rights were violated arising from the government's prosecution. As previously narrated in this Report, the evidence adduced at trial does not demonstrate that the movant was the subject of selective prosecution. Absent a showing that he was selected for prosecution or that his prosecution was racially based, the movant cannot establish prejudice pursuant to Strickland arising from counsel's failure to pursue this issue. He is thus entitled to no relief on this claim.

In **claim 4B**, the movant asserts that his due process rights were violated when the government suborned perjury of its witnesses, Elizabeth Garcia, Francisco Gato, and Detective Henry O.

119

Fernandez at the suppression hearing and at trial. (Cv-DE#1:17;Memo:50). The movant claims the government was advised by cooperating witness, Rudy Diaz, that Det. Fernandez lied in his affidavit when he said he witnessed the movant enter the Diaz residence empty-handed. (Id.). He further claims Elizabeth Garcia also testified falsely. (Id.). The movant asserts cooperating witness, Horacio Moreno, informed the government that the movant was not involved in any money laundering activities as alleged in Count 2. (Id.:52).

Additionally, the movant maintains that during an immunity debriefing of Davila, a former employee of the movant, the government learned that Davila handled numerous commercial and real estate matters for Garcia, and that none of the funds involved therein were derived from unlawful drug proceeds. (Id.). Likewise, the movant claims that during Smith's immunized testimony of August 12, 2003, she stated she received a total of $15,000 which she deposited into the law firm's trust account and her personal account, which she then transferred as directed by Garcia. (Id.). Finally, the movant claims Francisco Gato also testified falsely, and that the government was aware of this fact, because his testimony directly contradicted debriefing reports relating to Gato which indicated that Gato had stated that the movant was not involved in any illicit activities. (Id.:53).

As noted correctly by the court in its Report following the suppression hearing (Cr-DE#91), whether Det. Fernandez observed the movant empty handed as he entered the residence to collect the $266,800, is not critical to or dispositive of whether the movant violated federal laws. To the contrary, given the evidence adduced at the suppression hearing and at trial, it was more than sufficiently established that the movant retrieved the monies from

the Diaz home, then attempted to flee once he observed that he was being followed by agents. Moreover, any inconsistencies in Det. Fernandez' affidavit as it relates to his testimonies did not render the proceedings fundamentally unfair.

Moreover, there is nothing to suggest that Elizabeth Garcia's testimony was perjurious. Garcia testified regarding her association with Wlbert Garcia and the movant, including the laundering of $6,442 in drug monies through the movant's trust account so that Garcia could pay delinquent taxes, and the laundering of $9,800 in drug monies through the movant's trust account which was ultimately transferred to Jairo Bethes' account at Gulf Bank. <u>See</u> Cr-DE#287:96-149. The movant does not provide any evidence that this testimony was perjurious.[38] Even if it were, he has not provided any objective evidence demonstrating that the government suborned such testimony. No due process violation has been demonstrated in this regard.

Finally, the movant claims information provided by Lucinda Smith and Teresita Davila to law enforcement also contradicted Garcia's testimony. However, review of the record reveals that counsel had these documents as early on as December 2003, prior to the commencement of trial. He sought their introduction in a motion brought pursuant to Rule 804(b)(3). (Cr-DE#219). The movant was thus able to effectively cross-examine Garcia regarding her purportedly inconsistent statements. No showing has been made that the government withheld evidence, nor that the movant's due process rights were violated. Thus, he cannot prevail on this claim.

---

[38]His argument that Hector Moreno would have rebutted or discredited Garcia is also without record support. The movant provides not documents to reflect his allegations here. Such conclusory allegation is subject to summary dismissal. <u>Machibroda</u>, <u>supra</u>.

In conclusion, the movant has failed to establish that the government knowingly suborned perjury, and much less that his due process rights were violated for any of the reasons set forth in relation to this claim. He is therefore entitled to no relief thereon.

In **claim 4C**, the movant asserts that his due process rights were violated when the government suppressed and/or withheld evidence. (Cv-DE#1:19). He claims the government suppressed information that Gato was working as a federal informant prior to movant's arrest on November 15, 2001. (Cv-DE#1:19;Memo:54-55). He maintains the government used Gato to approach the movant after his arrest in an effort to obtain illicit information. (Id.). He further states the government withheld recordings generated by Gato during the movant's representation of him in state court proceedings, and instead, had Gato testify as to those events. (Id.). According to the movant, these audio recordings were exculpatory.

It should first be noted that the movant provides no documents in this collateral proceeding to demonstrate that the government withheld such audiotapes, nor that these audiotapes in fact exist. Even if they did, the movant provides no objective evidence that they would contain exculpatory testimony. Absent such a showing, this claim is subject to summary dismissal. Machibroda v. United States, 368 U.S. 487 (1962). Moreover, Gato was subject to cross-examination regarding his motive for testifying. Thus, assuming the movant would have had this information, and further assuming it had been used at trial, no showing has been made that this would have affected the outcome of the proceedings. Thus, no due process violation has been established, and the movant is entitled to no relief on this claim.

Additionally, the movant claims the government withheld exculpatory information regarding Lucinda Smith and Teresita Davila. (Cv-DE#1:19-20;Memo:55). Specifically, he claims the government failed to disclose that these witnesses had indicated the movant was not involved in the receipt, deposit, or wire transfer of $9,800, as alleged in Count 2. (Cv-DE#1:20). Even if it is true that these reports contradict Garcia's testimony, no showing has been made that Garcia in fact committed perjury, much less that the government suborned such testimony. Likewise, as previously narrated in this Report, the movant provides no affidavit from these witnesses indicating they would have testified as proffered. Consequently, no due process violation has been established and the movant is entitled to no relief on this claim.

In **claim 4D**, the movant asserts that his due process rights were violated when the government interfered with the movant's Sixth Amendment right to compulsory process. (Cv-DE#1:20-21). The movant complains that the government prevented him from calling defense witnesses to testify on his behalf at trial. (<u>Id</u>.;Memo:55-58).

This claim was raised and summarily rejected by the Eleventh Circuit without discussion. <u>See</u> Cv-DE#30:Ex.1-Mov't Brief on appeal, <u>United States v. Elso</u>, 2004 WL 4996856, pp.25-26 (11th Cir. 2004); <u>see also</u>, <u>United States v. Elso</u>, 422 F.3d 1305, 1308 (11th Cir. 2005); (Cr-DE#332). The religition of this claim in the guise of a due process violation is barred. <u>See</u> <u>Nyhuis</u>, <u>supra</u>. Moreover, no change of circumstance has been established sufficient to warrant relitigation of the claim.

Regardless, the claim fails on the merits. The law is clear that "[N]o person ... shall be compelled in any [c]riminal [c]ase

to be a witness against himself." U.S.Const.Amend.V. "This provision ... must be accorded liberal construction in favor of the right it was intended to secure." Hoffman v. United States, 341 U.S. 479, 486 (1951). While this privilege covers testimony that would either directly "support a conviction under a federal criminal statute" or merely "furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime," it only protects the witness where he or she "has reasonable cause to apprehend danger from a direct answer." Id. "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." Id. at 487.

"[A] criminal defendant has a constitutional right to present his own witnesses to establish a defense." Unites States v. Terzado-Madruga, 897 F.2d 1099, 1108 (11th Cir. 1990)(quotation omitted). "Substantial interference with a defense witness' free and unhampered choice to testify violates due process rights of the defendant." Demps v. Wainwright, 805 F.2d 1426, 1433 (11th Cir. 1986). "When such a violation of due process rights occurs, a court must reverse the conviction without regard to prejudice to the defendant." Id. Notably, however, a witness's right not to be compelled to incriminate himself trumps a defendant's right to subpoena witnesses in his defense. See United States v. Lacouture, 495 F.2d 1237, 1240 (5th Cir. 1974)(noting that even if the defendant had subpoenaed a witness, that witness's presence "[would] not override [her] privilege against compulsory self-incrimination").

In fact, when movant attempted to call Smith as a witness,

during a sidebar conference, outside the jury's presence, Smith indicated she would exercise her Fifth Amendment privilege agianst self-incrimination. (Cr-DE#271:5-6). Likewise, Davila's counsel provided a letter indicating that Davila would also be invoking the privilege.[39] (Cr-DE#219:11).

Here, there is no objective evidence that these witnesses would have testified as proffered by the movant, even if granted immunity. On the record before this court, the movant has failed to demonstrate a violation of his due process rights. Moreover, review of the reports of Davila and Smith's interviews reveal that none of the information contained therein would have exculpated the movant. See Cr-DE#219:12-20). Thus, for this alternative reason, this claim fails.

Finally, the movant appears to argue that the government engaged in intimidation of defense witnesses Smith and Davila. He also claims in passing that the government threatened John and Miriam Suarez.[40] The movant, however, provides no affidavits from these witnesses, nor does he have any objective evidence that such occurred.

Courts have identified two categories of government "intentional distortion" that can result in a due process violation. See United States v. Angiulo, 897 F.2d 1169, 1191 (1st Cir. 1990)(citing United States v. Hooks, 848 F.2d 785, 799 (7th Cir. 1988)). The first occurs where the government intimidates or harasses a potential defense witness to discourage that person from

_____

[39]Davila was indicated under case no. 03-20909-Cr-Jordan.

[40]It should be noted, however, that these two witnesses did testify as defense witnesses at trial.

testifying, "for example, by threatening [the witness] with prosecution for perjury or other offenses." Id.; See also, United States v. Henricksen, 564 F.2d 197 (5th Cir. 1977); United States v. Hammond, 598 F.2d 1008, modified on reh'q, 605 F.2d 862 (5th Cir. 1979), abrogated on other grounds, as recognized in United States v. Combs, 555 F.3d 60, 64 n. 3 (1st Cir. 2009); United States v. Heller, 830 F.2d 150 (11th Cir. 1987). As the Angiulo Court has explained, "[W]here such intimidation tactics cause a potential witness to invoke the fifth amendment and withhold testimony that otherwise would have been available to the defendant, a court may order the prosecutor to grant immunity to the witness or face a judgment of acquittal." Id. (citations omitted). The second category of "intentional distortion" includes cases where the government misuses its power to authorize immunity in order to manipulate the evidence presented to the jury and render certain exculpatory witnesses unavailable to the defense. Id. In this case, neither category has been established, and the movant's self-serving declarations to the contrary, without objective evidence to support the claims, must fail.

The facts in the instant case do not approach those present where the Eleventh Circuit and other courts have found prosecutorial intimidation. Rather, the law is well established that the government is permitted to inform a potential witness or his/her attorney that the client could be subject to prosecution if she/he testifies untruthfully. See United States v. Nunn, 525 F.2d 958, 960 & n.3 (5th Cir. 1976); United States v. Gloria, 494 F.2d 477, 484 (5th Cir. 1974); Griffin v. Weinberger, 492 F.2d 969, 970 (5th Cir. 1974)). Here, no showing has been made, other than by the movant's self-serving allegations, that the government either intimidated or harassed any witnesses.

126

Regardless, the court finds that the government did not engage in improper activity or prosecutorial misconduct. While no court should ever tolerate governmental intimidation of witnesses or unfair interference with a defendant's right to put on a defense, courts must be equally vigilant not to penalize legitimate and appropriate indications to a witness that the government fairly entertains a real possibility of charging that witness with criminal activity regarding the subject matter of the witness's expected testimony. Witness intimidation serves no legitimate purpose and plainly violates the defendant's due process rights, but the government's good-faith, reasonably based notice to a witness, that it considers that witness to be a prosecution target, actually protects the rights of the witness and ensures that the witness has actively considered whether to waive the Fifth Amendment privilege of avoiding self-incrimination. Under the totality of the circumstances present here, the movant has not demonstrated unlawful government interference. This claim thus fails on the merits, and the movant is entitled to no relief.

In **claim 4E,** the movant asserts that his due process rights were violated when the government constructively amended the Indictment. (Cv-DE#1:21-22;Memo:58-60). According to the movant, the government's proof at trial only established that he used his capacity as an attorney to falsely claim the $266,800 he removed from the Diaz home safe as payment for attorney's fees, knowing that this was not true, thereby concealing the true nature, source, and ownership of the monies. (Cv-DE#1:22). However, the movant claims that Diaz' testimony constructively amended the Indictment by demonstrating that the movant concealed the monies by placing it in the trunk of his car. (Id.).

The accused has a constitutional right to a notice of the case

127

the prosecution will present at trial.  <u>Kotteakos v. United States</u>, 328 U.S. 750 (1946).  The Eleventh Circuit has established a two step inquiry when considering allegations of variance between indictments and proof at trial: (1) the Court must first determine whether material variance did indeed occur, and, if so, (2) whether the defendant suffered substantial prejudice as a result of the variance.  <u>United States v. Prince</u>, 883 F.2d 953, 959 (11 Cir. 1989); <u>See also</u>: <u>United States v. Reed</u>, 980 F.2d 1568, 1581 (11 Cir. 1993).  To establish such prejudice, the defendant must show that "the proof at trial differ[s] so greatly from the charges in the indictment that the defendant was unfairly surprised and had an inadequate opportunity to prepare a defense.  <u>United States v. Caporale</u>, 806 F.2d 1487, 1500 (11 Cir. 1986).

A "constructive amendment" or "fatal variance" to an Indictment occurs when the government, through its presentation of evidence or its argument, or the district court, through its instructions to the jury, broadens the possible bases for conviction beyond that contained in the Indictment.  <u>United States v. Castro</u>, 89 F.3d 1443, 1452-1453 (11 Cir. 1996); <u>see e.g.</u>, <u>United States v. Williams</u>, 527 F.3d 1235, 1246-47 (11th Cir. 2008); <u>United States v. Tampas</u>, 493 F.3d 1291, 1301 (11th Cir. 2007). "[N]ot all differences between an indictment and the proof offered at trial, rise to the 'fatal' level of a constructive amendment." <u>United States v. Randall</u>, 171 F.3d 195, 203 (1999).

A legally significant variance occurs when the evidence proves facts which are materially different from those alleged in the indictment. <u>United States v. Ramos-Osequera</u>, 120 F.3d 1028 (9 Cir. 1997). The Court must determine whether the movant was convicted of an offense not charged in the Indictment.  <u>United States v. Behety</u>, 32 F.3d 503 (11 Cir. 1994); <u>United States v. Artrip</u>, 942 F.2d 1568,

1570 (11 Cir. 1991). A variance between what is alleged in the charging document and the proof at trial is immaterial where there is no prejudice to the defendant. <u>Isom v. State</u>, 387 So.2d 529 (Fla. 3 DCA 1980).

In this case, Count 1 specifically charged, in pertinent part, that the movant and Andrew Diaz did knowingly and intentionally conspire with each other and with others known and unknown "to conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, that is, the delivery and transfer of monetary instruments which were the proceeds of a specified unlawful activity, that is, the distribution and sale of controlled substances...knowing that the transaction was designed in whole and in part, to conceal and disguise, the nature, location, source, ownership and control of the proceeds...." (Cr-DE#2:1-2). Count 4 also charged the movant and Andrew Diaz with knowingly and intentionally conducting a financial transaction, "that is, the delivery and transfer of $266,800 in United States currency, which were the proceeds of a specified unlawful activity, that is, the distribution and sale of cocaine...knowing that the transaction was designed in whole and in part, to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activity..." (Cr-DE#2:5).

The movant's arguments as to the government's proof at trial is erroneous. As will be recalled, when the movant removed the $266,800 from the Diaz safe, he acted with the intent to conceal and disguise the "nature" and "source," as well as, the "ownership" and "control" of the funds. Likewise as to Count 1, the movant used his position as an attorney to draft a false affidavit for Andy Diaz to execute in order to attempt to recover $63,000 in drug proceeds that had been seized in 1999. He also advised Diaz and

129

others not to worry that he would be able to remove the $266,800 from the Diaz home because law enforcement would not stop him due to his status as an attorney. Moreover, the movant also lied when he indicated in an affidavit that the subject funds were for payment of attorney's fees owed. Review of the record confirms that the facts adduced at trial do not differ from those charged in the indictment. Thus, no showing has been made that the movant was convicted of uncharged conduct as it relates to the offenses of conviction, nor has he established a constructive amendment or variance in this case. Under these circumstances, no due process violation has occurred. Therefore, the movant is entitled to no relief on the claim.

In **claim 4F**, the movant asserts that his due process rights were violated when the court's bias and partiality affected the integrity of the trial. (Cv-DE#1:22; Memo:22-23). The movant wishes to incorporate by reference arguments previously made in his motion to recuse (Cr-DE#354) filed in the underlying criminal case. As previously discussed in this Report, the district judge's bias and the movant's request for recusal has been ongoing both in the underlying criminal case, as well as, in this §2255 proceeding. None have been found to be meritorious. The arguments reasserted here also fail.

Title 28 U.S.C. §455 requires a federal judge to "disqualify herimself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. §§ 455(a) & (b)(1) (2000). The purpose of §455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 874, 865 (1988). Title 28 U.S.C. §455(b)(1) provides that a judge shall recuse himself where he has a personal bias or prejudice concerning

a party. The standard for recusal under §455 is whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain significant doubt about the judge's impartiality. See United States v. Patti, 337 F.3d 1317, 1321 (11th Cir. 2003), cert. den'd, 540 U.S. 1149 (2004); see also, United States v. Kelly, 888 F.2d 732, 744-45 (11th Cir.1989); Parker v. Connor Steel Co., 855 F.2d 1510, 1524 (11th Cir. 1988).

It is well established that "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality recusal motion." Liteky v. United States, 510 U.S. 540, 556 (1994); see also, Byrne v. Nezhat, 261 F.3d 1075, 1103 (11th Cir. 2001). Likewise, judicial remarks during the court of a proceeding--even those that are "critical or disapproving of, or even hostile to, counsel, the parties or their cases" -- will not ordinarily support a bias motion. Liteky, supra at 556. In Liteky, the Supreme Court explained that "a judge's ordinary efforts at courtroom administration--even a stern and short-tempered judge's ordinary efforts at courtroom administration--remain immune." Id. An allegation of impartiality must be supported by some factual basis, and a motion for recusal cannot be based on unsupported, irrational or highly tenuous speculation. United States v. Cerceda, 188 F.3d 1291 (11th Cir. 1999). Absent a showing of bias, the movant cannot prevail on this claim. No such showing has been made here. None of the arguments previously raised in the underlying criminal case, nor in this collateral proceeding warrant recusal of the district judge. No due process violation has occurred, and the movant is entitled to no relief on this claim.

In **claim 4G**, the movant asserts that his due process rights were violated when the trial court erred in refusing to grant

severance of Count 2 which he claims was unrelated to Counts 1 and 4. (Cv-DE#1:23). According to the movant, he wanted to testify in his own defense as to the charges in Count 2, but doing so would have put him in the position of having to testify in a manner that would have established inconsistent defenses. (Cv-DE#1:23;Memo:61-63). He claims his testimony would have been at odds with the defenses theory as to Counts 1 and 4, that the $266,800 represented payment for bona fide attorney's fees earned. (Id.). Had he been able to testify as to Count 2, he avers that he would have denied any involvement in the $9,800 wire transfer, nor any knowledge of the source of those funds. He also would have denied being a member of a conspiracy. (Id.).

First, a motion requesting severance of either offenses or parties under F.R.Crim.P. 14 is a matter for the sound discretion of the trial judge. United States v. Berkowitz, 662 F.2d 1127, 1132 (5th Cir. Unit B 1981). When assessing the merits of a severance motion, the trial court must balance the possibility of prejudice to the defendant against the public interest in judicial efficiency and economy. United States v. Phillips, 664 F.2d 971, 1016 (5th Cir. Unit B 1981), cert. denied sub nom. Meinster v. United States, 457 U.S. 1136 (1982).

The general rule is that defendants who are jointly indicted should be tried together, and this rule has been held to be particularly applicable to conspiracy cases. United States v. Castillo-Valencia, 917 F.2d 494, 498 (11th Cir. 1990), cert. den'd, 499 U.S. 925 (1991), citing, United States v. Alvarez, 755 F.2d 830, 857 (11th Cir. 1985), cert. den'd, 474 U.S. 905 (1985); United States v. Sawyer, 799 F.2d 1494 (11 Cir. 1986).

In order to justify severance, it must be demonstrated that

132

the movant would suffer compelling prejudice against which the trial court was unable to afford protection, and that his trial thereby was rendered fundamentally unfair. Sawyer, supra; Smith v. Kelso, 863 F.2d 1564, 1568, n.2 (11 Cir. 1989); Johnson v. Dugger, 817 F.2d 726 (11 Cir. 1987); United States v. Magdaniel-Mora, 746 F.2d 715, 718 (11 Cir. 1984). No such showing has been made in this collateral proceeding.

To justify severance of counts based upon a claim of inconsistent defenses, a defendant must demonstrate that he has important testimony to give concerning some counts and a strong need to refrain from testifying as to other. See United States v. Whitworth, 856 F.2d 1268, 1277 (9th Cir. 1988); United States v. Walser, 3 F.3d 380, 385-386 (11th Cir. 1993). No such showing has been made here. The movant merely claims he would have denied his involvement as to one count. However, as is evident from the defense at trial and from the movant's own allegations here, he has denied involvement as to all charges.

The joinder of the offenses here was proper, and severance was not warranted. Rule 8(a) allows joinder of offenses against a single defendant that "are of the same or similar character," even if such offenses do not arise out of the same series of acts or transactions. United States v. Kopituk, 690 F.2d 1289, 1312 (11th Cir. 1982), cert. denied, 463 U.S. 1209 (1983). Rule 8(a) is not limited to crimes of the "same" character but also covers those of "similar" character, which means "[n]early corresponding; resembling in many respects; somewhat alike; having a general likeness." United States v. Werner, 620 F.2d 922, 926 (2d Cir. 1980)(quoting Webster's New International Dictionary (2d ed.)).

Here, the offenses charged in the Indictment are similar in

that they relate to fraudulent activity designed to conceal proceeds from unlawful drug sales or distribution. In sum, the charges alleged in the Indictment are sufficiently related to the movant's scheme. Moreover, on the record before this court, no showing has been made that severance would have been granted on the arguments proffered here by the movant. In passing, it is noted that counsel attempted on more than one occasion to sever the counts, albeit on a different legal basis, but each attempt was denied by the court. Thus, it is clear that no due process violation has occurred arising from denial of the movant's request for severance of charges.

In **claim 4H**, the movant asserts that his due process rights were violated when the movant's right to a public trial was abridged by the court, who prohibited the movant's children from attending closing arguments. (Cv-DE#1:23). At trial, the court explained that it was difficult to impose on the movant's children, then ages 9 and 12, to sit for four hours, and it would be very disruptive to have them coming in and out of the courtroom. (Cr-DE#273:9-13). The court indicated she was "very empathetic to your [the movant's] family and the emotional impact this [the trial] was having," but explained that it was standard practice not to have children in the courtroom, and did not want to get into a situation where the court created any issues of sympathy or prejudice. (Id.).

The movant complains, however, that this exclusion violated his right to a public trial pursuant to Waller v. Georgia, 467 U.S. 39 (1984).[41] However, a "partial closing of court proceedings does

---

[41]In Waller v. Georgia, the Supreme Court addressed the breadth of a criminal defendant's rights under the sixth and fourteenth amendments to insist upon a public trial. The sixth amendment provides, inter alia, that a defendant shall enjoy "the right to a speedy and public trial." In Waller, the Court recognized that the central aim of a criminal proceeding is to try the accused

not raise the same constitutional concerns as a total closure, because an audience remains to ensure the fairness of the proceedings." <u>United States v. Valencia</u>, 2006 WL 3707867, *5 (S.D. Tex. 2006), <u>citing</u>, <u>United States v. Osborne</u>, 68 F.3d 94, 99 (5th Cir. 1995).

Even if the facts as alleged by the movant are true, the movant's right to a public trial was not violated by the court's exclusion of the two minor family members from the courtroom. <u>See</u> <u>Woods v. Kuhlmann</u>, 977 F.2d 74, 77-78 (2d Cir. 1992)(A a trial court's exclusion of a defendant's family members during testimony of a government witness did not violate the public-trial right, where family members had approached witness outside courtroom and made her apprehensive about testifying.). Thus, the movant has failed to establish any due process violations in this regard. Likewise, no showing has been made that the fairness of the proceedings was compromised due to the exclusion of two minor children. Consequently, the movant is entitled to no relief on this claim.

In **claim 4I**, the movant asserts that his due process rights were violated when the court imposed a mandatory guideline sentence and made judicial fact-finding in arriving at the ultimate sentence

---

fairly. *See* 467 U.S. at 46. The Court noted that a public trial allows the public to see for itself that the accused is fairly dealt with and not unjustly condemned. Moreover, a public trial ensures that judges, prosecutors and witnesses carry out their respective duties with a keen sense of the importance of their functions. *Id.* at 46. The <u>Waller</u> Court also recognized, however, that the right to a public trial is not absolute, and in some instances must yield to other interests, such as those essential to the administration of justice. *Id.* at 45. To ensure that the proper balance of interests is struck, the Court adopted the following requirements: 1) a party seeking to close a court proceeding must advance an overriding interest that is likely to be prejudiced; 2) the closure must be no broader than necessary to protect that interest; 3) the trial court must consider reasonable alternatives to closing the proceeding; and 4) it must make findings adequate to support the closure. *Id.* at 48.

imposed. (Cv-DE#1:24;Memo:64). This is a mere reiteration of the arguments raised previously in this report, and should be denied for the reasons expressed therein.

In **claim 5,** the movant asserts that, pursuant to the Supreme Court's decision in <u>Cuellar</u>, the movant's convictions as to Counts 1 and 4 of are unlawful and subject to dismissal. (Cv-DE#13).

In <u>Cuellar</u>, the Supreme Court addressed the elements of a provision of the federal money laundering statute that prohibits international transportation of the proceeds of unlawful activities, 18 U.S.C. §1956(a)(2)(B)(i). Regarding the defendant's knowledge that the transportation of such monies was designed to "conceal or disguise the nature, the location, the source, the ownership, or the control" of the funds, the Supreme Court held that merely hiding or concealing funds during transportation was insufficient. <u>Id</u>. at 2006. In <u>Cuellar</u>, the government had failed to present evidence sufficient for a reasonable jury to find this element, and thus, the conviction could not be sustained.

The movant's case is easily distinguishable from <u>Cuellar</u>. The defendant in <u>Cuellar</u> went to trial and the United States failed to present sufficient proof of his knowledge that the transportation was designed to conceal a listed attribute of the funds. In the instant case, there was evidence adduced at trial, including the testimony of cooperating witnesses, that the movant knew the funds were derived from unlawful drug activities, and belonged to other unindicted coconspirators.

The movant's argument that he did not understand the meaning of the term "proceeds" as it relates to money laundering drug proceeds thus rendering his convictions unlawful also fails. The

movant relies upon <u>Santos</u> and <u>Cuellar v. United States</u>, 553 U.S. 550 (2008) to support vacatur of his convictions. The Eleventh Circuit has rejected this precise argument, finding that the <u>Santos</u> holding has "limited precedential value," and therefore it would not extend that holding to a money laundering case in which the proceeds came from drug trafficking. <u>United States v. Demarest</u>, 570 F3d 1232 (11th Cir. 2009). Specifically, the Eleventh Circuit held that **"[W]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds....' "** The narrow holding in <u>Santos</u>, at most, was that the gross receipts of an unlicensed gambling operation were not "proceeds" under section 1956, but there is no evidence that the funds Demarest laundered were gross receipts of an illegal gambling operation. The evidence instead established that the laundered funds were the proceeds of an enterprise engaged in illegal drug trafficking.**"** <u>Id</u>. (<u>quoting</u> <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977)).

Here, there was overwhelming evidence that the movant was involved in laundering monies for the Diaz brothers and others which were derived from drug sales and distribution. <u>Cuellar</u>, <u>supra</u>; <u>see</u> <u>also</u>, <u>United States v. Mercedes</u> 283 Fed.Appx. 862, 864 (2nd Cir. 2008)(**"In contrast to <u>Cuellar</u>, the evidence presented in this case indicated that the purpose of the attempted money transaction was to conceal the source of the narcotics proceeds."**). Thus, it appears that <u>Santos</u> and <u>Cuellar</u>[42] do not apply to cases such as the movant's, where the proceeds involved were from drug

---

[42]The movant has also failed to establish actual innocence in light of <u>Cuellar</u>.

trafficking. Moreover, the counts 1 and 4 pertained to illicit financial transactions. (See Cr-DE#415). Under these circumstances, the movant is entitled to no relief on this claim.

In **claim 6**, the movant asserts that appellate counsel was ineffective for failing to request that the appellate court stay and/or recall issuance of the mandate. (Cv-DE#21). The movant's claims that while his petition for rehearing and rehearing *en banc* was pending, it was discovered that Count 4 of the Indictment was fatally defective because it did not state an essential element of the offense, and thus the court lacked jurisdiction to enter judgment thereon. (Cv-DE#21:1-2). The movant maintains the failure to recall or stay the mandate effectively precluded him from pursuing the issue before the district court pursuant to Fed.R.Cr.P. 12(b)(3)(B). (Id.).

Pursuant to Fed.R.App.P. 41(d)(2)(A), a party may move to stay the mandate pending the filing of a petition for a writ of certiorari in the Supreme Court. Under the rule, the motion "must show that the certiorari petition would present a substantial question and that there is good cause for a stay." Fed.R.App.P. 41(d)(2)(A). However, "[T]he grant of a motion to stay the mandate 'is far from a foregone conclusion.'" Books v. City of Elkhart, 239 F.3d 826, 827 (7th Cir. 2001); United States v. Warner, 507 F.3d 508, 510-11 (7th Cir. 2007), cert. den'd, ___ U.S. ___, 128 S.Ct. 2500 (2008). Factors courts consider in deciding whether to grant such a motion include whether the applicant has a reasonable probability of succeeding on the merits and whether the applicant will suffer irreparable injury. United States ex rel. Chandler v. Cook County, 282 F.3d 448, 450 (7th Cir. 2002). Here, the movant has not shown that he would have succeeded on his challenge. To the contrary, certiorari review was denied by the Supreme Court.

Likewise, as discussed in this Report, his argument regarding the fatal defect to Count 4 has been found to be meritless. Consequently, he cannot establish prejudice arising from counsel's failure to file the requested motions.

Moreover, Rule 41(d)(2)(A) also provides that the appellate court must issue the mandate immediately when a copy of the Supreme Court order denying the petition for writ of certiorari is filed. In this case, the Supreme Court denied the movant's request for certiorari review on April 12, 2006. <u>United States v. Elso</u>, 547 U.S. 1131 (2006). Regardless, even if the appellate court had stayed the mandate following its ruling on direct appeal, that mandate would still have issued once certiorari review ended.

Even if counsel had requested a stay of the mandate, no showing has been made that the motion would have been granted. For the reasons previously expressed in relation to claim one above, the movant's jurisdictional challenge to the validity of Count 4 was made untimely and thus waived pursuant to <u>Fed.R.Cr.P.</u> 12(b)(3). <u>See</u> <u>United States v. Ramirez</u>, 324 F.3d 1225 (11th Cir. 2003). Regardless, even if not timely, the challenge was meritless. Consequently, the movant would not have been able to make a showing that recall of the mandate was necessary or warranted. Thus, no prejudice under <u>Strickland</u> has been demonstrated in this collateral proceeding.

The movant finally claims that the cumulative effects as alleged in this collateral proceeding warrant vacatur of his convictions and sentences.

When viewing the evidence in this case in its entirety, the alleged errors raised in this collateral proceeding, neither

individually nor cumulatively, infused the proceedings with unfairness as to deny the petitioner a fundamentally trial and due process of law. The movant therefore is not entitled to habeas corpus relief. See Fuller v. Roe, 182 F.3d 699, 704 (9 Cir. 1999)(holding in federal habeas corpus proceeding that where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation), overruled on other grounds, Slack v. McDaniel, 529 U.S. 473, 482 (2000). See also United States v. Rivera, 900 F.2d 1462, 1470 (10 Cir. 1990)(stating that "a cumulative-error analysis aggregates only actual errors to determine their cumulative effect."). Contrary to the movant's apparent assertions, the result of the proceedings were not fundamentally unfair or unreliable. See Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993).

Additionally, the movant's protestations of innocence regarding his convictions or sentences also fails on the merits. A habeas petitioner attempting to establish "actual innocence" must meet a high standard. Bousley v. United States, 523 U.S. 614 (1998). He must demonstrate that "in light of all the evidence, 'it is more likely than not that no reasonable juror would have convicted him.'" Bousley, supra at 623, quoting, Schlup v. Delo, 513 U.S. 298, 327-328 (1995). The Court emphasized that actual innocence means factual innocence, not mere legal insufficiency. Id. See also High v. Head, 209 F.3d 1257 (11 Cir. 2000); Lee v. Kemna, 213 F.3d 1037, 1039(8 Cir.2000); Lucidore v. New York State Div. of Parole, 209 F.3d 107 (2 Cir. 2000)(citing Schlup v. Delo, 513 U.S. 298, 299, (1995); Jones v. United States,153 F.3d 1305 (11 Cir. 1998)(holding that appellant must establish that in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him). To be credible, a claim of actual innocence requires the petitioner to "support his allegations of

140

constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." Schlup v. Delo, 513 U.S. at 324. All things considered, the evidence must undermine the Court's confidence in the outcome of the trial. Id. at 316. No such showing has been made here, and in fact, the movant's protestations of innocence are refuted by the record. Under these circumstances, counsel was not ineffective for failing to pursue this nonmeritorious claim.

In conclusion, the record reflects that the movant received vigorous and able representation more than adequate under the Sixth Amendment standard. See Strickland v. Washington, 466 U.S. 668 (1984). Defense counsel made a reasonable investigation of the facts, filed pretrial motions, including motions to suppress, was well-prepared for trial, conducted full and extensive cross-examination of the government witnesses, made appropriate objections, moved for judgment of acquittal, and presented a forceful closing argument. Consequently, the movant is entitled to no relief in this collateral proceeding arising from any alleged deficient performance or prejudice suffered in relation to counsel's performance either pre-trial, trial, sentencing, or on appeal. See Strickland v. Washington, 466 U.S. 668 (1984).

Finally, the movant's request for an evidentiary hearing on his claims of ineffective assistance of counsel should be denied. A hearing is not required on patently frivolous claims or those which are based upon unsupported generalizations or affirmatively contradicted by the record. See Holmes v. United States, 876 F.2d 1545, 1553 (11th Cir. 1989), citing, Guerra v. United States, 588 F.2d 519, 520-21 (5th Cir. 1979). As previously discussed in this Report, the claims raised are unsupported by the record or without

141

merit. Consequently, no evidentiary hearing is required.

<u>Conclusion</u>

It is therefore recommended that the motion to vacate be denied, and the case closed.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

Signed this 17th day of December, 2010.


_____

UNITED STATES MAGISTRATE JUDGE

cc:  Juan Carlos Elso, <u>Pro Se</u>
     Reg. No. 63187-004
     F.C.C.-Yazoo City (Low)
     P.O. Box 5000
     Yazoo City, MS 39194

     Michael Scott Davis, AUSA
     United States Attorney's Office
     99 N.E. 4th Street
     Miami, FL 33132

142